**EXHIBIT "A"**

1

2  UNITED STATES DISTRICT COURT

3  EASTERN DISTRICT OF NEW YORK

4  Case No. 1:21-cv-3703

5  -------------------------------------x

6  ISOJON KHUSENOV,

7                      Plaintiff,

8        - against -

9  PROKRAFT INC. and PRO-CUT,

10                     Defendants.

11 -------------------------------------x

12 PROKRAFT INC.,

13                     Third-Party Plaintiff,

14        - against -

15 KARZINKA US, INC.,

16                     Third-Party Defendant.

17 -------------------------------------x

18                     August 29, 2022

                       1:04 p.m.

19

20 Deposition of Expert Witness ANDREW

21 FOLEY, taken by the Defendants, held via

22 Zoom, before Tammy O'Berg, a Shorthand

23 Reporter and Notary Public of the State of

24 New York.

25

1

2  A P P E A R A N C E S :

3

4     LAW OFFICE OF YUIRY PRAKHIN, P.C.

5     Attorneys for Plaintiff

6          1883 86th Street, 2nd Floor

7          Brooklyn, New York 11214

8     BY:  GIL ZOHAR, ESQ.

9

10    O'CONNOR REDD ORLANDO, LLP

11    Attorneys for Defendants/Third-Party

12    Plaintiff

13         P.O. Box 1000

14         242 King Street

15         Port Chester, New York 10573

16    BY:  JOSEPH REDD, ESQ.

17         PETER URRETA, ESQ.

18

19    CONGDON FLAHERTY O'CALLAHAN FISHLINGER

20    & PAVLIDES

21    Attorneys for Third-Party Defendant

22         333 Earle Ovington Boulevard

23         Suite 502

24         Uniondale, New York 11553

25    BY:  THOMAS EVANS, ESQ.

1

2  A P P E A R A N C E S: (Cont'd)

3

4  ALSO PRESENT:

5     WHITEFIELD & EDDY, P.L.C.

6     Personal Counsel for Defendants/

7     Third Party Plaintiff

8          669 Walnut Street, Suite 2000

9          Des Moines, Iowa 50309

10    BY:   MATT JACOBSON, ESQ.

11

12                    *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    S T I P U L A T I O N S

3

4              IT IS HEREBY STIPULATED AND

5    AGREED, by and between the Attorneys for

6    the respective parties hereto, that filing

7    and sealing be and the same are hereby

8    waived;

9              IT IS FURTHER STIPULATED AND

10   AGREED that all objections, except as to

11   the form of the question, shall be

12   reserved to the time of the trial;

13             IT IS FURTHER STIPULATED AND

14   AGREED that the within deposition may be

15   signed and sworn to before any notary

16   public with the same force and effect as

17   though signed and sworn to before the

18   Court.

19

20

21

22

23

24

25

1              ANDREW FOLEY
2      ANDREW FOLEY, having first been duly sworn
3      by a Notary Public of the State of New
4      York, was examined and testified as
5      follows:
6      EXAMINATION BY
7      MR. REDD:
8          Q.    State your name for the record.
9          A.    Andrew Foley.
10         Q.    What is your business address?
11         A.    44 Buddington Road, Groton,
12     Connecticut 06340.
13         Q.    Good afternoon, sir.
14         A.    Good afternoon.
15         Q.    My name is Joseph Redd.  I'm
16     with the law firm of O'Connor Redd
17     Orlando.  I represent defendants in this
18     case Prokraft Inc. and Pro-Cut.
19               I'll be asking a series of
20     questions today regarding an accident
21     involving a plaintiff named Isojon
22     Khusenov.
23               I'm going to ask that you keep
24     all your responses verbal so we can take
25     down your responses.

1                    ANDREW FOLEY
2               Okay?
3        A.     Yes.
4        Q.     I'm also going to ask that you
5    let me finish my question before you give
6    your answer so that we have a clear
7    record.
8               Fair enough?
9        A.     Understood.
10       Q.     If at any point in time you
11   don't understand any question that I'm
12   asking you, please let me know.  I'll try
13   to rephrase it for you.
14              Okay?
15       A.     Yes.
16       Q.     I don't want you to guessing.
17   We don't want you speculating.
18              Fair enough?
19       A.     Yes.
20       Q.     Doctor, could you please tell
21   us, first off, when you were first
22   retained in this case?
23       A.     So that would have been in
24   December 2021, end of November, December
25   2021.

1          ANDREW FOLEY

2      Q.    And at the time you were

3   retained, were you given some kind of

4   retainer, a sum of money, for your

5   services?

6      A.    Yes.

7      Q.    Can you tell us, sir, how much

8   you were given in that initial retainer?

9      A.    $3400.

10     Q.    Since receipt of that initial

11   $3400, have you received any other sums of

12   money in your association with this case?

13     A.    Yes.

14     Q.    How much have you received,

15   additionally received?

16     A.    In addition, that would have

17   been 4590.  4,590.

18     Q.    Sir, are you being compensated

19   for your testimony here today?

20     A.    By the defense lawyers, I

21   understand.

22     Q.    I'm going to assume that you're

23   charging us the same rate as you charge

24   plaintiff's counsel for your services?

25     A.    No.  Deposition rate is $50 an

1                   ANDREW FOLEY
2    hour more.
3        Q.    Sir, we were provided a copy of
4    your curriculum vitae in this case, and I
5    want to spend a couple moments to go
6    through that.
7              Okay?
8        A.    Okay.
9        Q.    Briefly, can you start by
10   telling your educational background?
11       A.    I have a bachelor of science in
12   electrical mechanical engineering from the
13   University of Sussex in the United Kingdom
14   back in 1988, and then I also have a Ph.D.
15   in engineering mechanics from Cranfield
16   University, 1995.
17       Q.    After completing your education,
18   sir, what did you do next?
19       A.    I worked for -- well, in between
20   my bachelor's degree and my Ph.D., I
21   worked for Lucas Aerospace Engineering
22   Company and also did some consulting work
23   with an accounting firm in London.
24              And after my Ph.D., I worked for
25   several gas turbine manufacturers; Rolls

1              ANDREW  FOLEY
2    Royce, Alstom, Siemens.
3              And then I switched to academia
4    in 1999, started working for Coventry
5    University, Washington State, worked for a
6    university there, Ohio State University;
7    and for the last 17 years now the U.S.
8    Coast Guard Academy, New London.
9         Q.    For the better part of the past
10   25 years, you've been in academia.
11             Would that be a fair statement?
12        A.    Pardon?
13        Q.    In the past, we'll say, 20
14   years, would it be fair to say that your
15   job has been in academia?
16        A.    It would be fair, but I have
17   consulted for the last several years.
18        Q.    Starting with Lucas Aerospace,
19   can you be a little more specific as to
20   the kind of things you worked on at Lucas
21   back in 1988 and '89?
22        A.    As a graduate engineer, I worked
23   in the design office; so working on
24   basically drafting and doing calculations
25   for starter motors for aircraft engines

1              ANDREW FOLEY
2    was the main crux of that job.
3         Q.    That was a part-time job?
4         A.    Full-time.
5         Q.    Full-time.  All right.
6              Let's go to the next job over at
7    Kingsford in London.
8              Can you be a little more
9    specific as to what you did there?
10        A.    So there I am working for a firm
11   of chartered accountants in London.  So I
12   would do audits, particularly
13   manufacturing companies.  So I would be
14   going out, going through the stocks and
15   basically going through the books.
16             So that was -- I was an
17   accountant, effectively, in training.
18        Q.    Jumping to your next job over at
19   Cranfield University, can you be specific
20   as what you did there as a mechanical
21   engineer?
22        A.    So I was employed whilst I was
23   undertaking my Ph.D.  I was on full-time
24   employment doing research for rotational
25   aircraft equipment, so basically

1          ANDREW FOLEY
2    compressors and turbines.
3             So I would be doing coding for
4    the design of those and experimental work,
5    taking measurements inside compressors
6    with lasers and pneumatic equipment; so
7    pressure probes, vibration sensors, that
8    kind of thing.  So --
9       Q.    I'm sorry, go ahead.  I cut you
10   off, Doctor.  Go ahead.
11      A.    No problem.  So I was employed
12   to do that research work whilst I actually
13   was undertaking my Ph.D. for those four
14   years.
15      Q.    Was the work that you did at
16   Cranfield primarily involved with the
17   aircraft industry?
18      A.    Yes.  Compressors, in
19   particular, rotating machinery.
20      Q.    You also indicated that you
21   worked in some capacity for Rolls Royce?
22      A.    So that was post-Ph.D.  So I
23   would have worked for Alstom first, then I
24   went to work for Rolls Royce in Darby for
25   six months -- six to nine months I worked

1          ANDREW FOLEY
2   there, and then I worked for BMW, which
3   was BMW, Rolls Royce in Berlin after that.
4        Q.    Was most of the work that you
5   did for Rolls Royce, was it involved in
6   air systems?  Would that be a fair
7   statement?
8        A.    It was basically all -- lots of
9   things to do with compressors;
10  compressors, turbines, air oil systems,
11  combustion systems.  Basically, over those
12  years I worked on most things in the
13  aircraft engine.
14       Q.    Same with BMW, same kind of
15  role?
16       A.    Yeah.  BMW was predominantly air
17  systems, though, air and oil systems.
18       Q.    What was the next job you had
19  after that?
20       A.    So then I worked for -- I
21  returned to Alstom in Lincoln, and I
22  worked for them for another two years and
23  working on a new gas turbine design.  So I
24  was a project manager engineering
25  department head there on the new -- I

1                    ANDREW FOLEY
2      can't remember engine's name -- the,
3      Tempest, new Tempest gas turbine.
4          Q.    Were you working on new blade
5      and disc cooling systems?
6          A.    Yep, disc cooling systems, and,
7      also, I was running the new test facility
8      for that engine.
9          Q.    In your CV it indicates you
10     worked there from June of '95 to June of
11     '99; is that correct?  That's four years?
12         A.    It was broken up by the work I
13     did for Rolls Royce and BMW, so that was
14     in between there.
15                So I worked for Alstom, and then
16     I left Alstom for two years, basically
17     doing private consulting for Rolls Royce,
18     BMW, and then I went back to Alstom.
19         Q.    Got you.  Next job was over at
20     Coventry University?
21         A.    Yes.  So I was employed --
22         Q.    That was from --
23         A.    Sorry.
24         Q.    You were employed as?
25         A.    An associate professor.

1           ANDREW FOLEY
2           I started a new program, an
3   aerospace technology degree, and so they
4   brought me in to staff that and set up
5   that program.
6       Q.    Would it be fair to say that
7   thereafter you -- that's when you entered
8   academia, and you've been doing that ever
9   since, for the most part?
10      A.    Correct.
11      Q.    Now, your attorney in this case
12  was kind enough to send over to us an
13  interrogatory response.
14          Have you seen that, sir?
15      A.    If it's the one I sent in -- I
16  filled in one and sent it, so I assume
17  it's the same one.
18      Q.    On page three of that response
19  it indicates for us the types of cases
20  you've been retained in in the past, and I
21  wanted to go through that list with you.
22          Okay?
23      A.    Okay.
24      Q.    The first case that's indicated
25  here involves a commercial ship injury to

1              ANDREW FOLEY
2    pilot.
3              Could you be a little more
4    specific about the services you rendered
5    in that particular case?
6        A.    Yes.  So the instant involved a
7    pilot who boarded a cargo ship going into
8    New York and New Jersey.  He slipped on
9    ice.
10             And so basically I got the
11   log -- the track of the ship and matched
12   that to the weather distribution for that
13   time as the ship went through it; and then
14   I did a thermal model of the ship's deck
15   and basically showed that it was not for
16   possible for ice to have formed on that
17   deck during the time that the incident was
18   claimed to have happened --
19       Q.    Was there -- -- go ahead.
20       A.    That was basically it.
21       Q.    So there's nothing more to that
22   opinion than what you just gave to us,
23   correct?
24       A.    Yeah.  I wrote a report -- I
25   mean, I had to do a pretty comprehensive

1          ANDREW FOLEY
2    thermal model of the ship's deck, logs
3    from the engine room for the interior
4    temperature of the ship, the exterior
5    temperature from weather stations, and
6    then show that at no point was the
7    temperature cold enough for ice to have
8    formed on that deck.
9        Q.    The case had nothing to do with
10   warning signs or symbols, correct?
11       A.    Correct.
12       Q.    Or machine guarding, correct?
13       A.    Yes.
14       Q.    Or interlock devices, correct?
15       A.    Correct.
16       Q.    Did that case, did it go to
17   deposition?
18       A.    No.
19       Q.    So do you know if it went to
20   trial?
21       A.    I do not.  I assume they
22   settled.  I didn't hear anything else.
23       Q.    So would it be fair to say that
24   your service in that case was limited to
25   you looking at information, looking at

1                    ANDREW FOLEY

2    evidence, and generating a report?

3        A.    Correct.

4        Q.    What year was that when you

5    rendered that opinion, that report?

6        A.    Offhand, that was the -- one of

7    the longest ago, so offhand I can't

8    remember.

9        Q.    Don't guess, but if you can

10   approximate within five years, that would

11   be great.

12       A.    That's quite a long time ago,

13   that one.  Around six years ago, I should

14   think.  Maybe --

15       Q.    The next case that's listed

16   here -- it says, PWC jet ski, serious

17   injury.

18             Now, in that case were you

19   retained by the plaintiff or the

20   defendant?

21       A.    The plaintiff.

22       Q.    Can you tell us, sir, please,

23   what the issues were in that particular

24   case?

25       A.    Yeah.  So the jet ski -- the

1              ANDREW FOLEY
2    young lady was the passenger on the rear
3    seat, and the boyfriend accelerated.  She
4    was ejected, rotated off the back into the
5    water, and then -- because she was in
6    close proximity to the jet, which is a
7    pretty substantial fire hose, basically,
8    she suffered some serious internal
9    injuries to the rectum.
10             And so for that one I actually
11   was provided with the jet ski, and then I
12   did a series of tests actually on that jet
13   ski.  So I took it out onto the water.  I
14   measured pressures at the exit of that
15   nozzle.  I had a mannequin, a dummy, test
16   dummy, put on the back, which we filmed in
17   slow motion rotating off the back; and
18   then I wrote pretty comprehensive report
19   on that one, as well.
20        Q.    Would it be fair to say you did
21   an accident reconstruction in that
22   particular case?
23        A.    Yes, of sorts.
24        Q.    Do you consider yourself to be
25   an accident reconstruction expert?

```
 1            ANDREW FOLEY
 2       A.    No.
 3       Q.    I'm sorry, what was that?
 4       A.    I'm not sure what -- I don't --
 5   I'm not sure -- as far as the jet ski
 6   goes, I suppose -- I was expert enough to
 7   do the work that I did on that case, I
 8   believe.
 9       Q.    Now, in that particular case,
10   you actually went into the field, you
11   looked at the jet ski -- did you look at
12   the jet ski or --
13       A.    The jet ski.  Sorry, the jet
14   ski, the actual jet ski.
15       Q.    And then you also said you got a
16   dummy?  There was a dummy that was
17   utilized as part of your reconstruction?
18       A.    Correct.
19       Q.    Was it fair to say you did that
20   in order to, to the best of your ability,
21   reconstruct the circumstances that
22   presented at the time that that accident
23   occurred?
24       A.    Correct.
25       Q.    Now, in that particular case,
```

1             ANDREW FOLEY

2    were you deposed in that case?

3         A.    No.

4         Q.    You did not give a deposition in

5    that case?

6         A.    No.

7         Q.    Did that case ever go to trial?

8         A.    No.

9         Q.    Do you know if that case was

10   subject to a motion by defense counsel to

11   preclude your testimony?

12        A.    Not that I'm aware of, no.

13        Q.    Did you testify in any kind of a

14   court proceeding, a hearing, in that

15   particular case?

16        A.    No.

17        Q.    Now, in that particular case,

18   when you were retained, at any point in

19   time from the time you were retained to

20   the time you generated your report in that

21   case and you did the reconstruction,

22   looking at the actual machine, putting the

23   dummy on and recreating what had happened

24   there, did you also at any point in time

25   in that case review any deposition

1                   ANDREW FOLEY
2    transcripts of the parties in that case?
3         A.    Yes.
4         Q.    More specifically, did you look
5    at the deposition transcript of the
6    plaintiff?
7         A.    Yes.
8         Q.    Can you tell us, sir, why you,
9    as an expert, would look at the transcript
10   of the plaintiff?  What was the purpose of
11   that?
12        A.    The purpose of that was to -- to
13   see -- to confirm where the accident
14   happened, to find out how she was
15   attaching herself, how she was holding on
16   during that period.
17             All these things would have an
18   effect, perhaps, on how she came off, to
19   find out what they had done before the
20   accident occurred, had she got wet, was
21   she dry.
22             So to basically set the
23   parameters to understand how the accident
24   occurred.
25        Q.    Because obviously, as an expert,

1           ANDREW FOLEY
2   you weren't there when the actual accident
3   occurred, correct?
4        A.     Correct.
5        Q.     So as an expert, it's important
6   that you, as an expert, get sworn
7   testimony of person's involved, okay, who
8   testified under oath what it was that
9   happened, correct?
10       A.     Correct.
11       Q.     And in that case did you also
12  get the deposition transcripts of the
13  defendants, as well?
14       A.     I cannot recall in that case --
15  it was Yamaha, so I'm sure there was a
16  representative from Yamaha, but I can't --
17  ideally, it wasn't as useful for the
18  testing I was doing.
19              I don't believe I remember
20  seeing anything from Yamaha.
21       Q.     So you don't know if you did or
22  did not look at the transcripts of the
23  defendants in that case?
24       A.     I can't confirm.
25              THE COURT REPORTER:  Off the

1              ANDREW FOLEY
2      record.
3              (Discussion off the record.)
4      Q.    Sir, do you know what happened
5  with that case, the jet ski case?
6      A.    It was settled.
7      Q.    The next case in the
8  interrogatory response, C, is marine
9  boatyard equipment failure and personal
10 injury.
11             Do you see that?
12     A.    Yes.
13     Q.    Actually, before I go there, let
14 me jump back to the jet ski case.
15             When was that, when you gave
16 your report?
17     A.    Sorry, it's been a couple years
18 since that one.  I'd have to look on my --
19 on my resume.  I don't remember.  It's
20 been a couple years.  Four years maybe
21 ago.
22     Q.    That's an approximation?
23     A.    Yes.  It should be there on the
24 CV.
25     Q.    So let's jump to the marine

1              ANDREW FOLEY

2    boatyard equipment failure and personal

3    injury case.

4              What was that case about?

5         A.     So this was an accident in a

6    boatyard in Martha's Vineyard.  So the

7    yard workers were moving a sailboat on a

8    Tow Star (phonetic) trailer -- so it's a

9    trailer for moving the boats in the

10   boatyard -- when the boat -- one of them

11   was under the boat when it slipped off the

12   trailer and crushed him.

13             So my -- my case was to

14   basically look at the accident and find

15   out what happened, and it turns out that

16   the -- the trailer was -- it was not

17   designed very well.  It didn't hold the

18   boat and relying on friction, which is not

19   a very good way of restraining the boat,

20   and it slipped off the trailer.  So it

21   wasn't a good design.  It was a flawed

22   design.

23        Q.     Was there anything else that

24   formed the basis of your opinion besides

25   the design defect?  Anything else in that

1          ANDREW FOLEY

2    case?

3         A.    So there's a multitude of things

4    that go into it; looking at it, looking

5    the weight of the boat, looking at how the

6    boat was loaded, looking at the multiple

7    depositions and how they described how it

8    was moved, what he was doing at the time.

9    So friction coefficients of the metal, the

10   range that would be possible.  So all of

11   that stuff goes to making those

12   conclusions.

13        Q.    So in that case, you did get the

14   deposition transcripts in that case?

15        A.    Correct.

16        Q.    And you did review them,

17   correct?

18        A.    Yes.

19        Q.    Because it was important for you

20   to know what the witnesses had to say

21   about what happened, right?

22        A.    Correct.

23        Q.    And you actually went to the --

24   you actually went to the actual trailer,

25   and you looked at it yourself?

1              ANDREW FOLEY
2        A.    No, I didn't go to see the
3   trailer in that case.
4        Q.    Did you speak to anybody --
5   besides the deposition transcripts, did
6   you ever speak to anybody who was at the
7   accident scene to ascertain what they knew
8   about the accident?
9        A.    No.
10       Q.    Now, in these first three
11  cases -- we've got a commercial ship
12  injury, we've a jet ski injury, we've got
13  a marine boatyard equipment case -- all
14  these cases seem to have a common
15  denominator in that they seem to have to
16  do with water and crafts on water.
17            Why is it that, to the best of
18  your knowledge, you were retained in these
19  three water-related cases?
20       A.    Probably because I have a Ph.D.
21  in mechanical engineering.  Maybe because
22  I worked with the Coast Guard -- I think
23  it's because of my mechanical engineering
24  background, teaching mechanical
25  engineering and working in the field.

1              ANDREW FOLEY
2      Q.     As you sit here today, do you
3  have any licenses?
4      A.     Yes.  I have a professional
5  engineering license in the state of
6  Connecticut and also in the state of
7  Washington.
8      Q.     How about New York?
9      A.     Not in New York, no.
10     Q.     Is there an exam you have to
11 take to get that license?
12     A.     Yes.  For the professional
13 engineering license, yes, there is.
14     Q.     Did you ever apply for or try --
15            MR. REDD:  Strike that.
16     Q.     Did you ever take the exam in
17 New York to be a PE?
18     A.     No.
19     Q.     Any particular reason why not?
20     A.     I live in Connecticut, I
21 practice in Connecticut, so there's no
22 reason for me to take one in New York.
23     Q.     Well, our case here involves a
24 New York -- New York parties, correct?
25     A.     Correct.

1          ANDREW FOLEY

2     Q.    A piece of equipment that was

3  being used in New York, correct?

4     A.    Correct.

5     Q.    Are you a member of the

6  Institute of Mechanical Engineers?

7     A.    The American -- did you mean the

8  American Society of Engineers --

9     Q.    I'll rephrase it.

10          In your CV, under Professional

11  Societies, it states that -- it says

12  Institute of Mechanical Engineers UK.

13     A.    Okay.  No, I'm no longer a

14  member.  I was a member when I was in the

15  UK.  So that's expired.

16     Q.    It has expired, correct?

17     A.    I should think so, yes.

18     Q.    Now, it also says that you were

19  a member of a Society of Automotive

20  Engineers.

21          Do you see that?

22     A.    Correct.

23     Q.    Are you still a member?

24     A.    No, no, that's --

25     Q.    Has that also lapsed?

```
 1              ANDREW FOLEY
 2      A.    Yes.
 3      Q.    It also indicates here that --
 4  it says USCG master -- master's 50-ton
 5  license.  What is that?
 6      A.    So it's actually upgraded now.
 7  I have a hundred-ton master's license.  It
 8  means I can captain boats up to a hundred
 9  tons.  It's a U.S. Coast Guard license.
10      Q.    Is that still an active license?
11      A.    Yes.
12      Q.    Is that one of the reasons, to
13  the best of your knowledge, that you were
14  retained in those first three cases that
15  we talked about?
16      A.    I shouldn't -- no, I don't think
17  so.
18      Q.    In the marine boatyard case, in
19  that particular case, did you offer sworn
20  testimony?
21      A.    No.
22      Q.    Did you ever appear in court for
23  any kind of a hearing?
24      A.    No.
25      Q.    Do you know what happened with
```

1               ANDREW FOLEY
2    that case?
3         A.    It settled.
4         Q.    Sir, have you ever testified in
5    a courtroom in the United States in a
6    civil matter?
7         A.    Yes, once.
8         Q.    When was that?
9         A.    This was maybe about four, five
10   years ago.  It was a personal matter.
11        Q.    Aside from any personal matter,
12   divorces, things like that, I'm talking
13   about any professional -- in your
14   professional role, did you ever testify in
15   a court proceeding?
16        A.    No.
17        Q.    So would it be fair to say at
18   this point in time you've never been
19   qualified as an expert of any kind before
20   any court in the United States?
21        A.    That's correct.  If that's what
22   you describe as being qualified, then I
23   suppose that's correct.
24        Q.    Well, did any judge in any
25   courtroom, any venue, ever recognize you

1          ANDREW FOLEY
2     as being an expert in any field, to the
3     best of your knowledge?
4          A.    No.
5          Q.    Same question for the United
6     Kingdom:  Were you ever qualified as an
7     expert in the United Kingdom to testify
8     before any court or tribunal?
9          A.    No.
10         Q.    Next case, it says, Apartment
11    fire, malfunctioning range.
12               When were you retained in that
13    case?
14         A.    Three years ago, I think it was.
15         Q.    Can you briefly tell us what
16    that case was about?
17         A.    So there was a gentleman down in
18    Mississippi who went into his apartment,
19    was cooking some food.  He opened the
20    oven.  There was an explosion and a fire,
21    and so I was retained to find out what had
22    happened in that case, why was there an
23    explosion from an electric oven.
24         Q.    To ascertain what had happened,
25    can you tell us more specifically what you

1          ANDREW FOLEY
2    did, what you reviewed before reaching
3    your opinion?
4         A.    So I went through all the
5    maintenance records for the apartment --
6    it was a very large apartment complex --
7    looking at the history of these ovens.
8              I got the user manuals.  I went
9    through the depositions and then the
10   photographs, the fire marshal
11   investigations, all the information that
12   was provided to me by the attorneys, and
13   then tried to figure out how this
14   explosion could have occurred and caused
15   the damage that it did.
16        Q.    Once again, you did look at the
17   transcripts in that case, correct?
18        A.    Correct.
19        Q.    Besides looking at the
20   transcripts, did you ever independently
21   interview the injured person in that case?
22        A.    No.
23        Q.    Besides looking at the
24   deposition transcript of the plaintiff,
25   did you look at any accident report or

                    ANDREW FOLEY
 1
 2   incident report?
 3       A.    Yes.  So I looked at the
 4   investigating fire marshal's report.
 5       Q.    Did you go to the scene in that
 6   case?
 7       A.    No.
 8       Q.    Did you testify in that case?
 9       A.    No.
10       Q.    To the best of your knowledge,
11   did that case settle?
12       A.    Yes.
13       Q.    And you never appeared in a
14   hearing, correct?
15       A.    Correct.
16       Q.    Next case, it says, Dual
17   crawler-crane collapse.
18             Do you recall the venue of that
19   case?
20       A.    That was in Mississippi.
21       Q.    Do you know when you were
22   retained in that case?
23       A.    About two years ago.
24       Q.    Before rendering an opinion in
25   that case, can you tell us what background

1                ANDREW  FOLEY
2  information you gathered up?
3      A.    So, again, I had photographs, I
4  had video of the incident, I had numerous
5  depositions, product manuals, user
6  manuals.  Just a whole host of stuff
7  provided by the attorneys in that case.
8      Q.    In that particular case, did you
9  actually testify in that case at a
10  deposition?
11      A.    Yes.
12      Q.    And you offered sworn testimony
13  in that case?
14      A.    Correct.
15      Q.    And was that done virtually or
16  was that done live?
17      A.    That was live.
18      Q.    By the way, as we're doing this
19  today, you understand you're under oath?
20  This is sworn testimony as if you were
21  appearing at a deposition live or if you
22  were testifying in front of a judge,
23  right?
24      A.    Correct.
25      Q.    In that particular case, give us

1                 ANDREW FOLEY
2    some details on the crane collapse.
3        A.    So these were two very large
4    cranes in a shipyard, by coincidence.  So
5    they were doing a dual lift of a ship's
6    bow section, so it's about 200 tons; and
7    then as they were moving with the bow
8    suspended, basically one of them moved too
9    fast, pulled the other crane over.
10               So one crane came down, and then
11   the other one toppled down after it.  So
12   it actually injured one of the cab
13   drivers.
14               The case I was retained for was
15   one of the cranes fell on an adjacent
16   building and very seriously injured a man
17   that was -- there was a gentleman in that
18   building.  The crane fell on top of him.
19   And so I was retained to investigate that
20   failure.
21       Q.    When, sir, were you retained in
22   that case, in the crane case?
23       A.    I forget the exact date.  I
24   think it's 2019.  Somewhere around there.
25       Q.    And the next case we have on the

1              ANDREW FOLEY
2   list is a commercial meat -- it says
3   "grinder case."
4              I assume that would be our case?
5        A.    I'm not sure if that's this one
6   or another one that I've done that's
7   ongoing at the moment.
8        Q.    You have another case that's
9   ongoing right now?
10       A.    Yes.
11       Q.    Where is that case venued?
12       A.    That's New Jersey.
13       Q.    Can you tell us, were you
14  retained by the plaintiff or the defendant
15  in that other grinder case?
16       A.    By the plaintiff.
17       Q.    What is plaintiff's counsel's
18  name in that case?
19       A.    I'll have to find it.  I can't
20  remember offhand.  It's a New York firm, I
21  think.
22       Q.    Was it the same firm that
23  retained you in this case?
24       A.    No.
25       Q.    Were you retained in that case

1                    ANDREW FOLEY
2       before you were retained in our case or
3       after?
4            A.    I was retained before.
5            Q.    When you were retained in that
6       case, were you -- tell us what you did
7       before rendering an expert opinion in that
8       other grinder case, the one in New Jersey?
9            A.    That one I've done a site visit,
10      photographed the machine, and then it went
11      quiet.
12                 So it's actually just --
13      although I was retained before this one, I
14      didn't do much.  There was no request for
15      a report.  They just wanted -- retained
16      me, and now it's actually just starting to
17      pick up again.  It's been quiet.
18           Q.    Could you tell us the name of
19      the plaintiff in that case?
20           A.    Maldonado, M-A-L-D-O-N-A-D-O.
21           Q.    First name?
22           A.    I don't know offhand.  I have to
23      look at it.
24           Q.    What's the venue in New Jersey?
25           A.    Again, I would have to look at

1          ANDREW FOLEY
2    the files to find that out.
3         Q.    What kind of machine are we
4    talking about?
5         A.    So this is an industrial meat
6    grinder, much bigger than the one in this
7    case.
8         Q.    Do you know the manufacturer of
9    that other -- that meat grinder?
10        A.    MG -- I have to find -- again, I
11   don't want to say because I'm not sure.
12        Q.    Can you tell us what happened in
13   that case?  What's your understanding of
14   what happened in that case?
15        A.    The lady involved was working
16   nightshift cleaning the machine with a
17   water hose pipe.  In the process of
18   cleaning it, the pipe and her arm got
19   pulled into the machine, and she suffered
20   an amputation.
21        Q.    At this point in time, you've
22   not been deposed in that case as of yet?
23        A.    No.
24        Q.    And you've not generated a
25   formal report in that case as of yet?

1              ANDREW FOLEY
2      A.    No.
3      Q.    Based on the materials you've
4  looked at --
5            MR. REDD:  Strike that.
6      Q.    In that particular case, have
7  there been depositions yet?
8      A.    Again, I don't know.  I'm not
9  aware.
10     Q.    It is that a federal case or a
11  state case?
12     A.    I do not know offhand.
13     Q.    Did you go to the scene of that
14  accident?
15     A.    Yes.
16     Q.    When you went to the scene of
17  the accident in that case, what did you
18  do?
19     A.    So I basically inspected the
20  machine, walked around it, photographed
21  it, took some measurements.
22     Q.    Have you arrived at any
23  preliminary determinations in that case?
24     A.    No.
25     Q.    Have you spoken to the injured

1              ANDREW FOLEY
2    person in that case?
3         A.    No.
4         Q.    Have you seen any accident or
5    incident reports in that case?
6         A.    Not that I'm aware of, no --
7               (Crosstalk.)
8         Q.    At this early juncture in that
9    case, does that case involve any interlock
10   devices?
11        A.    Yes.
12        Q.    Does that case involve warnings
13   or lack thereof?
14        A.    Again, it's early, so I
15   haven't -- I haven't made any conclusions
16   or observations to that point yet.
17        Q.    Besides the attorney who
18   retained you, have you spoken to any
19   witnesses in that case?
20        A.    No.
21        Q.    What further information are you
22   waiting for before you render a report in
23   that case?
24        A.    Again -- I'm waiting for
25   instruction from the attorney as how we

                    ANDREW FOLEY
1
2   wish to proceed.
3       Q.    Now, in that case, you were
4   retained by the plaintiff, correct?
5       A.    Correct.
6       Q.    Would it be fair to say that all
7   the cases you told us about, with the
8   exception of the first one involving the
9   injury to the pilot, you've always been
10  retained by the plaintiff?  Is that a fair
11  statement?
12      A.    Correct.
13      Q.    Okay.  Let's jump to the next
14  matter, the residential heating system
15  transient analysis case.
16            Where is that venued?
17      A.    So that, I believe, is in
18  Massachusetts.
19      Q.    And you were retained by the
20  plaintiff, correct?
21      A.    Correct.
22      Q.    How far along is that case?
23            MR. REDD:  Strike that.
24      Q.    Have you been deposed in that
25  case?

1                    ANDREW FOLEY
2        A.     No.
3        Q.     Has the plaintiff been deposed
4    in that case?
5        A.     I don't know.
6        Q.     Have you been to the scene of
7    that accident?
8        A.     No.
9        Q.     Can you be a little more
10   specific as to what that case is about?
11       A.     So the case is about heating
12   oil.  So the gentleman passed away --
13   didn't have eating oil when it was
14   supposed to be delivered.  The claim was
15   that it was delivered.
16              So it basically boiled down to
17   finding out at what point the furnace went
18   out.  So I did a thermal analysis on the
19   house.  I had to work out the temperature
20   drop -- the range of temperature drops
21   that could occur to figure out when the
22   furnace would have went off.
23              So based on that, that's what I
24   was retained to do for the attorney,
25   thermal analysis of the property.

1           ANDREW FOLEY

2      Q.    Does that case have anything to

3   do with interlock devices?

4      A.    No.

5      Q.    Warnings?

6      A.    No.

7      Q.    Emergency shutoffs?

8      A.    No.

9      Q.    Next case, lawnmower machinery

10  failures.

11           Do you see that?

12     A.    Correct.

13     Q.    Where is that venued?

14     A.    That one is in Rhode Island.

15     Q.    Can you give us a little more

16  information about the factual

17  underpinnings of that case?

18     A.    The what?  Sorry.

19     Q.    Can you give us some more

20  information, the factual background, of

21  that particular case?

22     A.    So the case involves a Honda

23  lawnmower.  And so the lady involved was

24  moving the lawnmower -- it has a foldable

25  handle.  The handle closed, collapsed, and

1              ANDREW FOLEY
2    in the process severed her finger.  So
3    it's not the actual lawnmower blade.  It's
4    the handle design with the pinch point is
5    the problem with the design there.
6         Q.    Have you not been deposed in
7    that case yet?
8         A.    No.
9         Q.    Has plaintiff been deposed in
10   that case?
11        A.    I do not know.
12        Q.    Have you reviewed any deposition
13   transcripts in that case?
14        A.    No.
15        Q.    Did you look at the lawnmower in
16   question before --
17             MR. REDD:  Strike that.
18        Q.    Have you looked at the lawnmower
19   yet?
20        A.    No, not that one.
21             There's two lawnmower cases.  So
22   there's another one that's almost
23   identical.  With the gentleman, same
24   thing, the lawnmower folded on his finger.
25             That one I have read some of the

ANDREW FOLEY

1    depositions, but they're -- both of those

2    are ongoing cases.

3        Q.    In those cases where you

4    reviewed the transcripts, the deposition

5    transcripts, were they -- were those

6    cases, were they were provided to you by

7    counsel, whether you requested them, a

8    combination of these things or something

9    else?

10       A.    It's a combination of each.  So

11   usually I'm retained, I ask for the files,

12   and the attorney provides them.

13            Sometimes I ask, sometimes they

14   just provide them, but that's usually

15   discussed when they're interviewing me for

16   the position to be retained.  We discuss

17   those things then, and then they send the

18   files to me.

19       Q.    Sir, have you ever been employed

20   with any company who manufactures

21   equipment in the food preparation

22   industry?

23       A.    No.

24       Q.    Have you ever been retained as a

1           ANDREW FOLEY

2    consultant engineer to evaluate equipment

3    that is used in the food preparation

4    industry?

5         A.    No.

6         Q.    Sir, have you ever designed a

7    meat grinder?

8         A.    No.

9         Q.    Have you ever designed any piece

10   of equipment that is used in the food

11   preparation industry?

12        A.    No.

13        Q.    Have you ever worked in a

14   butcher shop?

15        A.    No.

16        Q.    Have you ever operated a meat

17   grinder of the type involved in this

18   lawsuit?

19        A.    No.

20        Q.    As part of your review of this

21   particular case, did you ever consult with

22   anybody who works in the food preparation

23   industry?

24        A.    No.

25        Q.    Sir, can you identify any of

1              ANDREW FOLEY
2    Prokraft's competitors in the industry?
3              My client is Prokraft.  We're
4    the defendant here.
5              Can you identify any of my
6    client's competitors in the industry?
7         A.    So there's -- I'm trying to
8    think.  Hobart would be one, Hobart.  So
9    that's one that jumps out.  Kingfisher, I
10   think, was another one.
11             Again, these kind of -- Prokraft
12   isn't actually the manufacturer -- most of
13   these are made -- Prokraft imports them.
14   I'm not sure they actually manufacture
15   them.
16        Q.    That's correct.  I appreciate
17   that.
18             So when I say "consulting" --
19             MR. REDD:  Strike that.
20        Q.    Have you ever offered your
21   services to a company that distributes
22   food preparation equipment?
23        A.    No.
24        Q.    Now, does Hobart, do they
25   manufacture, sell or distribute a meat

1                ANDREW FOLEY

2  grinding machine?

3      A.     I believe so.

4      Q.     Do you know the models?

5      A.     No, offhand.

6      Q.     You said the other one that you

7  can think of was Kingfisher, I think you

8  said?

9      A.     Yeah.  I was looking at a few of

10  them earlier today.

11            I'm trying to think -- there's

12  Kingfisher, there's Pro-Cut -- sorry, not

13  Kingfisher, Thunderbird.  That was it,

14  Thunderbird -- and, again, I don't know if

15  they're the manufacturer like of the

16  Prokraft or the just the importer.  And

17  KWS was another one, I think.

18            Again, most of these are

19  imported.  Whether those names are the

20  manufacturer or not, I don't know.

21      Q.     The New Jersey case, you said it

22  was a larger machine?

23      A.     Yes.

24      Q.     Do you know the manufacturer of

25  that particular machine?

1          ANDREW FOLEY

2     A.    Let's see.  I know it's MG -- it

3     escapes me at the moment, but, again, I

4     think it's another case where it was

5     imported.

6          It was a much bigger machine.  I

7     can find it, but I don't remember the name

8     at the moment.

9     Q.    Can you give us a better

10    description of this larger machine on the

11    case you're working on in New Jersey?

12    A.    So it's probably ten-foot tall,

13    12-foot -- 12-feet probably deep.

14          You load the -- the meat is

15    loaded into the top, into a big hopper,

16    and it has twin blades, twin augers, that

17    are basically -- it's a blender rather

18    than a grinder, is probably a better

19    description.

20          So it mixes the meat up in this

21    big hopper and pushes it out and through

22    the front, through two gates in the front,

23    into collecting buckets.  So it's a

24    blender rather than a grinder.

25    Q.    And the injured person in that

1                    ANDREW FOLEY
2    case was attempting to clean the machine?
3         A.    Yes.
4         Q.    Do you have any knowledge of FDA
5    standards for food safety when it comes to
6    cleaning of machines that process meat
7    products?
8         A.    Specifically, do I know all the
9    steps by heart --
10        Q.    Do you know of any FDA standards
11   that apply to food processing machines,
12   and more specifically as to how they
13   should be cleaned or how often they should
14   be cleaned after they've been utilized?
15        A.    No, no.
16        Q.    Have you ever designed or
17   written a warning that's been used in any
18   type of product?
19        A.    No.
20        Q.    In this case, our case, did you
21   ever conduct a formal accident
22   reconstruction?
23        A.    In this case, no.
24        Q.    Are you familiar with the study
25   of human factors and ergonomics?

1                  ANDREW  FOLEY
2       A.     By who?
3       Q.     Are you familiar with that term,
4    "human factors and ergonomics," more
5    specifically in the context of machine
6    use?
7       A.     Yes.
8       Q.     Are there experts who are human
9    factors experts?
10      A.     There are.
11      Q.     Do you know what qualifications
12   those persons have?
13      A.     Nope.
14      Q.     Do you have a working definition
15   of what a human factors expert does?
16      A.     Basically looking at the
17   interaction of people with machinery.  Not
18   just machinery, furniture, accommodation
19   space, that kind of thing.  So it's how --
20   how the human form interacts with
21   hardware.
22      Q.     Are you familiar with an outfit
23   called the Human Factors and Ergonomics
24   Society?
25      A.     I've heard of them, yes.

1          ANDREW FOLEY
2      Q.    Is there specific training in
3  human factors that these people undergo to
4  become part of that society?
5      A.    I assume there is.
6      Q.    Have you ever taken such
7  courses?
8      A.    No.
9      Q.    Is psychology also part of human
10  factors in ergonomics?
11      A.    Not -- it actually can be part
12  of anything if you want it to be, but my
13  understanding of ergonomics, it's the
14  physical interaction between the human
15  body and the hardware, not the psychology.
16      Q.    The way the human body interacts
17  with a machine, there's also a
18  psychological component of how the person
19  is going to utilize his body when working
20  with that particular machine.
21          Would you agree with that, sir?
22      A.    The question, I think, is
23  flawed.  I teach engineering.  Psychology
24  is involved with that, but I don't need to
25  teach psychology to teach engineering.

1              ANDREW FOLEY
2          Psychology is involved with
3    everything.  I would agree with you.
4       Q.    Is psychology involved in
5    everything, Doctor?
6       A.    Yes.
7       Q.    Including how human beings
8    interact with machines?
9       A.    Yes, in that case.
10      Q.    Including how humans would
11   operate machinery such as a grinder?
12      A.    Correct.
13      Q.    Sir, are you familiar with
14   biomechanics?
15      A.    Yes.
16      Q.    Is there an area of study called
17   biomechanical engineering?
18      A.    There is.
19      Q.    What is that?  Can you give us a
20   working definition of biomechanical
21   engineering?
22      A.    So it's -- my son just got a
23   degree in biomechanical engineering.
24          So as far as he's concerned,
25   it's very similar to what I do.  There's

1                  ANDREW FOLEY

2     the general engineering base to it, and

3     then there's some specialties in -- it's

4     basically -- from what I've seen of

5     biomechanical engineering, it's mechanical

6     engineering with specialties in human

7     materials; blood, bones, flesh, that kind

8     of thing.

9          Q.    Do you have any specific

10    training in biomechanics, biomechanical

11    engineering?

12         A.    Only in what I've taught and

13    what I've picked up in doing these cases

14    over the years.

15         Q.    Is there a biomechanics

16    engineering society?

17         A.    I don't know.  I would think so,

18    but I'm not a member of one if there is,

19    no.

20         Q.    Sir, do you possess any medical

21    training?

22         A.    Just CPR, first aid, that kind

23    of thing.

24              MR. REDD:  If everyone's okay

25        with it, why don't we take a

1             ANDREW FOLEY
2      five-minute break?
3             MR. EVANS:  Okay.
4             (Brief recess taken.)
5  BY MR. REDD:
6      Q.    Dr. Foley, earlier you indicated
7  that you were retained in a case in New
8  Jersey, but you couldn't recall -- you
9  could only recall the plaintiff's name;
10 you could not recall the defendant's name
11 or the venue or the index number.
12            Do you maintain -- are you in
13 your home office right now?
14     A.    I am.
15     Q.    Do you have information
16 regarding that other case in your home
17 office, more specifically a copy of the
18 caption or pleading in that case?
19     A.    I'll take a quick look.  Give me
20 one second.  I'll get the file.
21            So -- are you there?
22     Q.    Yep.  Go ahead.
23     A.    So it's -- you want the civil
24 docket number or -- I've got my --
25     Q.    Let's start with the venue --

1          ANDREW FOLEY
2    start with the venue and the docket
3    number, if you would.
4        A.    So it's the United States
5    District Court of New Jersey.
6        Q.    And the docket number?
7        A.    2:20-cv-06297-ES-CLW.
8        Q.    Can you give us the full name of
9    the plaintiff in case?
10       A.    It's Marjorie, M-A-R-J-O-R-I-E,
11   Marjorie, Maldonado, M-A-L-D-O-N-A-D-O.
12       Q.    And the name of the defendant or
13   defendants in that case, please?
14       A.    It's Material Transportation
15   Company and Kohler Industries,
16   K-O-H-L-E-R, Kohler Industries Inc.
17       Q.    Any other defendants?
18       A.    That's it.
19       Q.    Is there a third-party action
20   attached to it?
21       A.    No, that seems to be it.
22       Q.    All right.  Thank you.
23             Moving right along now,
24   directing your attention to our case, and
25   more specifically I want to -- I want you

ANDREW FOLEY

1
2   to look at your report which is -- which
3   we've marked today as Exhibit G.
4           (Defendant's Exhibit G, expert
5       report, marked for identification, as
6       of this date.)
7       Q.    Do you have your report in front
8   of you, Dr. Foley?
9       A.    I do.
10      Q.    Could I direct your attention to
11  page three of your report?
12           So I'm going to direct your
13  attention to the document, and more
14  specifically I'm going to direct you to
15  page three of the report, the page titled
16  Introduction.
17      A.    Okay.
18      Q.    Now, going back to page three,
19  it indicates that you were retained by the
20  law office of Yuiry Prakhin, correct?
21      A.    Correct.
22      Q.    And you were retained to
23  investigate, okay, a Pro-Cut KG-32 grinder
24  injury, correct?
25      A.    Correct.

1                    ANDREW FOLEY
2        Q.     Sustained by the plaintiff, Mr.
3    Khusenov, on May 29, 2021, correct?
4        A.     Correct.
5        Q.     Now, below that it says, While
6    generating this report, the following
7    documents have been reviewed.
8                Could you please, for the
9    record, indicate for us what it was that
10   you reviewed before preparing this report?
11       A.     So there's the product sales
12   brochure, owner's manual, video footage.
13   There's an initial disclosure by
14   Third-Party Defendant Karzinka,
15   plaintiff's initial disclosure, response
16   to interrogatories, photographs from the
17   inspection on the 1st -- 10th of January
18   2022, photographs from an inspection on
19   the 11th of February 2022, UL 763
20   motor-operated commercial food preparing
21   machines Underwriters Laboratory standard.
22   There's a CFR 1910.147, Control of
23   hazardous energy lock-out, and another CFR
24   1910.212, General requirements for
25   machines, a guidebook for designing

1                    ANDREW FOLEY
2    emergency stop equipment, and then I've
3    got Amazon.com, various meat grinders
4    advertised for sale.
5         Q.     Besides the items that you just
6    listed for us which are contained in this
7    report, did you review any other writings
8    or documents or things before generating
9    this report?
10         A.     Before generating this, no.
11               Since this has been generated, I
12    have seen two other depositions -- not
13    depositions, reports.
14         Q.     You saw -- I'm sorry.
15         A.     That's what was involved --
16    since writing this, I have seen two more
17    expert reports.
18         Q.     Expert reports, and you're
19    talking about -- which expert reports are
20    you talking about?
21         A.     So the defendants' experts,
22    which were -- I've got their names written
23    here somewhere.  So basically the two
24    defendant experts.  I can't remember their
25    names.  I can't give you their names now.

1          ANDREW  FOLEY
2     Q.     I'll help you out.  Did you look
3   at a report from Affiliated Engineering
4   Laboratories Inc., a report dated June
5   14th, 2022, by a PE named George -- get
6   ready, Miss Reporter --
7   P-F-R-E-U-N-D-S-C-H-U-H?
8     A.     Yes.
9     Q.     So you looked at that report,
10  correct?
11    A.     That one, correct.
12    Q.     What was the other report that
13  you looked at?
14    A.     The other one was by
15  Mr. Crawford.
16    Q.     Mr. Crawford?
17    A.     Crawford, Robert Crawford.  I
18  reviewed the report.
19    Q.     What kind of report was
20  Crawford's report?
21    A.     A mechanical engineer report,
22  and retained by the law firm -- I think
23  it's Congdon Flaherty O'Callahan
24  Fishlinger & Pavlides.
25    Q.     So just to go back, besides all

1          ANDREW FOLEY
2    the items that you testified to which are
3    contained on page three of your report,
4    the two expert reports that -- expert
5    reports that you just identified for us,
6    have you reviewed any other documents or
7    things besides that?
8        A.    No, not specifically, no.  Just
9    general textbooks and things that I would
10   look at but nothing specific.
11       Q.    When did you receive the expert
12   report from Affiliated?
13             MR. REDD:  Let me rephrase that.
14       Strike that.
15       Q.    When did you receive the report
16   that was generated by Affiliated
17   Engineering?
18       A.    I would have received that a
19   week ago.
20       Q.    And that was forwarded to you by
21   plaintiff's counsel?
22       A.    Correct.
23       Q.    And the same with Mr. Crawford's
24   report; that was also forwarded to you by
25   plaintiff's counsel?

1                    ANDREW FOLEY

2        A.      By plaintiff's counsel, correct.

3        Q.      Now, the list of items that are

4    contained on page three of your report

5    that you reviewed, did you get those

6    reports right out of the box when you were

7    first retained, did they dribble to you

8    over time, or something else?

9        A.      Some of them were given to me,

10   some of them I found.

11               So the standards are mine.  The

12   photographs I generated on my trips.  So a

13   couple of those were provided by the

14   attorney, correct.

15       Q.      And I would assume you've had

16   multiple conversations with plaintiff's

17   counsel about this case?

18       A.      I had several conversations,

19   yes.

20       Q.      How many conversations would you

21   say you had?

22       A.      In total, probably six to eight.

23       Q.      When was the last conversation

24   you had with counsel?

25       A.      I had a brief conversation with

1          ANDREW FOLEY
2  Attorney Zohar about 15 minutes before
3  this meeting.
4      Q.    Any other conversations with his
5  office in the last 30 days besides that
6  conversation with Mr. Zohar?
7      A.    Only e-mails with the secretary.
8      Q.    Any other phone conversations
9  with any attorneys at the Prakhin law
10 firm?
11     A.    In the last -- how many days?
12     Q.    Let's open it up.
13           You had one conversation today
14 for 15 minutes?
15     A.    Correct.
16     Q.    When was the last conversation
17 before that that you had with plaintiff's
18 office, a phone conversation where you
19 spoke to him?
20     A.    I'm trying to -- it's been a
21 while.  It's been a couple weeks probably.
22 I can't remember exactly.
23     Q.    Well, you said in total there
24 were six to eight conversations you had
25 with plaintiff's counsel?

1                ANDREW FOLEY

2        A.    Over the last eight months or

3   so, yeah.

4        Q.    How many attorneys in that

5   office did you speak to?  Was it just

6   Mr. Zohar, or was there anybody else you

7   spoke to?

8        A.    Attorney Prakhin once or twice

9   and Attorney Zohar.  I think I talked to

10  Attorney Zohar last week when you

11  cancelled, as well.  He called me up from

12  California to say that the deposition was

13  cancelled.

14       Q.    Earlier we asked you about a

15  bunch of other cases where you were

16  brought in as an expert to render an

17  opinion, and in those cases you told us

18  how important it was for you, as the

19  expert, to review the deposition

20  transcripts of the person or persons who

21  were involved in the incident, correct?

22       A.    I don't think I said that

23  exactly.  It's important but not

24  necessarily always the case.

25       Q.    Well, in a case like this,

1           ANDREW FOLEY
2   obviously, as the expert, you weren't
3   there, you didn't see what happened,
4   correct?
5       A.    Correct.
6       Q.    And in this particular case we
7   did have a video, correct?
8       A.    Correct.
9       Q.    And you did review the video,
10  correct?
11      A.    Correct.
12      Q.    Now, in talking to plaintiff's
13  counsel, at any point in time did you ever
14  ask counsel, by the way, were there ever
15  any depositions in this case, sworn
16  testimony in this case from the plaintiff?
17      A.    I did not.
18            I -- I would assume they would
19  send them to me when they had them.
20  Numerous cases where that hasn't occurred
21  yet, usually I get sent them when they
22  occur or shortly afterwards.
23      Q.    Well, were you ever sent any
24  depositions of the defendants in case?
25      A.    No.

1          ANDREW FOLEY

2          Let me check.  Sorry.

3          I do not believe I received any

4   depositions in this case.

5      Q.    Now, in this particular case,

6   what is your understanding as to what

7   happened to the plaintiff?

8      A.    So my understanding is he was

9   placing meat into the grinder, and in the

10  process of shoving it across the tray and

11  pushing it down into the tube, he pushed

12  it in -- either his sleeve got caught or

13  his hand got caught and was ingested into

14  the grinder.

15     Q.    Where are you getting this

16  information from?

17     A.    So there's the video and there's

18  also -- I mean, the video -- that's

19  probably the big source and -- so, yes,

20  basically from the video and from the --

21  was it the disclosures, initial

22  disclosure, from the documents that I have

23  that describe the incident?

24          So there's an initial

25  disclosure.  Let's see.  But predominantly

1          ANDREW FOLEY
2    from the video and photographs and from
3    seeing the machine itself.
4         Q.    Let's first talk about the video
5    itself, right?  You did look at the video,
6    correct?
7         A.    Correct.
8         Q.    And you indicated in your report
9    that you did in fact look at the video,
10   right?
11        A.    Correct.
12        Q.    And that video is a fairly
13   critical piece of evidence; would you
14   agree?
15        A.    It's very instructive, yes.
16        Q.    Now, unfortunately --
17              MR. REDD:  Strike that.
18        Q.    In that video, can you actually
19   see the machine?
20        A.    You can see part of machine, you
21   can't see it all.
22        Q.    What part of the machine can you
23   see in the video?
24        A.    The tray.  Basically the tray
25   outside of the actual tube where the

1              ANDREW FOLEY
2   grinder is.
3      Q.    You can't see the tube where the
4   meat gets fed into, right?
5      A.    Not initially.  At the end of
6   the video, I think you can see it as
7   they've taken it apart and leave the room.
8   You can probably see the grinder head.
9      Q.    So post-accident, some workers
10  are able to dissemble part of the machine,
11  and you see that machine leaving the
12  picture with the plaintiff, correct?
13     A.    Correct.
14     Q.    Tell me if I'm wrong, sir,
15  Doctor, that video does not actually show
16  us the safety guard -- it doesn't show us
17  the meat tray in the area of the hole
18  where the meat is pushed down during
19  operation.
20            Is that a fair statement?
21     A.    That is a fair statement,
22  correct.
23     Q.    And you also can't see in the
24  video the warnings signing, correct?
25     A.    No, no.

1                ANDREW FOLEY
2        Q.     Nor can you see the on/off
3   button, correct?
4        A.     I don't believe so, no.
5        Q.     Nor can you see the headstock,
6   correct?
7        A.     Correct.
8        Q.     Nor in that video do we actually
9   ever see the plaintiff's hand in proximity
10  to the opening where the meat is fed.
11             Is that a fair statement, sir?
12       A.     Correct.
13       Q.     So it's a fair statement that we
14  don't know exactly what transpired in the
15  area of the hole and plaintiff's actions
16  near the hole at the time he met with his
17  accident?  Is that a fair statement,
18  Doctor?
19       A.     You don't see the hand going
20  into the hole, but you do see him shoving
21  the meat down the tray, but you don't see
22  his hand going into the tube.
23       Q.     Right.  You see him -- on one
24  side of the tray there's meat, and you see
25  the hand go to the meat, push towards the

1                    ANDREW FOLEY

2      other side of the tray towards the

3      opening?  You see that, correct?

4          A.    Correct.

5          Q.    But in the video we don't see

6      the actual opening during that process,

7      correct?

8          A.    Correct.

9          Q.    Because we can't see exactly

10     what happened in the area of the hole,

11     would you agree, Doctor, that as an expert

12     coming in to testimony about the

13     reconstruction of this accident, that it

14     might be a good idea to ascertain if the

15     plaintiff himself has given sworn

16     testimony as to what exactly happened to

17     him that day?  Would you agree?

18         A.    That would be useful, correct.

19         Q.    So at any point in time from the

20     time you got this case months ago to the

21     time you're testifying here today, did you

22     ever ask plaintiff's counsel, by the way,

23     was the plaintiff ever deposed in this

24     case?  Did you ever ask him that?

25         A.    I did not.

1          ANDREW FOLEY
2     Q.     Did he ever tell you that the
3  plaintiff was deposed not once but on two
4  occasions in this case?
5     A.     No.
6     Q.     Did you ever learn at any point
7  in time that there were other persons in
8  the room with the plaintiff at the time he
9  met with his accident?
10    A.     Did I ever -- can you ask the
11  question again?
12    Q.     Did you ever learn, okay, that
13  there were other persons in the room where
14  plaintiff was at the time he met with his
15  accident?
16    A.     From the video you can see there
17  are other people in the room at the time,
18  correct.
19    Q.     Did you ever ever ascertain or
20  make inquiry about who those persons were?
21    A.     No.
22    Q.     Did you ever attempt to
23  interview any of the other persons who
24  were in the room at the time the accident
25  occurred?

1              ANDREW FOLEY
2       A.    No.
3       Q.    Did you ever actually go to the
4    space where the accident occurred?
5       A.    No.
6       Q.    Do you know the configuration of
7    the room where the accident occurred?
8       A.    From photographs I can see where
9    the meat grinder is in relation to the
10   tray and what position it is in in the
11   room.
12      Q.    Are you aware that there was a
13   person, a coworker, in this case -- his
14   name is Khusen Nosirovich,
15   N-O-S-I-R-O-V-I-C-H, an experienced
16   butcher -- who was present that day who
17   testified under oath in this case?
18      A.    I'm aware, yes.
19      Q.    Did you ever ask plaintiff's
20   counsel whether any other persons besides
21   the plaintiff were deposed in this case?
22      A.    I did not.
23      Q.    Would you agree that it would be
24   a good idea to obtain and evaluate all
25   sworn testimony from persons who were

1          ANDREW FOLEY
2    present in the room at the time the
3    accident occurred before you testified
4    about causation in this case?
5        A.    It would help, correct.
6        Q.    Sir, going once again to your
7    report, and more specifically let's go to
8    page six of the report --
9        A.    Okay.
10       Q.    -- there's three photographs
11   that are seen on that page, right?
12       A.    Photographs on page seven?
13       Q.    I'm sorry.  What I have is page
14   six.  There appears to be three
15   photographs at the top?
16       A.    Okay, yeah.  Sorry.
17             MR. REDD:  Peter, can you put
18        that up, please, Exhibit G, page six?
19       Q.    Doctor, could you please take a
20   look at this page?
21       A.    Correct.  Yep.
22       Q.    These are photographs that you
23   imbedded into your report?
24       A.    Yes.
25       Q.    Now, are these stills that were

1           ANDREW FOLEY
2  taken from the video itself?
3      A.    Yes.
4      Q.    Can you tell us, sir, why you
5  put these three pictures in this report?
6      A.    So the first one is to show the
7  plaintiff, Mr. Khusenov here, the meat
8  behind him.  I mean, you cannot see the
9  full -- the tray here, but you can see the
10 gentleman in the video, and you can see
11 that his action is consistent with pushing
12 the meat into the tray.  And then -- so
13 that goes on for probably 50 or so
14 seconds.
15           And then in the text I explain
16 all of a sudden he drops out of the
17 screen.  This would be consistent with
18 when his hand went into the machine.
19           And then you see the two
20 coworkers coming over and reaching around
21 him trying to either extricate or switch
22 the stop button off or basically try to
23 assist him.
24     Q.    Looking at that page again, and
25 more specifically the photograph in the

1                    ANDREW FOLEY
2    upper left-hand corner, the first photo,
3    there appears to be a white table.
4             Do you see that?
5        A.    Yes.
6        Q.    There appears to be some meat
7    there?
8        A.    Yes.
9        Q.    To your understanding, is that
10   some kind of a prep table?
11       A.    That would be -- that's what it
12   looks like, yes.
13       Q.    And that's the place where the
14   workers could cut up the pieces of meat,
15   correct?
16       A.    I would assume so, yes.
17       Q.    Once they cut up those pieces of
18   meat, they would transfer those pieces
19   onto the meat tray.
20             Is that a fair statement?
21       A.    Correct.
22       Q.    Now, going to the next page,
23   page seven, do you see that?
24       A.    Yes.
25       Q.    That's another still taken from

```
 1              ANDREW FOLEY
 2   the video, correct?
 3        A.    Correct.
 4        Q.    Now, in this particular picture,
 5   we see what appears to be a metal tray.
 6              Do you see that?
 7        A.    Yes.
 8        Q.    And in the metal tray appears to
 9   be -- what's on the left-hand side of the
10   tray?
11        A.    It's meat products.  I assume
12   it's the stuff that's going to go into the
13   grinder.  So probably the ribs or -- it's
14   definitely some kind of meat product.
15        Q.    And we appear to see the
16   plaintiff in that picture?
17        A.    Yes.
18        Q.    And he's bent over?
19        A.    Correct.
20        Q.    Now, that meat tray that we see
21   in the photograph, it's been detached from
22   the power cabinet, correct?
23        A.    Correct.
24        Q.    Now, besides the tray that was
25   detached from the power unit, to the best
```

1          ANDREW FOLEY
2    of your knowledge and in your expert
3    opinion, did they also remove the
4    headstock with the tray?
5         A.    Yes.
6         Q.    Fair to say that in order to
7    remove the tray, one would have to remove
8    the headstock, right?
9         A.    Yes, in this case.  His hand
10   is -- it's still in there, it's stuck, and
11   it goes through the tray.
12        Q.    Now, in order to -- have you
13   looked at all the materials on the
14   machine, the product manual?
15        A.    (No response.)
16        Q.    In order to remove the tray and
17   headstock from the power unit or cabinet,
18   how would one do that?
19        A.    So there's a -- basically a
20   threaded T.  It's like a T with a thread
21   on it that actually locks into the
22   headstock that locks it to the power head.
23             So you would have to turn that
24   clockwise, loosen that off, and then move
25   the headstock slightly forward and free of

1                    ANDREW FOLEY
2    the power head.
3        Q.    How many headstock knobs are
4    there?
5        A.    There's just the one.
6        Q.    You sure there's not one on the
7    other side?
8        A.    I'm pretty sure there's just the
9    one.
10            MR. REDD:  Peter, can you go to
11        the next page, please, in the report?
12        Q.    Again, we're looking at Exhibit
13    G, correct?
14        A.    (No response.)
15        Q.    Now, at the bottom there's a
16    photograph -- do you see that?
17        A.    Yes.
18        Q.    -- of the machine?
19            What does that photograph
20    represent?
21        A.    That is the machine in question,
22    the KG-32 grinder.
23            MR. ZOHAR:  Just for the record,
24        just so we know, we're looking at the
25        page which is numbered at the bottom

1                    ANDREW FOLEY
2       eight.
3                 MR. REDD:  Yeah, page 8 of
4       Exhibit G.
5    BY MR. REDD:
6       Q.    So looking at the photograph at
7    the bottom of page eight of Exhibit G --
8    if we can perhaps walk through this
9    together -- at the top of the photograph
10   there appears to be the meat tray,
11   correct?
12      A.    Correct.
13      Q.    And on the left-hand side of the
14   meat tray, there appears to be something
15   in the tray.  What is that?
16      A.    So there's a guard and --
17   unfortunately, it's white on white
18   background, but there's also basically a
19   plunger or pusher that's inserted into the
20   central hole of the guard.
21      Q.    That's in order to push meat
22   down through the guard, correct?
23      A.    Correct.
24      Q.    And then below the plunger we
25   have a vertical section of steel which is

```
 1            ANDREW FOLEY
 2   part of the headstock, correct?
 3      A.    Correct.
 4      Q.    And then there's a horizontal
 5   portion of the headstock, as well,
 6   correct?
 7      A.    Correct.
 8      Q.    And we see the one headstock
 9   knob that you mentioned, correct?
10      A.    Correct.
11      Q.    And then there also appears to
12   be some sort of a plate on the left -- on
13   the left-hand side of the machine --
14      A.    Yes.
15      Q.    -- by the headstock?
16            So it's your understanding that
17   the worker would put the meat in the tray,
18   and then in an ideal world would push the
19   meat towards the guard, correct?
20      A.    Correct.
21      Q.    And then the meat would be
22   pushed under the guard, and then a plunger
23   would be used to push the meat down into
24   the throat of the headstock.
25            Is that a fair statement?
```

1                ANDREW FOLEY
2      A.    I think the intent is to use the
3   plunger for both operations, pushing it
4   under the guard and also down.
5      Q.    And the idea is that the meat
6   goes down the vertical section and then it
7   encounters something, correct?
8      A.    Correct.
9      Q.    What does the meat encounter
10  when it goes through the vertical section
11  of the headstock?
12     A.    There's an auger at the bottom.
13  It's like giant screw.
14     Q.    And it turns, correct?
15     A.    Correct.
16     Q.    When it turns, the meat that's
17  being placed in that vertical section,
18  what happens to it?
19     A.    It's pushed from the right of
20  that picture to the left into a rotating
21  blade, a knife, and then after it's sliced
22  by the knife, it then goes through a
23  series of holes and creates -- 3/16ths
24  holes and comes out --
25            (Crosstalk.)

1           ANDREW FOLEY

2      Q.     I'm sorry.

3      A.     Okay.

4      Q.     Are there different size blades

5  that go inside the headstock?

6      A.     I'm not so sure about the

7  blades.  There are different size holes

8  that would go on the outside, I think.

9      Q.     So the different size holes

10  would determine how the meat was going to

11  be pushed out, correct?

12      A.     And beside the diameter of the

13  minced meat, correct.

14      Q.     So if you wanted hamburger meat

15  versus minced meat, you would have to

16  change that up, right?

17      A.     Yeah.  I think there's a choice

18  of two.

19      Q.     Looking at the photograph, we

20  also see prominently displayed on the

21  cabinet Pro-Cut, right?

22      A.     Correct.

23      Q.     And we also see to the left of

24  that what appears to be a warnings label,

25  correct?

1                    ANDREW  FOLEY
2      A.     Correct.
3      Q.     And there's also sticker below
4   that, as well?
5              MR. REDD:  Strike that.
6      Q.     Now, on the same corner by the
7   warning sticker, there's on/off buttons,
8   correct?
9      A.     They're around the corner, 90
10  degrees.
11     Q.     So on the opposite side of the
12  corner but on the same corner, right?
13     A.     Same corner, around the corner,
14  correct.
15     Q.     And there's two buttons there,
16  right?
17     A.     Yes.
18     Q.     And they're located directly
19  adjacent to the warning sticker, correct?
20     A.     Around the corner from it, but
21  yes, correct.
22     Q.     If you had to estimate the
23  distance, it's about, what, an inch or
24  two?
25     A.     Correct.

1           ANDREW FOLEY
2     Q.    On a different face obviously,
3  right?
4     A.    Yes.
5     Q.    And there's two buttons side by
6  side, correct?
7     A.    Correct.
8     Q.    And those two buttons are
9  aligned with one another?
10     A.    Correct.
11     Q.    On the same horizontal line, I
12  would say?
13     A.    Yes.
14     Q.    And on the two buttons there's
15  -- the one on the left is for what?
16     A.    That's -- it's not shown in the
17  black and white, but that would be a green
18  start button.
19     Q.    And to the right of that, closer
20  to the warning label, is another button.
21           What is that for and what color
22  is it?
23     A.    That's a stop button which is
24  also -- which is red.
25     Q.    And it's a raised button,

1              ANDREW FOLEY
2    correct, the red button?
3         A.    They're both raised off the
4    surface.  So they both come off the
5    surface.  The red is slightly -- so
6    they're both -- they both stick up from
7    the surface probably half an inch, and
8    then the red one is slightly raised above
9    the enclosure of the button by an eighth
10   of an inch, 16th of an inch or something.
11        Q.    Okay.  Now, in order for a
12   person to energize this particular
13   machine, how would they do that?
14        A.    So they would have to plug it in
15   to the three-phase power plug.  So this is
16   not a regular plug, this is a three-phase.
17   It's a three-horsepower motor, so it needs
18   a special -- 220-volt supply.
19              Once it's plugged in, then it's
20   literally a matter pressing the green --
21   once it's assembled, pressing the green
22   button.
23        Q.    Green for go, right, start?
24        A.    Correct.
25        Q.    And if one wants to stop the

1                ANDREW FOLEY
2    machine, how would one do that?
3        A.    You'd reach down and press the
4    red button.
5        Q.    In order to do that, you would
6    have to see -- you'd have to see where
7    your hand is, right, so you know where the
8    button is, right?
9        A.    Ideally.  I don't believe you
10   can see the button when you're standing in
11   the operating position, though.
12       Q.    Well, at some point, if someone
13   is going to operate this machine, they
14   have to understand where the start and
15   stop buttons are, right?
16       A.    If they want to switch it on and
17   switch it off, yeah.
18       Q.    In order to do that, one would
19   have to look with your own two eyes,
20   right, onto the buttons that you're trying
21   to push, right?
22       A.    Ideally you would look.
23   Sometimes you might just reach down and
24   just press where the buttons are, if
25   they're that way inclined.

1                     ANDREW FOLEY
2        Q.    Well, at some point -- let's
3    assume somebody is using the machine for
4    the first time.
5              In order to figure out where the
6    start and stop buttons are, they would
7    have to actually engage their eyeballs and
8    look at those two buttons, right?
9        A.    Yes.
10       Q.    Would you agree, during that
11   process --
12             (Crosstalk.)
13       Q.    Would you agree, during that
14   process, whether it was the first time
15   they operated it or the three hundredth
16   time they operated it, they'd have to know
17   where the buttons were by seeing where the
18   buttons were?
19       A.    No.  I think if you use this
20   machine constantly, you will probably just
21   reach down and not look at the buttons to
22   switch it on.
23       Q.    What are you basing that on?
24   Psychology?
25       A.    Probably -- human nature,

1              ANDREW FOLEY

2    practiced familiarity with the machine.

3         Q.    But you never operated a machine

4    like this, right?

5         A.    Small mechanical machines I've

6    operated; lathes, mills, those things.

7         Q.    Will you give me this, though:

8    At least one time, when an operator wanted

9    to operate this machine, they would

10   actually have to look at those buttons to

11   know where they were?

12        A.    If you're not familiar with the

13   machine, you'd have to know --

14        Q.    You can't engage a start or stop

15   button unless you know where it is,

16   correct?

17        A.    Right.

18        Q.    Would you agree, if you're

19   engaging either the start or stop button

20   for the first time, it would be pretty

21   hard not to see the warning label, which

22   we see literally an inch from the stop

23   button?  Would you agree with that?

24        A.    Yes.

25        Q.    Now, in this case, you've

                    ANDREW FOLEY
1
2    rendered an opinion about this machine,
3    correct?
4         A.    Yes.
5         Q.    I think your opinion breaks down
6    into a couple different areas, right?
7         A.    Yes.
8         Q.    Give me one moment.
9              MR. REDD:  Peter, if you would
10        go to page 23.
11             MR. URRETA:  Okay.
12        Q.    Sir, can you see the page, page
13   23?
14        A.    Yes.
15        Q.    I think you offer up a total of
16   six areas of review, correct?
17        A.    Correct.
18        Q.    It carries onto the next page,
19   page 24, right?
20        A.    Correct.
21        Q.    Let's go at this in seriatim
22   fashion.  Read to us your first point
23   here.
24        A.    So Opinions Resulting From This
25   Review.  Warning signal words in the

1          ANDREW FOLEY
2   manual do not clearly state the danger
3   posed by the grinder.  Warning signs need
4   to be re placed with --
5              (Reporter clarification.)
6       A.    I'm sorry.  Warning signal words
7   in the manual do not clearly state the
8   danger posed by the grinder.  Warning
9   signs need to be replaced with danger
10  signal words and a clear description that
11  the worm screw will ingest and grind the
12  user's hand and arm if the user inserts
13  his hand into the down chute, causing
14  catastrophic damage and/or death.
15      Q.    Okay.  So let's start there.
16            Now, this first point is
17  referencing the manual itself, correct?
18      A.    Correct.
19      Q.    And I believe, and tell me if
20  I'm wrong, your first point here is just
21  about the manual, right?
22      A.    Correct.
23      Q.    Now, in this particular case, I
24  know you didn't -- are you aware that my
25  client was deposed in this case?

1              ANDREW FOLEY
2        A.    No.
3        Q.    Are you aware that the office
4   manager for Karzinka, Hira Akram,
5   testified in this case?
6        A.    I am.  I'm sorry, the
7   Prokraft -- the gentleman, I am aware that
8   he was deposed, as well.
9        Q.    Also, there's a lady named Hira,
10  H-I-R-A, Akram, A-K-R-A-M, who's an office
11  manager for Karzinka who was also deposed
12  in this case.
13            Are you aware of that now?
14       A.    Yes.
15       Q.    Now, in terms of this manual
16  that you're referencing in the first
17  point, are you aware that there was in
18  fact a manual in the boxed materials that
19  came with this machine when it was
20  purchased?
21       A.    I don't know for a fact that
22  that was the case, but that would not
23  surprise me, correct.
24       Q.    In this particular case, are you
25  aware whether the plaintiff himself ever

1                ANDREW FOLEY
2    looked at or reviewed the operator manual
3    that came with this machine at the time of
4    purchase?
5        A.    From his deposition, which is
6    quoted in the defendants' records, he says
7    he didn't.
8        Q.    Is that significant to you as an
9    expert in this case?
10       A.    It's -- it's significant in that
11   he didn't look at it.  Am I surprised?
12   Not particularly.
13       Q.    Now, in terms of the plaintiff,
14   do you know how long he worked for
15   Karzinka before the accident occurred?
16       A.    I think it's several months.  I
17   can't remember the exact number.
18       Q.    Was it more than six months?
19       A.    I think it was about six months,
20   is my understanding.  I can't remember the
21   exact number.
22       Q.    I know you didn't look at his
23   deposition transcript, but are you aware
24   how many times he utilized this particular
25   machine, used it?

1               ANDREW FOLEY
2      A.    I'm not aware how many times he
3  actually used it.
4      Q.    Would it be significant for you
5  to know, as an expert, whether he used it
6  one time, this was his first time, whether
7  he used a hundred times, a thousand times,
8  or something else?
9      A.    It doesn't really make a
10  difference to the injury that he
11  sustained.  So no, it doesn't really make
12  a difference.
13      Q.    So his experience working on
14  this particular machine is of no moment to
15  you as an expert in this case?
16      A.    Is it significant?  I'm trying
17  to think of an answer to that.  He had not
18  used it for years.  So, again, how would
19  you judge -- how long he's been there, how
20  many times he's used it.
21          Most of these accidents happen
22  with people that haven't used the machine
23  very often, the ones that I've been
24  looking at.
25          So the longer he'd been using

1          ANDREW FOLEY
2   it, the less likely, I think, the accident
3   would have happened perhaps.
4        Q.    Would it surprise you in this
5   case if he used the machine approximately
6   two or three times a week for about six
7   months?
8        A.    No.
9        Q.    Now, you believe there's a
10  fundamental difference between the word
11  "warning" and "danger," correct?
12       A.    There is.
13       Q.    Somehow, if there was a sticker
14  on the side of the machine that said
15  Danger as opposed to Warning, it would
16  have made a difference in the outcome of
17  this case?
18       A.    There's many stages in this
19  accident prevention.  We have a thing
20  called the "pyramid."  And so there's a
21  reason we do these things.  There's a
22  reason why we have warning signs and
23  danger signs.
24            Whether or not they have an
25  effect on a particular case or

1          ANDREW FOLEY

2    circumstance, it's hard to say.  But on

3    balance, if there's enough of this stuff

4    going on, it will help.

5               It's the reason we put warning

6    stickers and danger stickers on machines.

7    So whether or not it helps this particular

8    case, I don't know, but there's a reason

9    we do it, industry does it.

10       Q.    Did you ever ask the plaintiff

11   if he saw a warning sticker or a danger

12   sticker on the subject machine?

13       A.    I did not ask him, no.

14       Q.    Do you think it would be

15   important to know the answer to that

16   question if you're going to come in and

17   offer testimony as an expert in this case?

18       A.    The answer, I believe, is in the

19   other report from the deposition.

20               I believe they said that he had

21   seen it but didn't read it.  So I don't

22   think he paid any attention to it.

23       Q.    But you generated your report

24   before you received the defendants'

25   expert's report.

1            ANDREW FOLEY
2            Is that a fair statement?
3     A.    Yes.
4     Q.    Do you know one way or the other
5 whether -- by the way, do you know if the
6 plaintiff -- do you know what language --
7 what his primary language is?
8     A.    I believe it's Russian,
9 Ukrainian or Russian.  Sorry.
10     Q.    Do you know if he can speak
11 English?
12     A.    Yes, he can, to a degree, is my
13 understanding.
14     Q.    Do you know if he can read
15 English?
16     A.    I don't know.
17     Q.    In this particular case --
18            MR. REDD:  Actually, Peter, I
19      want to go to the exhibit that shows
20      the warning sticker.  That's going to
21      be -- I just lost my screen.
22            Peter, can you put up the
23      exhibit that has the warning sticker,
24      and tell us how it's been marked?
25            MR. URRETA:  I have the warning

                    ANDREW FOLEY
1
2       sticker and it's Exhibit L.
3              (Defendant's Exhibit L,
4       photograph of warning sticker, marked
5       for identification, as of this date.)
6              MR. REDD:  If you can make that
7       as big as possible for all of us.
8   BY MR. REDD:
9       Q.    Doctor, can you see the Exhibit
10  L which has been marked and put on the
11  screen for your consideration?
12      A.    Yes.
13      Q.    Now, this is the warning sticker
14  that was present on the machine in close
15  proximity to the red stop button that we
16  talked about before, correct?
17      A.    Correct.
18      Q.    In fact, in this exhibit you can
19  actually see the red button, right?
20      A.    That's the casing.  The actual
21  button is inside that, but yeah.
22      Q.    And you can also see the green
23  button next to it, at least a portion of
24  it, right?
25      A.    Correct.

1          ANDREW FOLEY

2      Q.    Now, in terms of this particular

3  sticker, there's two -- there are two

4  warnings that are in writing, correct?

5      A.    Correct.

6      Q.    The first column is in Spanish,

7  correct?

8      A.    Correct.

9      Q.    And the third column on the

10  right side has all the warnings in

11  English, correct?

12      A.    Correct.

13      Q.    And it has the word "warning"

14  which is embedded in an orange box,

15  correct?

16      A.    Correct.

17      Q.    By the way, is it significant

18  that the warning is put on an orange

19  field?

20      A.    Yeah.  So there's a standard for

21  these signs.  It's quite a big deal.

22  There's a standard that describes how

23  these signs, the three columns, that kind

24  of thing, how it should be laid out, the

25  size of the warning signs.  There's an

1              ANDREW FOLEY

2    ANSI -- American National Standard

3    Institute standard for this.

4         Q.    So the standard requires under

5    certain situations that certain colors be

6    used and certain words be used, right?

7         A.    Correct.

8         Q.    In your expert opinion, do they

9    use orange in order to grab somebody's

10   attention as they're going near the

11   sticker?

12        A.    Yes.

13        Q.    There's also next to the word

14   "warning" what appears to be a yellow

15   triangle, right?

16        A.    Correct.

17        Q.    Does the yellow triangle have

18   any significance in your area of

19   expertise?

20        A.    The symbol is the hand inside.

21   That's probably the more relevant warning.

22        Q.    I'm just asking generally about

23   the use of yellow triangles.

24        A.    I don't think there's anything

25   particular significant with that.  The

1    ANDREW FOLEY

2  yellow, it's the warning sign.  You can

3  see the exclamation mark next to the

4  warning; there's a yellow triangle.

5       Q.    Again, to the best of your

6  understanding, is it in yellow in order to

7  draw someone's attention towards it?

8       A.    Yes.

9       Q.    And in the English section, the

10  writing on the right-hand side, that third

11  column, could you please read off for us

12  what those warnings state?

13       A.    Moving parts can crush and cut.

14  Keep hands and fingering out of grinder

15  head.  Do not use hands to feed product

16  into machine, use the stomper or pusher.

17  Do not operate if safety guard is removed

18  or damaged.  Disconnect power before

19  cleaning or servicing.  Do not allow

20  untrained, unqualified personnel or

21  children to operate this equipment.  Read

22  instruction manual for proper use and

23  maintenance.

24       Q.    Now, let's direct our attention,

25  if you will, towards the middle column.

```
 1              ANDREW  FOLEY
 2              Okay?
 3      A.    Okay.
 4      Q.    There  appears  to  be  some
 5   pictographs  there?
 6      A.    Correct.
 7      Q.    Let's  talk  about  the  one  at  the
 8   top  first.
 9              This  is,  again,  a  yellow
10   triangle,  correct?
11      A.    Correct.
12      Q.    And  inside  the  yellow  triangle
13   is  what  appears  to  be  what?
14      A.    A  hand  and  a  rendition  of  a
15   screw,  an  auger.
16      Q.    And  at  the  bottom  of  the  --
17   below  the  auger  --  what's  below  the  auger
18   in  that  yellow  triangle?
19      A.    I  think  that's  part  of  the  hand
20   going  underneath  it.
21              Is  that  what  you're  talking
22   about?
23      Q.    Yeah.  Does  it  appear  to  be,
24   like,  fingers  possibly  removed?
25      A.    Correct.
```

```
1              ANDREW FOLEY
2       Q.     And that would be a warning,
3  right?
4       A.     Correct.
5       Q.     One would not need to understand
6  English or Spanish or even Russian or
7  Ukrainian or Uzbekistani to understand
8  what that's telling you?
9       A.     Yeah.  That's the intent.
10      Q.     The intent there is don't put
11 your hands near the auger, right?
12      A.     Right.
13      Q.     Let's drop down to the second
14 pictograph there.
15             What do we have there?
16      A.     So this one -- it's not probably
17 as clear as the other one, but it's a
18 no-entry sign effectively overlaid on top
19 of a pictograph of a person -- again,
20 looks like their arm going down the chute
21 next to the machine so you could associate
22 that with this machine.
23             But don't put your hand down the
24 chute is what's it's trying to get across.
25      Q.     Right.  That red circle with the
```

```
1              ANDREW FOLEY
2  line through it, that's a universal "don't
3  do this" sign?  Would you agree with that?
4      A.    Correct.
5      Q.    And that's used in the United
6  States, correct?
7      A.    Yes.
8      Q.    And in the United Kingdom,
9  right?
10     A.    Yes.
11     Q.    And across the world, right?
12     A.    Yeah.  Yes.
13     Q.    Let's drop down to the third
14  pictograph.
15           Do you see the blue circle?
16     A.    Yeah, just about.
17     Q.    What's depicted in the blue
18  circle?
19     A.    I can't actually see that one
20  very well, I'm afraid.
21           MR. URRETA:  Let me bring up
22      Exhibit M.  I think it's a clearer
23      picture.
24     Q.    Going to Exhibit M of today's
25  date --
```

1                    ANDREW FOLEY
2        A.      I think I've got it.  It's the
3    pusher going down --
4                 (Defendant's Exhibit M,
5            photograph of label, marked for
6            identification, as of this date.)
7                 MR. REDD:  If you could enlarge
8            that, Peter, it would be great.
9    BY MR. REDD:
10       Q.      Doctor, is that a better visual
11   of the exhibit?
12       A.      Yes.
13       Q.      Would it be fair to say that the
14   blue circle denotes the guard push-stick
15   and a hand on the push-stick indicating
16   that it's being used inside the guard?
17       A.      Correct.
18                MR. ZOHAR:  Just objection.
19            Just, if you can have an open-ended
20            question as opposed to describing what
21            you see in general.
22                This label that's being shown
23            now is not from the machine, as
24            opposed to the last one that was shown
25            that was from the actual machine.

1                    ANDREW FOLEY
2        Just for the record.
3    BY MR. REDD:
4        Q.    So the sticker we're looking at
5    now, does it vary in any way, shape or
6    form to the actual sticker that we saw on
7    the actual machine, and more specifically
8    the power cabinet?
9        A.    No, I don't think so.
10             There is a sticker underneath
11   this one, the Attention, that wasn't on
12   the original one, I don't think.
13       Q.    My question was not directed
14   towards the sticker below.  I agree that
15   the Attention sticker is not what we're
16   talking about.  We're talking about the
17   three-column warning.
18             Okay?
19       A.    Yeah.  That looks very similar,
20   yes.
21       Q.    Just so the record is crystal
22   clear, this exhibit that we're looking at,
23   that three-column warning is exactly the
24   same sticker that was present on the
25   machine cabinet on the machine that was

1                ANDREW FOLEY

2   involved in the subject accident.

3            Is that a fair statement?

4       A.    Yes.

5       Q.    Now, you indicated that you did

6   look at the expert report that was

7   generated by the PE, Dr. Pfreundschuh?

8   You did look at his report, correct?

9       A.    Correct.

10      Q.    In that report, did you see that

11  it was his expert opinion that this

12  warning sticker was fully compliant with

13  ANSI Section Z535.4?

14      A.    In the sense that the texts are

15  the right sizes and -- yes, as far as the

16  placement and the warning sign.  Then, you

17  know, that doesn't say anything about

18  that, but -- for what it is and the size

19  of it, that's compliant, correct.

20      Q.    So do you agree that this

21  sticker, in your expert opinion, is

22  compliant with ANSI Section Z535.4?

23      A.    As far as it's designed,

24  correct.

25      Q.    The issue that you take, it

                    ANDREW FOLEY
1
2   should have been deemed to be a danger as
3   opposed to a warning?
4       A.      Right.
5       Q.      In your ideal world, this
6   sticker would have not had the word
7   "warning," it would have had the word
8   "danger," correct?
9       A.      It's not my ideal world.  It's
10  just the intention of these warning signs.
11              In an ideal world you remove the
12  hazard.  This is third level in trying to
13  protect people.  So the danger sign is
14  what I believe this machine justified.
15              MR. REDD:  Peter, if we can go
16      back to his report.  I think it's G,
17      page 13.
18      Q.      Doctor, do you see we're on page
19  13 now?
20      A.      Correct.
21      Q.      In the upper portion -- the top
22  of the page, there's a section that says
23  Warning, correct?  There's four
24  categories:  Danger, Warning, Caution,
25  Notice, correct?

1              ANDREW  FOLEY
2        A.     Correct.
3        Q.     Now,  under  Warning,  okay  --
4    which  is  the  one  that  we  have  on  our
5    sticker,  right?
6        A.     Yes.
7        Q.     With  the  orange  background  and  a
8    yellow  triangle,  right?
9        A.     Yes.
10       Q.     And  for  the  Warning  category,
11   what  does  it  state?
12       A.     Warning  indicates  a  hazardous
13   situation  which,  if  not  avoided,  could
14   result  in  death  or  serious  injury.
15       Q.     So  would  you  agree  that  if  one
16   puts  one's  hand  into  the  opening  while  the
17   machine  is  operating,  that  would  present
18   as  a  hazardous  situation?
19       A.     I  believe  it  will,  which  is  why
20   the  danger  sign  is  more  relevant  rather
21   than  could.   I  don't  think  there's  any
22   could  about  it.   It  will  destroy  your  hand
23   if  you  put  it  in  there.
24       Q.     If  you  put  it  in,  right?
25       A.     Well,  that's  what  the  warning

1              ANDREW FOLEY
2    sign is for.  So will result in death or
3    serious injury.  It's not, if you put it
4    in there, it could chew your hand up; if
5    you put it in there, it will.
6              That's the reason why I think
7    the danger sign is more appropriate.
8        Q.    But the warning here says that,
9    if you don't avoid this hazard, it could
10   result in death, right?
11       A.    Could.  I would argue that it
12   will result in death or serious injury.
13       Q.    And it could result in serious
14   injury, correct?
15       A.    It will.
16             Again, the whole point of these
17   warnings -- it's kind of important --
18   there's only subtle differences between
19   them.  It's the difference between will
20   and could.  If you put your hand into
21   that, it will chew it up.  There's no
22   could about it.
23       Q.    Let's go to the Danger -- the
24   highest level, Danger, right?
25             Basically it says here, if you

1                    ANDREW FOLEY
2    use it improperly, it will result in death
3    or serious injury, right?
4              And the big change here is the
5    word "will" as opposed to "could,"
6    correct?
7         A.    Correct.
8         Q.    Now, sir, I want you to assume
9    that we've got sworn testimony in this
10   case that the plaintiff, Mr. Khusenov,
11   used the machine without a guard by
12   pushing meat into that opening on at least
13   30 occasions before meeting with his
14   accident.
15             If we were to assume it was 30
16   times, in the prior 29 times he used the
17   machine, did it result in his death or
18   serious injury?
19        A.    No.
20        Q.    Thank you.
21             MR. REDD:  Anybody need a short
22        break?
23             Miss Reporter, how are you
24        doing?
25             THE COURT REPORTER:  Just a

1                ANDREW FOLEY
2      quick restroom break.
3                (Brief recess taken.)
4   BY MR. REDD:
5      Q.    Doctor, I want to talk about the
6   hazard that's being referred to in the
7   warnings and the danger signs.
8                The hazard that's being talked
9   about --
10               MR. REDD:  Strike that.
11     Q.    The hazard that's being referred
12  to with this machine is presented by --
13  that presents with the meat grinder is the
14  risk of amputation if one gets his or her
15  hand caught in the unguarded grinder.
16               Do you agree with that?
17     A.    Yes.
18     Q.    Is it your opinion that the word
19  "danger" would have appropriately
20  communicated the hazard presented by this
21  meat grinder?
22     A.    In the spirit of the warning and
23  the danger sign, yes.  It's better than
24  the warning sign.
25     Q.    I know you haven't seen the

1                ANDREW FOLEY
2    plaintiff's transcript, but at this point
3    in time, I want to go to certain pages in
4    that transcript and ask your thoughts
5    about his testimony as it relates to the
6    warning sticker on this machine.
7            MR. REDD:  Peter, can you please
8        pull up the transcript from the
9        deposition of February 7th, 2022?
10       Peter, what exhibit is that?
11           Peter, your audio might be off.
12           MR. URRETA:  I can hear you.
13           MR. REDD:  We're trying to pull
14       up the transcript from February 7th,
15       2022, if you can kindly tell us how it
16       was marked for today.
17           MR. URRETA:  January 26th, 2022?
18           MR. REDD:  No, I think it was
19       February 7th of 2022, was the date of
20       the...
21           MR. URRETA:  We're going to mark
22       that as Defendant's -- it will be
23       Defendant's ZG.
24           (Defendant's Exhibit ZG,
25       transcript, marked for identification,

1                ANDREW FOLEY
2        as of this date.)
3    BY MR. REDD:
4        Q.    If we go to the exhibit and more
5    specifically to page 17 of the transcript,
6    Doctor, since you haven't seen plaintiff's
7    transcript, I'm going to read some pages
8    to you, and then after I'm done reading
9    the pages in the transcript, I'm going to
10   ask you a question.
11               Okay?
12       A.    All right.
13       Q.    Going to page 17 at the bottom
14   of the page, line 24, it reads:
15               "Question:  Were you careful
16   when" -- this is the deposition of the
17   plaintiff.  Again, on February 7th, 2022.
18               "Question:  Were you careful
19   when you were putting the meat in the
20   grinder?"
21               Page 18, top of the page.
22               "Answer:  Yes, of course.  I was
23   very cautious, and I tried to put it
24   slowly, trying to take care of my wrist,
25   my fingers.

1              ANDREW FOLEY

2              Question:  Why were you very

3    cautious, trying to take care of your

4    fingers?

5              Answer:  It's commonsense that

6    under my hand under high-speed

7    accelerating stuff is working.  Of course

8    I will be cautious.

9              Question:  So you knew it would

10   be dangerous to your hand and fingers if

11   you put your hand in there?

12             Answer:  I didn't know that -- I

13   didn't know that this was really

14   dangerous, but I try my best to take care

15   of my fingers.

16             Question:  Why did you try your

17   best to take care of your fingers?

18             Answer:  It's like the same

19   question in a different way.  I'm getting

20   asked again and again.

21             Question:  Answer the question,

22   please.

23             Answer:  It's commonsense.  If

24   something working at a high speed

25   accelerating under my hand, so that's why

```
1                 ANDREW FOLEY
2   I am cautious."
3                 Page 19, next page.  Colloquy at
4   the top.
5                 First question, line 10:
6                 "Mr. Khusenov, you understood,
7   if you put your hand too close to the
8   auger, your fingers would get cut off,
9   correct?
10                Answer:  Yes, by seeing what
11  happens with the meat."
12                MR. REDD:  Go to page 23.
13      Q.    Top of the page, line three.
14                "Question:  You did that even
15  though you understood you had to be very
16  careful because your fingers could get cut
17  off, correct?
18                Objection.
19                Answer:  Yes, yes."
20                MR. REDD:  Page 24, line 20.
21      Q.    "Question:  Each time that you
22  used that meat grinder, did you always use
23  your hand to push the meat in to make it
24  easier?
25                Answer:  Yes.
```

1           ANDREW FOLEY
2              Question:  Knowing it was
3    dangerous and your hand could be injured,
4    why did you continue using your hand to
5    push the meat in?
6              Objection.
7              Answer:  This is the only
8    option.  I should continue to granulate
9    this meat, to push in the meat to
10   granulate it."
11             MR. REDD:  Page 27, line 16.
12       Q.    "Question:  You used your
13   fingers to push the meat in, correct?
14             Answer:  Yes.
15             Question:  Earlier you said you
16   had to be cautious when you use the meat
17   grinder because you knew your fingers
18   could get cut off.
19             Can you tell me what precautions
20   you took when you were pushing the meat in
21   with your hands?
22             Objection.  Colloquy.
23             Answer:  Because everyone knows
24   that this is dangerous.
25             Question:  Yes.  I just want to

```
 1                    ANDREW FOLEY
 2   know what precautions you took to be extra
 3   careful because you knew it was a
 4   potentially dangerous machine.
 5             Answer:  Yeah, because seeing
 6   how meat going through being granulated,
 7   of course I tried to be cautious.
 8             Question:  Because you knew that
 9   the meat grinder would treat your hand
10   like it would a regular piece of meat,
11   correct?
12             Objection.
13             Answer:  Yes, as I understood."
14             Doctor, after hearing those
15   questions and those answers from
16   plaintiff's sworn testimony, do you agree
17   that plaintiff, based upon these sworn
18   answers, knew of the hazard presented by
19   the meat grinder prior to his accident?
20             MR. ZOHAR:  First of all, I'm
21       going to object to the form of the
22       question, object to the manner in
23       which these transcripts are being
24       used, especially under the
25       circumstances that we're here for, an
```

ANDREW FOLEY

1

2      expert testifying about his specialty.

3           Go ahead.

4      A.    I mean, I've just got a bunch of

5   segments pulled out of this report, but it

6   seems that, yeah, he was aware of the --

7   it was grinding meat, and it was dangerous

8   to his hand.

9      Q.    Would you agree that if he was

10  aware of the hazard presented, that his

11  hand might get caught and ground up or

12  granulated, as he would say, whether there

13  was a danger sticker or a warning sticker

14  is of little moment?  Would you agree,

15  Doctor?

16     A.    The fact that stickers are there

17  changes things.  It reinforces the danger.

18  But you visually can see the danger, as

19  well.

20           It doesn't discredit the use of

21  the stickers or warning signs.  They do

22  add to the sense of danger.

23     Q.    But if he knew that it was

24  dangerous and his hand would get caught,

25  are you saying that the sticker would tell

1        ANDREW FOLEY

2   him something more than that?

3        A.    No.  Again, there's a reason the

4   sticker is part of a system of things that

5   as engineers we try to put into place.

6   One of them on their own may seem trivial,

7   but in their entirety, in the thousands of

8   machines that are made, somewhere along

9   the line there's an added benefit to

10  having those stickers.  That's why we put

11  them on there, and it's the intent that

12  they do help.

13       Q.    But in this case, based on the

14  sworn testimony, do you think a sticker

15  would have made a difference?

16       A.    How would I know?  I can't read

17  his thoughts.  But I think it could only

18  help; it can't do any harm.

19       Q.    So we're getting into the whole

20  idea of psychology of human interaction --

21  or interfacing with a machine?

22       A.    I guess that's where we're

23  going.

24       Q.    I want to go back to your

25  opinion, your six points that you had.  I

1                ANDREW FOLEY

2      think we're up to number three, correct,

3      on page 23 of your report, which I think

4      is Exhibit --

5              MR. REDD:  Is that G, Peter?

6        A.    Okay.  We didn't discuss the

7      manual.  We just discussed the machine,

8      yeah, but one and two have the warning

9      signs.

10       Q.    Okay.  So let's go to number

11     three.  Could you read that opinion in

12     your report?  Again, it's number three on

13     page 23.

14       A.    Okay.  Number three, A bigger

15     mushroom-head-type standard emergency stop

16     button needs to be added to the machine --

17             (Reporter clarification.)

18             THE WITNESS:  I read too

19        quickly.  Sorry.

20       A.    A bigger mushroom-head-type

21     standard emergency stop button needs to be

22     added to the machine in a location that is

23     more accessible and can even be operated

24     by the user's body if an arm was to be

25     trapped, i.e., not on the side of the

1              ANDREW FOLEY
2    machine next to the worm screw.  The
3    current stop button is not an emergency
4    stop button.
5         Q.    Now, Doctor, an emergency stop
6    button, the idea there is you hit the
7    button, and what's supposed to happen?
8         A.    So you hit the button and it
9    stops the machine.
10        Q.    Do you know what the auger speed
11   was on this particular machine?
12        A.    From seeing it in operation when
13   we did the inspection, it's probably of
14   the order of about 60 RPMs, 60 revolutions
15   per minute.
16        Q.    You looked at the expert report
17   generated by defendants' expert, correct?
18        A.    Yes.
19        Q.    In there it indicates that the
20   auger was rotating at three revolutions
21   per second.
22              Did you see that?
23        A.    Okay.
24        Q.    Do you take issue with that
25   number?

1              ANDREW FOLEY
2        A.    No.  It's similar.  One to three
3    doesn't make a lot of difference.
4        Q.    Fair to say that if the machine
5    was unguarded and one was to get their
6    hand stuck in the auger, that the auger
7    would be moving quickly and would pull the
8    affected body part into the auger quickly?
9        A.    Not particularly quickly.  It
10   depends how you define quickly.
11             It will pull it in appropriate
12   to the speed of the screw.  It's not
13   actually superfast.  It's not like a lathe
14   or a milling machine.
15             It depends how you define
16   quickly.  I don't think it's particularly
17   quick.
18       Q.    Let's say the finger makes
19   contact with the auger, how quickly would
20   the finger get pulled in; in one second,
21   half a second, second and a half or
22   something else?
23       A.    Again, I'm just making an
24   estimation here on the order of a second
25   or two.  One thousand, two thousand -- not

1          ANDREW FOLEY

2    milliseconds but the order of a second.

3          Q.    In fact, when you saw the video,

4    you don't see the actual event, but you

5    see something happen.  You can see the

6    plaintiff's arm -- he's moving towards

7    the -- off-screen -- as his arm gets

8    pulled in, correct?

9          A.    Correct.

10         Q.    In your opinion, did that happen

11   relatively quickly based on your viewing

12   of the video?

13         A.    Again, it's the definition of

14   relatively quickly.  It's kind of very

15   loose.

16         Q.    Let's tighten that up then.

17               Would you say it's between one

18   and two seconds?

19         A.    For his whole arm, no.  Probably

20   a bit longer for his whole -- for his

21   whole hand, a few seconds.  Yeah, three --

22   again, I haven't done the calculations,

23   but based on the turning of the screw,

24   it's a couple of seconds probably.

25         Q.    In that couple-of-seconds

```
 1              ANDREW FOLEY
 2   period, what exactly is going on with the
 3   hand?
 4       A.     It doesn't leave a lot to the
 5   imagination.  Basically it's being crushed
 6   between the screw and the casing, and so
 7   it's literally being sliced and pushed
 8   along at the same time.  Crushed, should I
 9   say.
10       Q.     It's literally getting pulled
11   into the direction of the blades, correct?
12       A.     Yeah.  So the screw itself will
13   be -- the -- it will be rotating, and as
14   it's rotating, it's crushing the fingers
15   and drawing the hand in.
16       Q.     As this is occurring, the auger
17   is doing precisely to the hand what it
18   does to meat that was deliberately put in,
19   right?
20       A.     Yeah.  The constituency [sic] is
21   similar, I suppose.  The fingers probably
22   bonier than the meat, but yeah, it's
23   basically doing what it's designed to do.
24       Q.     You're not a biomechanical
25   expert, correct?
```

                    ANDREW FOLEY
1
2       A.      As a mechanical engineer who's
3  done some of these cases, it depends on
4  what you define as an expert.  I've looked
5  at these before.
6            I don't have certifications, if
7  that's what you mean, but as much as
8  anybody that's done this job, I would say
9  I am.
10      Q.      Are you familiar with a concept
11  called "perception" or "reaction time"?
12      A.      Yes.
13      Q.      Can you give us a working
14  definition of perception and reaction time
15  in the context of accident reconstruction?
16      A.      So the easiest is to think of a
17  car accident.  When you see a hazard,
18  there's a time between seeing it and
19  processing it and putting your foot on the
20  pedal.
21            It's seeing the danger, and the
22  reaction time is the time it takes you to
23  then respond to that danger.
24      Q.      So breaking that down a little
25  further, you have to -- you have to see

1                    ANDREW FOLEY
2    it, right, process it in your brain,
3    correct?
4         A.    Correct.
5         Q.    Then your brain has to make a
6    decision, and it causes a corresponding
7    reaction in your body, correct?
8         A.    Correct.
9         Q.    That's a mechanical kind of
10   reaction, mind to muscle to the action,
11   correct?
12        A.    It's a control system, yeah.  So
13   you sense and then you react.
14        Q.    Now, knowing about perception
15   and reaction, whether it's a car accident,
16   an accident like this, any accident, what
17   is a -- what is a --
18             MR. REDD:  Hang on a second.
19        Q.    What is an average perception
20   and reaction time when confronted with an
21   emergency?
22        A.    It varies on how you sense the
23   emergency, if it's visual or smelling or
24   hearing.
25             So you have to sense it, and

1                    ANDREW FOLEY

2    then what you define by the reaction, is

3    the reaction reaching over and pressing a

4    button, or is it literally just moving to

5    the right to dodge an arrow or something?

6    So I can't give you an average for that.

7         Q.    Is it like three to five

8    seconds, on average?

9         A.    Again, it depends on what we're

10   talking about.  What's the danger?  How

11   are we sensing that danger, and what body

12   parts we have to move to react to that

13   danger?  They're all different.

14               I mean, what scenario -- you

15   have to be more specific about what you're

16   talking about there.

17        Q.    What I'm getting at here is in

18   our particular case we know that Mr.

19   Khusenov got his hand or his fingers

20   caught in that auger, and he was --

21   basically his hand was pulled in, correct?

22        A.    Correct.

23        Q.    It got pulled in.  The machine

24   was continuing to run, correct?

25        A.    Correct.

1              ANDREW FOLEY
2        Q.     By the time he could observe
3    what happened, appreciate what happened
4    and react to what had happened, would you
5    agree that a couple of seconds must have
6    gone by?
7        A.     Not necessarily.  I think you
8    would know the -- the pain would be
9    intense, I imagine, and he would know
10   fairly quickly that this was not a good
11   thing that was happening to him.  I don't
12   think it would be seconds.
13       Q.     Let's break it down.
14              He gets pulled in, feels the
15   pain, in his brain he's processing it.
16              How much time is that?
17       A.     If you touch a hot stove, the
18   pain is intense.  You pull away very fast.
19   And so this is probably a not too
20   dissimilar sensation to touching a hot
21   stove.  So fractions of a second.
22       Q.     He had to process that pain in
23   that situation, correct?
24       A.     Yeah.  That happens pretty
25   quick, I think, physical pain.

1          ANDREW FOLEY
2     Q.     And then he has to react to it,
3  correct?
4     A.     Correct.
5     Q.     Now, in this case you didn't
6  speak to the plaintiff, correct?
7     A.     No.
8     Q.     You didn't read his transcript,
9  correct?
10    A.     Correct.
11    Q.     It's your understanding that at
12 some point he then attempts to turn the
13 machine off?  Is that your understanding?
14    A.     Yes.  From the other report, the
15 defendants' report I read, he says he
16 reached around to turn the button, switch
17 it off.
18    Q.     As you sit here today, from the
19 moment he got his hand or fingers pulled
20 into that auger and he's feeling that pain
21 and processing it, how much damage had
22 already been done to the hand at that
23 point in time, if you know?
24    A.     Instantly, probably the tips of
25 his fingers probably -- I mean, you will

```
 1                ANDREW FOLEY
 2    know pretty quickly your hand's been
 3    crushed.  So probably the tips of his
 4    fingers.
 5        Q.    Are you guessing here?  Is this
 6    to a reasonable degree of accident
 7    reconstruction certainty, sir?
 8        A.    Again, everybody is familiar
 9    with touching a hot stove.  So this is the
10    analogy I would use.
11              This crushing pain would be
12    pretty instantaneous.  So your reaction
13    time to that kind of pain is pretty quick.
14        Q.    And in this particular case, his
15    initial reaction would be to try to pull
16    your hand out, right?
17        A.    Correct.
18        Q.    In this case, that could not be
19    accomplished while the machine was still
20    on, right?
21        A.    I don't believe so, yeah.
22        Q.    So then we need to have -- so
23    the first thought would be get my hand
24    out, right?
25        A.    Right.
```

1                    ANDREW  FOLEY

2       Q.      That  doesn't  work,  right?

3       A.      Correct.

4       Q.      So  then  he's  got  to  go  to  Plan

5   B,  which  is  I  got  to  try  to  shut  the

6   machine  down,  right?

7       A.      Correct.

8       Q.      And  in  this  case,  you  don't  know

9   how  long  that  took,  right?

10      A.      I  don't  know.

11      Q.      I  want  to  jump  back  for  a  second

12  and  just  talk  again  about  the  warning

13  labels  before  I  forget.

14              Would  you  agree  that  the  purpose

15  of  a  safety  label  is  to  communicate  a

16  potential  hazard?

17      A.      Correct.

18      Q.      Under  ANSI  Section  Z535,  a

19  safety  label  must  identify  the  hazard,

20  correct?

21      A.      Yes.

22      Q.      Under  ANSI  Z535,  a  safety  label

23  must  identify  the  consequences  of  failing

24  to  avoid  the  hazard,  correct?

25      A.      That's  what  it  says,  yeah.

1                ANDREW FOLEY
2        Q.     Under ANSI Z535, a safety label
3    must identify the means to avoid the
4    hazard, correct?
5        A.     Again, you're reading that, but
6    I'm not sure if that's what it says
7    exactly.
8        Q.     If you don't know, say you don't
9    know.
10       A.     I don't know if those are the
11   words exactly, no.
12       Q.     The words, and I quote, Moving
13   parts can crush and cut, close quote,
14   identifies the hazard and the consequences
15   of failing to avoid the hazard, correct?
16       A.     So we are looking at the label
17   now.  So that's words taken from the
18   label -- yep, that looks like that
19   identifies the hazards.
20       Q.     The hazard is, open quote,
21   moving parts, close quote, and, open
22   quote, crush and cut, close quote, is a
23   consequence of failing to avoid the
24   hazard, correct?
25       A.     Correct.

```
 1              ANDREW FOLEY
 2       Q.    The words, open quote, keep
 3  hands and fingers out of grinder head,
 4  close quote, identifies the means to avoid
 5  the hazard, correct?
 6       A.    Correct.
 7       Q.    The words, open quote, do not
 8  use hands to feed product into the
 9  machine, use the stomper or pusher, close
10  quote, identifies the means to avoid the
11  hazard, right?
12       A.    Correct.
13       Q.    The words, open quotation, do
14  not operate -- do not operate if safety
15  guard is removed or damaged, close quote,
16  identifies the means to avoid the hazard,
17  correct?
18       A.    Correct.
19       Q.    Doctor, would you agree that the
20  safety label on the subject grinder, A,
21  identifies the hazard?
22       A.    Correct.
23       Q.    B, identifies the means to avoid
24  the hazard?
25       A.    Yes.
```

1              ANDREW FOLEY

2        Q.    And C, identifies the

3    consequences of failing to avoid the

4    hazard?

5        A.    Yes.

6        Q.    You testified earlier that it

7    was your understanding that plaintiff

8    chose not to read the safety labels,

9    right?

10       A.    Correct.

11       Q.    You also testified that, based

12   upon the segments of plaintiff's

13   testimony, it appears that he understood

14   the hazard presented by the meat grinder,

15   and he made a conscious effort to keep his

16   hand out of the grinder, correct?

17              I could read that back if you'd

18   like.

19              MR. REDD:  Miss Reporter, don't

20       worry, I got this one.

21       Q.    You also testified that, based

22   upon the segments of plaintiff's

23   testimony, it appears that he understood

24   the hazard presented by the meat grinder,

25   and that he made a conscious effort to

```
 1              ANDREW  FOLEY
 2  keep his hands out of the grinder,
 3  correct?
 4          MR. ZOHAR:  I'm just going to
 5      object just because it asks for this
 6      expert to put a mental state on the
 7      person who testified, and he's not
 8      here as an expert -- a psychologist or
 9      someone that has done those kinds of
10      interviews and examination of this
11      deposed individual that you want to
12      use their testimony.
13          MR. REDD:  Over objection?
14          MR. ZOHAR:  Over objection.
15          If you can answer, it's fine.
16      A.    I would say the first part's
17  true, but the second part, his hand ended
18  up in the grinder, so I can't comment on
19  that.  At some point it went into the
20  grinder.
21      Q.    So you don't think he made a
22  conscious effort to keep his hand out of
23  the grinder?
24      A.    I don't know.  His handed ended
25  up in the grinder.
```

ANDREW FOLEY

1

2      Q.     Well, didn't he testify

3  unequivocally that he was aware of the

4  danger and wanted to keep his hands away

5  so his hand wouldn't get ground up, or

6  words to that effect?

7      A.     People don't want to crash their

8  car but they do.  So it's -- he didn't

9  want to, but somehow his hand ended up in

10  the grinder.

11      Q.     Let's get back to the emergency

12  stop.

13             An emergency stop button, when

14  used on a machine such as this, needs to

15  shut down the motor and the power

16  transmission, correct?

17      A.     Everything, yeah.

18      Q.     Have you heard of a term called

19  "coast down time"?

20      A.     Yes.

21      Q.     What is coast down time?

22      A.     So this is where the stored

23  energy would -- even though you

24  de-energized the machine or system,

25  there's stored energy that has to

```
 1              ANDREW FOLEY
 2   dissipate.
 3              So with coast down, that would
 4   be like switching the engine off the car.
 5   There's a time for you to come to a stop
 6   as you coast down to a stop, to dissipate
 7   the energy that's in the machine.
 8       Q.    In our case here, we've got
 9   stored energy, which is the mass of the
10   auger, right, that's rotating?
11       A.    So angular kinetic energy, there
12   is some, yes.
13       Q.    So the act of hitting a stop
14   button doesn't mean the machine goes off
15   in a snap, correct?
16       A.    In this case it would be quick,
17   very quick, I believe.
18       Q.    As a practical matter, hitting
19   the off button basically de-energizes the
20   machine, correct?
21       A.    Correct.
22       Q.    So there's no new energy going
23   into the machine at the moment it's
24   de-energized, correct, or turned off?
25       A.    Yes.
```

1          ANDREW FOLEY

2      Q.     Then we have to wait for

3  dissipation of the stored energy, right?

4      A.     Correct.

5      Q.     Which in this case, it would be

6  the turning auger, correct?

7      A.     Correct.

8      Q.     In a machine like this, did you

9  ever test to see what the coast down time

10 was?

11     A.     I didn't test, no.

12     Q.     Is there any particular reason

13 why you didn't test the coast down time?

14     A.     Because I know it's going to be

15 very quick just by inspection.

16     Q.     Well, when you say "very quick,"

17 what does that mean; three seconds, four

18 seconds, two seconds?

19     A.     Fractions of a second.  Maybe a

20 second, max.

21          I haven't done the experiment or

22 the calculations, but just by looking at

23 that machine and what it's doing, the

24 stored energy is -- the reason I can say

25 this is because there is three kilowatts

```
 1              ANDREW FOLEY
 2   of power going into it when it's running.
 3              That three kilowatts is just
 4   turning over at three revolutions per
 5   second, one to three revolutions per
 6   second.  So it's not moving very fast, so
 7   there isn't much stored energy.
 8              The radius of the auger is
 9   relatively small, so it doesn't have a big
10   radius, because it's a function of the
11   radius, as well.  And the friction in
12   pumping the meat through the auger is
13   high.
14              So those three things mean
15   stored energy is low, the friction is
16   high, so it will come to a stop very, very
17   quickly.
18      Q.    And in this particular case, in
19   terms of that coast down time, whether it
20   was a half a second, a second, two
21   seconds, whatever it was, in that coast
22   down time, would you agree, Doctor, that
23   the plaintiff's hand would have continued
24   to get injured as the auger turned with
25   his hand in it?
```

1              ANDREW FOLEY
2       A.    For the fraction of a second,
3  yes, it would still continue to get
4  some --
5       Q.    Whatever the time is, when it's
6  coasting down, it's spinning, his hand's
7  in the auger, and it's continuing to be
8  injured, right?
9       A.    Correct.  I was just correcting
10  the three-second comment, that's all.
11       Q.    Again.  You haven't done the
12  math on this, correct?
13       A.    Correct.
14       Q.    At some point down the road, you
15  might be asked to do so.  We can maybe
16  identify with specificity how much coast
17  down time there was, but for purposes of
18  right now we don't know exactly, correct?
19       A.    Correct.
20            MR. ZOHAR:  The testimony is
21       going to read for itself, and he did
22       respond of what the max number time
23       is.  So despite the fact of not having
24       an exact time here, he did give a time
25       restraint, an upper limit on this.

1              ANDREW FOLEY

2    BY MR. REDD:

3        Q.    Now, for this design that you've

4    recommended -- which is a mushroom

5    emergency stop, right?

6        A.    Yeah, it's a standard stop

7    button.

8        Q.    -- you're saying that should

9    have been there instead of the red button

10   that we see next to the warning label?

11       A.    I would recommend that, yes.

12       Q.    Now, in putting out that opinion

13   about a mushroom stop instead, did you

14   ascertain the cost of that?

15       A.    I don't know exactly what it is.

16   It's not tremendously expensive relative

17   to the price of the machine.

18       Q.    But you didn't do that cost

19   analysis in your review of this case,

20   correct?

21       A.    I did not.

22       Q.    You also didn't do any field

23   testing of this mushroom design you talked

24   about, correct?

25       A.    No.  I have used them before.

1              ANDREW FOLEY
2        Q.     On this type of machine?
3        A.     On rotating machinery, lathes,
4   mills, rotating machines, not a grinder
5   specifically.
6        Q.     Not a meat grinder, though,
7   right?
8        A.     Correct.
9        Q.     Now, in terms of the location of
10  this mushroom stop button, where would you
11  have put it?
12       A.     On the front of the machine.
13       Q.     Where on the front of the
14  machine?
15       A.     On the front face.  So it would
16  be facing the operator, not around the
17  corner.  Maybe even above the tray
18  somewhere.
19       Q.     You haven't drawn out any plans,
20  right, about the feasibility of that or
21  the cost of that idea?
22       A.     No, but it's just a button.
23  It's just a switch.
24       Q.     In terms of the biomechanics of
25  this -- or the accident reconstruction of

```
 1              ANDREW FOLEY
 2   this particular accident, was it your
 3   understanding that the --
 4              MR. ZOHAR:  Strike that.
 5       Q.    Do you know where the plaintiff
 6   was standing at the moment the accident
 7   occurred, the moment his hand got drawn
 8   in?
 9       A.    So he -- from the video, he was
10   in front of the machine.  The power head
11   would have been to his left and below him
12   under the tray.
13       Q.    Do you know where he was
14   standing in relation to the warning label?
15       A.    So he would have been
16   standing -- it would have been directly in
17   front of him below the tray, not visible,
18   I believe.
19       Q.    If he was standing facing the
20   machine, do you know if his head would
21   have been lined up with the hole, would it
22   have been to the right of the hole, left
23   of the hole, if you know?
24       A.    Just looking at the video, it
25   would be maybe just to the right of the
```

```
 1                ANDREW FOLEY
 2   hole, I would think.
 3                I mean, he's moving as -- as
 4   he's doing this, he's moving (indicating).
 5   But it's basically, on average, somewhere
 6   in the center of the tray, I imagine, is
 7   where the axis of his body was.
 8        Q.    In the center?
 9        A.    Somewhere in the center of the
10   tray.  I mean, he moves as he's doing
11   this.
12        Q.    Well, I want you to assume that
13   there's been testimony in the case that he
14   was taking meat in a tray with his right
15   hand, and he was pushing the meat across
16   the tray with his hand and pushing it into
17   the hole.  I want you also to assume that
18   as he put -- I'll start again.
19                I want you to assume that we've
20   had testimony in the case that he was
21   taking meat on the right-hand side of that
22   tray and was moving it along with his
23   right hand --
24                (Technical difficulty.)
25        Q.    I want you to assume we've had
```

1               ANDREW FOLEY

2    testimony in the case that Mr. Khusenov

3    was taking meat with his right hand, meat

4    that was located on the right side of the

5    tray, and was moving the meat along and

6    pushing it into the hole on the left-hand

7    side of the tray; and as he was pushing

8    meat into the hole, that's when his hand

9    got caught.

10              Now, I want you to tell me if he

11   was -- when his right hand got caught in

12   the hole, where would his left hand have

13   been in relation to the on/off button that

14   existed?

15       A.    Again, I don't know where his

16   left hand was.  I can't see it in the

17   video, but it's to the left of his right

18   hand.  I can't say where it was.

19       Q.    Was it within a foot of the stop

20   button?

21       A.    Again, I can't say because I

22   can't see it in the video, but it's --

23   well, his right hand is in the machine, so

24   his left hand is -- again, I don't know if

25   he's rotated -- it's difficult to say

1              ANDREW FOLEY

2  because I can't see his left hand in the

3  video.  It could be a foot, could be 18

4  inches, could be 12 inches.  I don't know.

5  Of that order.  Does that help?

6       Q.    In any case, because you didn't

7  read the transcript, you don't know where

8  his body was specifically positioned

9  relative to the machine.

10            Is that a fair statement?

11      A.    From the video I can see where

12  he was standing when he was operating the

13  machine.

14      Q.    But we can't see his head,

15  correct, at the moment the accident

16  occurs?

17      A.    At the moment -- well, just

18  before, then he goes off shot, correct.

19      Q.    We can't see the left portion of

20  his body, correct?

21      A.    Correct.

22      Q.    We can't see the machine -- we

23  can't see the area where the guard should

24  be, and we can't see the headstock in that

25  video, correct?

1              ANDREW FOLEY
2        A.     Correct.
3        Q.     And we can't see the off button
4   and where it is in relation to his left
5   hand, correct?
6        A.     Correct.
7               I'm looking at my video.  He's
8   kind of rotated at 90 degrees to the
9   machine, it looks like, pushing the meat
10  in.  He's rotating as he's pushing the
11  meat in.
12       Q.     At the moment his right hand
13  gets caught, his left hand is free,
14  correct?
15       A.     Yes.  But, again, if he's at
16  right angles, then it could be further
17  away because he's at right angles to the
18  machine.  So, again, I can't say how close
19  he is.
20       Q.     So if we don't know the exact
21  position of his body at the moment his
22  right hand gets caught, we really can't
23  with any certainty determine whether he
24  could have taken his left hand and hit
25  that big red button on the side of the

1                    ANDREW  FOLEY
2  machine,  correct?
3                MR.  ZOHAR:   Objection  to  the
4        form  of  the  question.
5                Go  ahead  if  you  can  answer.
6        A.    You  don't  know  --  we  don't  know.
7                From  the  front  of  the  machine?
8  Again,  the  button  that's  there  already  is
9  effectively  in  that  zone.
10               I  don't  know  what  the  point  of
11  the  question  is.   Could  he  touch  it?   I
12  don't  know.
13       Q.    You  don't  know?   We're  kind  of
14  speculating  here,  correct,  on  that
15  specific  point?
16       A.    On  his  hand  operation,  correct.
17               The  button's  designed  so  you  can
18  push  it  with  your  body,  as  well.
19       Q.    And  the  left  hand  is  part  of  the
20  body,  too?
21       A.    You  can  bump  it  --  so  you  can
22  bump  it  with  other  parts  of  your  body.   It
23  doesn't  require  a  hand  to  actually  operate
24  it.
25       Q.    So  are  you  suggesting  there

```
1                ANDREW FOLEY
2   should have been some sort of other device
3   that he could have bumped into --
4       A.    This button is designed -- it's
5   a big mushroom head, so you can hit it
6   with your body if your hand's caught.
7       Q.    What dimensions would you use
8   for your mushroom button?
9       A.    So I gave some dimensions in my
10  report of a format that would not be too
11  dissimilar in size to the button, but the
12  head was bigger, probably 80 percent
13  bigger, the mushroom head.
14      Q.    How much bigger?
15      A.    Again, looking at it, somewhere
16  between -- I think the existing one is an
17  inch.  The one that I've shown in my
18  report is about 40 or something
19  millimeters, so about 60 percent bigger in
20  diameter.
21      Q.    Would you have placed that
22  button in the exact same location as the
23  existing button or somewhere else?
24      A.    I would have put it on the front
25  face.
```

1                    ANDREW FOLEY
2        Q.     And you never did any drawings
3    or sketches showing that button, correct?
4        A.     I did not.
5        Q.     You never did any feasibility
6    studies about the effectiveness of that
7    button, how much it would cost in an
8    altered or changed design?
9        A.     I didn't do specific studies,
10   but these buttons are on similar machines,
11   competitive machines.  They're already
12   there.
13              Usually, by default you would
14   put something like this on a machine like
15   that.
16       Q.     Doctor, can you cite any design
17   standard that applies to KG-32 Pro-Cut
18   meat grinder, our machine, which requires
19   the use of an emergency stop button?
20       A.     No.
21       Q.     I'm sorry.  That was no?
22       A.     That's a no.
23       Q.     Would you agree that the off
24   button here on the meat grinder is not
25   designed to be an emergency stop button?

1              ANDREW FOLEY

2      A.     Correct.

3      Q.     Would you agree that the

4  emergency stop button that you propose in

5  this case would not be designed to prevent

6  an incident but would be pressed only

7  after the plaintiff's hand is grabbed by

8  the auger?

9      A.     That's possible, yeah.  There's

10 other reasons -- somebody seeing somebody

11 doing something dangerous, they can press

12 it.

13             But yeah, this case, he would

14 have pressed it after his hand had gone

15 in.

16     Q.     Would you agree that you lack

17 the necessary expertise to offer an

18 opinion regarding what -- whether there

19 would have been any difference in

20 plaintiff's injury if there would have

21 been an emergency stop button on the

22 grinder?

23     A.     Sorry, can you phrase that

24 question again?

25     Q.     Well, you've offered an opinion

1          ANDREW FOLEY
2    about the impact of the mushroom button
3    being available to plaintiff.
4              My question to you is, if we
5    assume that there was a mushroom-style
6    button, as you propose, on the front of
7    the machine, can you state with any -- to
8    a reasonable degree of engineering
9    certainty that the plaintiff's injuries
10   would have been any different if your
11   button that you talked about was in place?
12        A.    I believe it could have been
13   less serious.
14        Q.    Well, at the moment that the
15   machine powered down and all the energy
16   was dissipated from the machine, do you
17   know how much injury was done to the
18   plaintiff's hand at that moment in time?
19        A.    Again, the time the machine
20   takes to stop I think was small.  The time
21   it takes to hit the stop button is a
22   different period of time.  It's not the
23   same thing.
24        Q.    Did you review any medical
25   records in this case?

1              ANDREW FOLEY

2         A.    I did not.

3         Q.    Do you know the extent and the

4    severity of the injury and -- what

5    specific bones and joints were affected by

6    the accident?

7         A.    I just know it's basically up to

8    just past his wrist, is my understanding.

9         Q.    But you didn't look at the

10   medical records, correct?

11        A.    No.

12        Q.    And you didn't see any

13   photographs, correct?

14        A.    Not of his hand, no.

15        Q.    And you're not a biomechanical

16   expert who's qualified to testify about

17   the interaction of human body parts and

18   machinery --

19        A.    Again --

20        Q.    -- in terms of injury causation?

21        A.    I'm not a doctor.  I'm not a

22   medical doctor, but I know what a -- I can

23   visualize what a grinder will do to a

24   hand.  I've seen pictures of hands in

25   grinders.  I know the damage they will do.

1        ANDREW FOLEY

2        Q.    But in this case, because you

3    haven't seen the medical records, you

4    don't know if there was two inches that

5    were pulled into the machine of his

6    fingers, whether part of his hand got

7    pulled in, whether it got pulled in up to

8    his forearm?

9             You don't know the exact extent

10    of the physical injuries sustained in this

11    case because you haven't looked at the

12    medical records.

13             Is that a fair statement?

14        A.    I've been told that the injuries

15    were just past his wrist, and I know what

16    the injury would look like because I've

17    seen pictures of grinders with hands in

18    them.

19        Q.    Being told is one thing.  That

20    is hearsay.

21             My question to you is did you

22    see any certified medical records showing

23    you the extent and severity of this

24    particular injury?

25        A.    No, I did not.

1                  ANDREW FOLEY

2          Q.      And you didn't look at the

3      transcript of the plaintiff that told

4      about the extent and severity of the

5      injury, correct?

6          A.      I did not.

7          Q.      Based on the fact that we don't

8      have this fundamental information, we're

9      speculating as to the extent and severity

10     of the injury caused in whatever seconds

11     it was for this accident to occur and for

12     the injuries to be sustained?

13              MR. ZOHAR:  We have to object to

14          the form.  We have to keep some proper

15          form here because I don't even

16          understand these questions at this

17          point.

18              MR. REDD:  I think we're going

19          to move on.

20     BY MR. REDD:

21          Q.      Let's go to your next point,

22     which is -- I think we're up to four.

23              If we go back to your report,

24     which I think is G, if you could read that

25     into the record, please.  It's page 23 of

1                ANDREW FOLEY
2    your report.
3        A.    The location of the stop button
4    should not be impaired by obstructions and
5    protrusions, such as the grinder head
6    locking handle and the feed tray locking
7    knob, both of which are in close proximity
8    to the stop button on this machine.
9            Other grinders provided by the
10   same manufacturer have removed these
11   obstructions.
12       Q.    Let's talk about that.
13           So the grinder head, is that
14   also known as the headstock?
15       A.    I believe so, yes.
16           MR. REDD:  Peter, can we go to
17       the photograph that shows the full
18       side view of the machine with the
19       cabinet, the headstock, the pan.  Like
20       this.
21           THE WITNESS:  Page 19.
22           MR. URRETA:  This is Exhibit ZD.
23           (Defendant's Exhibit ZD,
24       photograph, marked for identification,
25       as of this date.)

1              ANDREW FOLEY
2    BY MR. REDD:
3        Q.    Doctor, if you could take a look
4    at this exhibit that's before you, just so
5    we get a clearer picture in color.
6              Now, in sub-point four, you said
7    that the stop button should not be
8    impaired by the obstructions and
9    protrusions such as the grinder head.
10             Looking at that photograph
11   before you, where is the grinder head?
12       A.    So the grinder head is the --
13   it's the cylinder that you can see in the
14   middle of the photograph to the left
15   underneath the tray.  It's a horizontal
16   cylinder sticking out with the ring on the
17   end.
18       Q.    And that grinder head's on the
19   other side of the stop button, correct?
20       A.    It's behind the stop button from
21   this view, correct.
22       Q.    Before you could reach the --
23   any portion of the headstock, you would
24   have to put your hand -- your hand would
25   have to bypass and go by the stop button.

1                  ANDREW FOLEY

2            Is that a fair statement?

3       A.    Sorry, again, I was talking

4    about the handle and the knob, not the

5    grinder head in point four.

6            So the obstructions are the

7    black knob and the silver T I was talking

8    about, not the grinder head.

9       Q.    I'm just going to read what it

10   says here.  It says, The location of the

11   stop button should not be impaired by

12   obstructions and protrusions, such as the

13   grinder head locking handle.

14           So the locking handle you're

15   referring to is -- it looks like a handle,

16   right, below the red button?

17      A.    Correct.

18      Q.    That locking handle is below the

19   red button, right?

20      A.    Correct.

21      Q.    So if your left hand is --

22   you're standing in front of the machine,

23   your hand doesn't touch the handle if

24   you're going for the button, right?

25      A.    Well, depends how you're going

1                    ANDREW FOLEY
2    to the button, the vector that you take,
3    the path your hand takes.
4         Q.    Well, the handle is not between
5    the stop button and the person?
6         A.    If you're lifting your hand up
7    to the button it is.
8         Q.    Well, how high is this handle
9    off the ground?
10        A.    Well, his right arm is now in
11   the grinder.  He's standing there, and I'm
12   not sure he's looking for the button.
13             So if he has to reach down
14   underneath -- if he has to reach under the
15   tray, so it's conceivable that he could
16   hit that handle.
17        Q.    Well, if he's reaching under the
18   tray, the first thing he would encounter
19   would be the red stop button?
20        A.    Not necessarily.  That hand has
21   to travel to the button.  There's a path,
22   an vector, that it takes.  So it could
23   easily hit either of those obstructions or
24   protrusion.
25        Q.    So if his left hand was down by

1                    ANDREW FOLEY
2    the floor and he wanted to hit the button,
3    then he'd have to raise his hand upwards
4    and then possibly encounter the handle
5    before he gets to the button.
6              Is that what you're saying?
7        A.    This grinder is on a table, a
8    raised surface, so it's not on the floor.
9              So he wouldn't have to be on the
10   floor -- he has to bring his hand to the
11   button.  He has to transit that hand
12   through space, and there's two obstacles
13   in the way there, potentially.
14       Q.    But you don't know the path of
15   his hand?
16       A.    I do not.
17       Q.    Because you didn't talk to him,
18   and you didn't look at the transcript,
19   right?
20       A.    No, I've just seen the
21   transcript that's been quoted by the
22   defendants, so I don't know the path of
23   his hand, no.
24       Q.    Was there any testimony from any
25   source that said he was fumbling for the

1                    ANDREW FOLEY
2       stop button and encountered the handle
3       that you mentioned in point four?
4            A.    Not that I'm aware of.
5            Q.    Let's go to point five, please.
6            A.    Would you like to me read it?
7            Q.    Yes.
8            A.    As a practical matter, to obtain
9       the high meat-processing rates advertised
10      for this machine, it is not realistic to
11      expect an operator to be constantly
12      removing and inserting the plastic pusher
13      into the guard in order to move the meat
14      horizontally across the tray and then
15      vertically down the chute.  As such, this
16      system needs to be improved.
17               In the interim, recognition of
18      the fact that users will remove the guard
19      needs to be made.  Full stop.  Per UL
20      7319.1A, and as such, an interlock that
21      would prevent operation of the grinder
22      without the guard is required.
23           Q.    Okay.  Let me break that down.
24      Let me start by asking you about the
25      processing rates.

1          ANDREW FOLEY
2          Do you know how much meat was
3    being processed on this particular
4    machine?
5        A.    I do not on that day, no.
6        Q.    On any day?
7        A.    I know the literature claims it
8    can do 3,000 pounds an hour.
9        Q.    Putting aside the literature, in
10   terms of this machine in this location,
11   did you ever ascertain what the needs were
12   of this butcher shop in terms of the use
13   of this machine, whether it was five
14   pounds a day of pork, 10 pounds of beef,
15   30 pounds of chicken?  Did you ever
16   ascertain what their needs were, their
17   processing needs were?
18       A.    I did not and I doubt -- that
19   changes, as well.  They probably don't
20   know that either.
21          No, I did not.  Sorry.
22       Q.    Now, before you did your
23   analysis and rendered your opinion here,
24   did you ever go to the machine and attempt
25   to put meat across the tray and into the

1          ANDREW FOLEY
2  hole to grind it up?
3      A.    I did not.
4      Q.    More specifically, using a
5  pusher?
6      A.    I used the pusher without the
7  meat when I was inspecting it.  I
8  simulated, to my knowledge, what I think
9  would have been going on, but I have not
10 pushed meat in, no.
11     Q.    But in terms of how much meat
12 could be processed here by the people
13 actually working in that shop, you
14 probably should have talked to them,
15 right?
16          MR. ZOHAR:  Objection to form.
17          Is there a question?
18     A.    Are you saying I -- I -- there's
19 lots of things you should do.
20          I did not talk to them, no, I
21 did not.
22     Q.    Well, in talking to them, we can
23 get a better understanding whether the
24 processing rates of this machine with the
25 guard on were a problem --

1                  ANDREW FOLEY

2              MR. ZOHAR:  I'm going to object

3        to statements.  If there's a

4        question -- because I don't understand

5        what question is being posed on this.

6        Q.    You don't know what the

7    processing rate was for the workers in

8    this store as they processed meat on this

9    machine on any given day.

10              Is that a fair statement?

11       A.    Correct.

12       Q.    Again, because you didn't talk

13   to anybody in the shop, correct?

14       A.    Correct.

15       Q.    And you didn't read the

16   plaintiff's transcript, correct?

17             MR. ZOHAR:  Asked and answered.

18       A.    Correct.

19       Q.    Have you ever seen a guard where

20   there was -- on a meat grinding machine

21   where they used a pusher through a guard

22   besides the subject machine?

23       A.    I believe so.  Other

24   manufacturers.

25       Q.    Now, for this particular

1           ANDREW FOLEY

2    machine, at some point in time there was a

3    guard in place, correct?

4        A.    I understand that to be the

5    case, yes.

6        Q.    And in this particular case, how

7    was that guard, okay, attached to the

8    machine?

9        A.    So there are two, I believe,

10   stainless steel columns that are attached

11   to the guard and the tray.  How they're

12   actually attached, I think they're

13   probably spot welded.  I couldn't

14   determine when I looked at it, but they

15   are rigidly attached, or they would be

16   rigidly attached.

17          On the second machine where I

18   saw the guard, they were probably friction

19   or spot welded into place.

20       Q.    In this case, it's your

21   understanding at some point in time there

22   was a permanently affixed guard on the

23   subject machine?

24       A.    That is my understanding, yes.

25       Q.    And this was not a guard that

1              ANDREW FOLEY
2    was designed to be removed, correct?
3         A.    Correct.
4         Q.    On top of the guard, there were
5    a number of holes, right?
6         A.    Correct.
7         Q.    And the idea with the holes
8    were, once the meat gets pushed into the
9    hole using the pusher, then the pusher
10   would be put into a vertical position, and
11   you would push the meat down by putting
12   the pusher through the hole and pushing
13   the meat down into the throat, correct?
14        A.    Correct.
15        Q.    Now, in this point five you
16   indicate that you think there should have
17   been some sort of an interlock device,
18   right?
19        A.    Correct.
20        Q.    That, you believe, somehow would
21   have prevented the accident in question?
22        A.    Correct.
23        Q.    And you also did some sort of a
24   drawing, I think?
25        A.    A sketch.

1              ANDREW FOLEY
2            MR. REDD:  Peter, can you put up
3     the drawing, please?
4            MR. URRETA:  Do you know what
5     page of the report that is?
6            THE WITNESS:  22.
7 BY MR. REDD:
8     Q.    Now, looking at that -- there
9 seems to be a handwritten drawing there,
10 right?
11    A.    Correct.
12    Q.    Is that what you hand drew?
13    A.    Yes.
14    Q.    What's the wording you have?
15 What does it say next to your drawing
16 there?
17    A.    Guard insulated from tray,
18 completes permanent interlock system.
19    Q.    Now, one of the problems with
20 interlock devices is that they can be
21 gotten around, correct?
22    A.    Correct.
23    Q.    And so if somebody wants to get
24 around an interlock device, they'll find a
25 way to get around it, right?

1              ANDREW FOLEY

2      A.     They can try, yes.

3      Q.     Now, in this case, this is not a

4   removable guard, correct?  It's a

5   permanent guard, correct?

6      A.     Correct.

7      Q.     Now, when you rendered your

8   opinion in this case, were you aware of

9   how this guard was removed?

10      A.     I am now.  When I wrote the

11   report, I was not.

12      Q.     What's your understanding now as

13   to the efforts that were made to remove

14   that guard?

15      A.     I believe a gentleman who was

16   the plaintiff's father, I believe, used an

17   angle grinder over about a 10- to

18   15-minute period and ground the two

19   cylinders off.

20      Q.     Well, before they employed the

21   grinder to grind off that guard, are you

22   aware of any other measures that were

23   taken to try to remove the guard?

24      A.     I believe they tried to use a

25   hammer.

1        ANDREW FOLEY

2        Q.    So we had two separate ways to

3    try to get this thing off, right?

4        A.    Correct.

5        Q.    Eventually, through the use of a

6    grinder and a grinding process of 10 to 15

7    minutes, they finally succeeded in getting

8    the safety guard off, right?

9        A.    Correct.

10       Q.    So in your opinion, you believe

11   there should have been an interlock where?

12   Exactly where would that be located?

13       A.    So an interlock is made up of

14   a -- there's the physical interlock

15   itself, and then there's the wiring that

16   would go to a -- to a server or switch

17   that would then disconnect the machine.

18            So this would be part of that

19   circuit, would be the wires through the

20   cylinder and then coming down the other

21   cylinder.  So the actual metal of the

22   guard would complete the circuit.

23            And so once that guard was

24   removed, you wouldn't have a complete

25   circuit, and the machine wouldn't work.

1              ANDREW FOLEY
2       Q.     Now, are you familiar with the
3   use of this machine, in terms of how it
4   gets cleaned?
5       A.     I -- no, no, I can't say as I
6   am.
7       Q.     Would it surprise you, sir, that
8   pursuant to FDA requirements, that this
9   machine needs to be cleaned with some
10  frequency?
11      A.     That does not surprise me, no.
12      Q.     Because when you're pushing
13  meats through, you got to clean it often,
14  correct?
15      A.     Correct.
16      Q.     What's your understanding in
17  terms of the cleaning?  What parts of the
18  machine would have to be removed to
19  properly clean it to comply with the FDA
20  and other food standards?
21      A.     So I imagine they would take the
22  head off, the auger, and probably the
23  tray, as well, and wash those down on a
24  daily basis, I should imagine.
25      Q.     We'll say you were going from

1              ANDREW FOLEY

2    pork or beef, for example.  You would have

3    to clean it up between the use of

4    different kinds of meat, right?

5        A.    Yes, yes.

6        Q.    So, theoretically, you could be

7    changing out and -- you could be cleaning

8    this machine multiple times a day if

9    you're cutting different types of meats,

10   right?

11       A.    Correct.

12       Q.    Now, so in terms of your

13   interlock proposal, right, you did a

14   little drawing there, right?

15             Was there any other drawing that

16   you did that would show us the wiring and

17   the circuitry that would be involved in

18   your interlock proposal?

19       A.    No.

20       Q.    Would you agree that

21   something -- if you're going to offer up

22   an opinion about an interlock, you need to

23   offer up, you know, a little more detail

24   about the electrical circuitry surrounding

25   the guard or the interlock device,

1              ANDREW FOLEY
2    correct?
3        A.    I think this was sufficient for
4    the point I was trying to make.  I don't
5    think -- you can argue with quantity, how
6    much, but I was making the point that
7    there's a possibility there of an
8    interlock.  That's all I was trying to do.
9        Q.    But if you're talking about the
10   possibility of an interlock, you also have
11   to talk at the electronics that go with
12   it?
13       A.    Well, there's concepts, there's
14   detail design.  I could produce CAD
15   drawings, electric circuit diagrams.
16            For the purpose of this report,
17   that's all I was trying to portray.
18       Q.    But you didn't do those drawings
19   and schematics specifically in terms of
20   electronics for this interlock that you've
21   proposed, right?
22       A.    I did not for this report, no.
23       Q.    By doing the drawings and doing
24   the design, we also might get a better
25   understanding of the feasibility of the

ANDREW FOLEY
1
2    concepts which you've recommended, right?
3         A.    You can -- you can go into as
4    much detail as you require.  This was
5    sufficient for this report.
6         Q.    Well, but one of the
7    considerations here is cost, right?
8         A.    That is a consideration.
9         Q.    So if we're going to add an
10   interlock and circuitry on the machine, we
11   need to understand exactly what's going to
12   be added to it and the costs associated
13   with it, right?
14        A.    And the design of that is also a
15   cost, which you have to take the time to
16   do the design.
17             For the purpose of this report,
18   it wasn't justified to show that, in my
19   opinion, for this report.
20        Q.    If we're talking about an
21   alternate design, these are considerations
22   we need to consider, and one of them is,
23   is it feasible, right?
24        A.    Eventually, you can get into a
25   detailed design, correct.

1          ANDREW FOLEY
2     Q.     And then we have to look at
3  cost, correct?
4     A.     Correct.
5     Q.     And we have ask ourselves if
6  it's practical, correct?
7     A.     Correct.
8     Q.     So in this particular case, if
9  you've got your interlock device that
10 needs to be wired by the guard there, if
11 the tray has got to be removed with the
12 guard in place, right, that tray has got
13 to be submerged in water and cleaned,
14 right?
15    A.     Right.
16    Q.     In those circumstances, in your
17 report here, you don't give us any
18 understanding as to how the electronics
19 would work after they were submerged in
20 water perhaps multiple times a day because
21 of the cleaning process.
22    A.     There's no electronics in the
23 tray.  That's just a wire connection.
24 Electronics could be in the power head --
25 in the actual -- the box, the enclosure.

                   ANDREW FOLEY
1
2    There's no reason for the sensitive
3    electronics to be on the tray.
4         Q.    So it's going to be inside the
5    tray itself?
6         A.    No.  It could be inside the
7    Pro-Cut -- the box that you see underneath
8    the tray where all the electrical
9    equipment is already, it would probably be
10   in there.
11        Q.    If I was to tell you that the
12   tray gets removed to be cleaned, and now
13   you've got a wire going to an interlock
14   device, how does that work?
15        A.    We have electrical wires in many
16   things that are submerged.  It's not --
17   it's just a wire and a connector, so -- we
18   can get into the details, but there is no
19   electronics apart from a connector on that
20   tray required by this sketch.
21        Q.    But as a practical matter, if
22   we've got to clean this tray, we've got to
23   get it to the water.
24              So are we bringing a tub of
25   water over to dip it in, so that's it's

1                ANDREW FOLEY
2    stretching the wire over so that we can
3    put it in to clean it?  How does this
4    work?
5        A.    You can have connectors.  The
6    tray comes in and connects to the box.
7    It's not a problem.  It's just the
8    interlock itself is not a problem being
9    washed.
10       Q.    You're saying it's not a
11   problem, but you haven't done the
12   diagrams, you haven't done the cost
13   studies.
14             So you're speculating here,
15   correct?
16       A.    For the purpose of the report, I
17   showed where an interlock -- the working
18   part of the interlock would be.  I did not
19   design the entire interlock system into
20   this machine, no.
21       Q.    And therein lies the problem
22   here.  Okay.
23             Would you agree that the cutting
24   off of the guard was a misuse of the meat
25   grinder?

1                ANDREW FOLEY
2        A.    Yes.
3        Q.    Would you agree that the
4    employees at Karzinka used a grinder to
5    cut off the guard?
6        A.    I believe so, yes.
7              MR. ZOHAR:  Objection to --
8        first of all, to secondhand
9        information here.
10              If there's something that you
11        want to introduce here or ask a
12        question in proper form, I don't have
13        a problem, but we're getting away from
14        proper form in some of these
15        questions.
16              MR. REDD:  Gil, just object to
17        form, and we'll talk to the judge
18        about it.
19    BY MR. REDD:
20        Q.    Would you agree that there's
21    nothing in the literature that accompanied
22    the purchase of the meat grinder
23    suggesting that the guard should be
24    removed for any purpose?
25        A.    I believe the 3,000 pounds an

1              ANDREW FOLEY
2    hour kind of implied a potential for this
3    machine that probably couldn't be realized
4    with the guard.  So indirectly I would say
5    it's not clear-cut.
6         Q.    Did you ever ascertain if it was
7    possible to get that kind of production
8    out of the machine?
9         A.    No, I did not.
10        Q.    In order to find out if it can
11   meet the production that's quoted in the
12   manual, you probably want to have a worker
13   there with the meat and to go at it, and
14   see if it can do what it says it can do,
15   right?
16        A.    It's 3,000 pounds of meat.  I've
17   got a vision of what that is, and I've
18   seen the size of those holes.  So it would
19   be quite the feat to do that.
20        Q.    But we don't know for sure
21   because it was never tested?  No one ever
22   did it?  No one ever tried to do it,
23   right?
24        A.    No, they did not.  That number
25   came from somewhere in their manual, so...

1                    ANDREW FOLEY
2        Q.    Would you agree that, as
3    designed, the guard need not be removed?
4        A.    Again, to achieve those
5    production rates, maybe it does have to be
6    removed.
7        Q.    It may?  It may, correct?
8        A.    Correct, it may have to be
9    removed.
10       Q.    But it may not because we don't
11   know because nobody tried to do it.  We
12   don't know?
13       A.    Correct.
14       Q.    Would you agree that Mr.
15   Khusenov's incident is the only accident
16   known to Prokraft involving a Pro-Cut meat
17   grinder where a customer removed the
18   guard?
19       A.    I do not know the answer to that
20   question.
21       Q.    Did you do any research in that
22   regard?
23       A.    As much as I can Google and
24   search for news stories, I did.
25       Q.    Other than the sketch that we

1              ANDREW FOLEY
2    see right there, did you do any further
3    engineering analyses with respect to the
4    proposed alternative design?
5        A.    No.
6        Q.    Have you attempted to create the
7    alternative design and implement it into a
8    meat grinder?
9        A.    No.
10       Q.    Have you attempted to create the
11   components that would comprise the
12   interlock?
13       A.    No.
14       Q.    Have you attempted to perform
15   any tests of the alternative design to
16   determine whether there was any potential
17   rate for error?
18       A.    Rate for error?  Sorry.  Is that
19   what you said?
20       Q.    Correct.
21       A.    No.
22       Q.    You would agree with the general
23   proposition that interlocks can be
24   bypassed by operators?
25       A.    Yes.

1              ANDREW FOLEY

2       Q.    Have you attempted to perform

3   any tests to determine whether the

4   proposed interlock that you propose could

5   be bypassed by users of the meat grinder?

6       A.    I have not.

7       Q.    Have you attempted to perform

8   any tests to determine how to incorporate

9   the wiring for the interlock into the

10  existing meat grinder housing?

11      A.    I have not.

12      Q.    Have you attempted to perform

13  any tests to determine whether the

14  alternative design may pose alternative

15  risk or other performance issues?

16      A.    No.

17      Q.    Have you performed a patent

18  search to determine whether your proposed

19  alternative design has been subject to

20  peer review?

21      A.    A patent search for patent

22  review?  I have not, no.

23      Q.    Have you provided your proposed

24  alternative design to any other engineer

25  for peer review?

```
 1              ANDREW FOLEY
 2      A.    No, I have not.
 3      Q.    Have you published any academic
 4  paper in which you identified the proposed
 5  alternative design for the purpose of
 6  obtaining peer-review feedback?
 7      A.    No.
 8            MR. REDD:  I'm just checking on
 9      some things here.  Give me a moment.
10            THE WITNESS:  I'll just nick to
11      the bathroom.  I'll be right back.
12            MR. REDD:  Let's take five.
13            (Brief recess taken.)
14  EXAMINATION BY
15  MR. EVANS:
16      Q.    Good afternoon, Dr. Foley.  My
17  name is Tom Evans.  I'm an attorney with
18  Congdon Flaherty.  I represent Karzinka in
19  the third-party action.  I just have a few
20  follow-up questions for you.
21            With respect to the warnings, in
22  your opinion that there should have been a
23  danger warning as opposed to a regular
24  warning based upon "could" or "will" cause
25  serious injury or death, you're aware that
```

1                    ANDREW FOLEY
2    this machine had a permanent fixed guard,
3    correct?
4        A.    Correct.
5        Q.    Okay.  And as a permanent fixed
6    guard in the design of the safety guard on
7    this machine, it would not allow one's
8    hand to go down into the opening of the
9    headstock, correct?
10       A.    Correct.
11       Q.    And under no circumstances could
12   one get their hand into the headstock with
13   that fixed safety guard in place, correct?
14       A.    I'm not sure about children,
15   small hands and stuff.
16       Q.    Well, outside of children
17   operating the machine, correct?
18       A.    Correct.
19       Q.    So, therefore, the warning was
20   sufficient enough for this particular
21   machine as designed because there's not a
22   "will" aspect to the warning that you
23   would consider on this machine with a
24   fixed guard and the inability to get one's
25   hand down into that headstock, correct?

1              ANDREW FOLEY

2       A.    No.   Again, I think if the

3   headstock's there, correct, but will

4   people remove it?   Yes.

5              And do you still want the

6   guard --

7              (Reporter clarification.)

8       A.    So I would say that once the

9   guard's been removed, even though they

10  shouldn't, then there's still a need for

11  that danger sign.

12      Q.    Well, as part of the warning

13  sign that was currently on the machine, it

14  warned against removing the guard,

15  correct?

16      A.    Yeah.   But these are two

17  independent attempts at protecting people.

18  The -- removing the danger is the first

19  thing, the guard is the second, the labels

20  are a third level.   They're not

21  independent.   They're working together to

22  stop the injury.

23              So I would still say that the

24  danger sign is relevant.

25      Q.    Well, as designed -- as the

                    ANDREW FOLEY
 1
 2   distributor and/or manufacturer, as
 3   designed with the permanent fixed guard,
 4   we've already established that one could
 5   not get their hand into that headstock?
 6       A.    Again, I'll go back -- sorry to
 7   repeat myself, but you can have enclosures
 8   and guards that can be removed, and
 9   there's still warning signs there present.
10   I mean, they shouldn't remove it, but they
11   did.
12            Once that's gone, the danger is
13   definitely there.
14       Q.    Well, we didn't talk much about
15   the plunger, so I'd like to get into the
16   plunger with you, as well.
17            The plunger, as utilized or
18   designed on this particular machine, is
19   used by your hand to push the meat into
20   the headstock so that your hand would not
21   come anywhere near the entrance or opening
22   to that headstock, correct?
23       A.    Correct.
24       Q.    And even with a removed guard,
25   the fixed guard, the operator could use

                    ANDREW FOLEY

1

2   just the plunger and not get his hand

3   anywhere near that headstock, correct?

4        A.    Correct.

5             MR. EVANS:  I don't think I have

6        anything else, Mr. -- Dr. Foley.

7        Thank you very much.

8             MR. REDD:  One follow-up here.

9   CONTINUED EXAMINATION

10  BY MR. REDD:

11       Q.    Doctor, in terms of the proposal

12  you made for an interlock device, did you

13  do any research to look into the

14  possibility that the interlock, as you

15  proposed, might be bypassed?

16       A.    I did not.

17            MR. REDD:  Okay.  Thank you,

18       Doctor, I appreciate your time.

19            I'm done.

20            THE COURT REPORTER:  Off the

21       record, please.

22            (Discussion off the record.)

23            MR. ZOHAR:  On the record, we

24       need a copy of the transcript of

25       today's deposition of Mr. Foley.

1                ANDREW FOLEY

2            MR. EVANS:  Yes, third-party

3       defendant needs a copy of the

4       transcript.

5            (Time noted:  5:08 p.m.)

6

7

8

9

10                 _____

11                      ANDREW FOLEY

12

13    Signed and subscribed to

14    before me this      day

15    of              , 20__.

16    _____

17    Notary Public

18

19

20

21

22

23

24

25

```
1
2                     I N D E X
3    Witness:  ANDREW FOLEY
4    Examination by:                     Page
5      MR. REDD                            5
6                                        186
7      MR. EVANS                         182
8
9                   E X H I B I T S
10   DEFENDANT'S        DESCRIPTION         PAGE
11   Exhibit G   Expert report           57
12   Exhibit L   Photograph of warning    97
13               sticker
14   Exhibit M   Photograph of label     104
15   Exhibit ZG  Transcript              112
16   Exhibit ZD  Photograph              156
17
18   Counsel has retained all exhibits.
19
20
21
22
23
24
25
```

1

2                    C E R T I F I C A T E

3

4          I, TAMMY O'BERG, a Notary Public

5     within and for the State of New York, do

6     hereby certify:

7          That ANDREW FOLEY, the witness whose

8     examination is hereinbefore set forth, was

9     duly sworn by me and that this transcript

10    of such examination is a true record of

11    the testimony given by such witness.

12         I further certify that I am not

13    related to any of the parties to this

14    action by blood or marriage and that I am

15    in no way interested in the outcome of

16    this matter.

17         IN WITNESS WHEREOF, I have hereunto

18    set my hand this 7th day of September, 2022.

19

20

21

22                  TAMMY O'BERG

23

24

25

1                    **ERRATA SHEET**

            **Veritext Reporting Company**

2                     **1-800-727-6396**

   Name of Case: ISOJON KHUSENOV v. PROKRAFT

3   INC.

   Date of Deposition: August 29, 2022

4   Name of Deponent: ANDREW FOLEY

   Page        Line      Change                        Reason

5   _____     \_\_\_\_      _____ _____

6   _____     \_\_\_\_      _____ _____

7   _____     \_\_\_\_      _____ _____

8   _____     \_\_\_\_      _____ _____

9   _____     \_\_\_\_      _____ _____

10   _____     \_\_\_\_      _____ _____

11   _____     \_\_\_\_      _____ _____

12   _____     \_\_\_\_      _____ _____

13   _____     \_\_\_\_      _____ _____

14   _____     \_\_\_\_      _____ _____

15   _____     \_\_\_\_      _____ _____

16   _____     \_\_\_\_      _____ _____

17   _____     \_\_\_\_      _____ _____

18   _____     \_\_\_\_      _____ _____

19

20              _____

21                    ANDREW FOLEY

22

23   THIS \_\_\_\_DAY OF _____, 20\_\_.

24

   _____       _____

25   NOTARY PUBLIC              COMMISSION EXPIRES

| & | | | |
|---|---|---|---|
| **&** 2:20 3:5 60:24 | **1995** 8:16 | **3/16ths** 81:23 | **89** 9:21 |

**&**   2:20 3:5 60:24

**0**

**06297** 56:7
**06340** 5:12

**1**

**1-800-727-6396**
  190:2
**10** 115:5 162:14
  168:17 169:6
**1000** 2:13
**104** 188:14
**10573** 2:15
**10th** 58:17
**112** 188:15
**11214** 2:7
**11553** 2:24
**11th** 58:19
**12** 49:13,13
  146:4
**13** 107:17,19
**14th** 60:5
**15** 63:2,14
  168:18 169:6
**156** 188:16
**16** 116:11
**16th** 85:10
**17** 9:7 113:5,13
**18** 113:21 146:3
**182** 188:7
**186** 188:6
**1883** 2:6
**19** 115:3 156:21
**1910.147** 58:22
**1910.212** 58:24
**1988** 8:14 9:21

**1995** 8:16
**1999** 9:4
**1:04** 1:18
**1:21** 1:4
**1st** 58:17

**2**

**20** 9:13 115:20
  187:15 190:23
**200** 35:6
**2000** 3:8
**2019** 35:24
**2021** 6:24,25
  58:3
**2022** 1:18 58:18
  58:19 60:5
  112:9,15,17,19
  113:17 189:18
  190:3
**22** 167:6
**220** 85:18
**23** 89:10,13
  115:12 120:3,13
  155:25
**24** 89:19 113:14
  115:20
**242** 2:14
**25** 9:10
**26th** 112:17
**27** 116:11
**29** 1:18 58:3
  110:16 190:3
**2:20** 56:7
**2nd** 2:6

**3**

**3,000** 162:8
  177:25 178:16

**3/16ths** 81:23
**30** 63:5 110:13
  110:15 162:15
**32** 57:23 78:22
  150:17
**333** 2:22
**3400** 7:9,11
**3703** 1:4
**3894** 189:21

**4**

**4,590** 7:17
**40** 149:18
**44** 5:11
**4590** 7:17

**5**

**5** 188:5
**50** 7:25 29:4
  74:13
**502** 2:23
**50309** 3:9
**57** 188:11
**5:08** 187:5

**6**

**60** 121:14,14
  149:19
**669** 3:8

**7**

**7319.1a** 161:20
**763** 58:19
**7th** 112:9,14,19
  113:17 189:18

**8**

**8** 79:3
**80** 149:12
**86th** 2:6

**89** 9:21

**9**

**90** 83:9 147:8
**95** 13:10
**97** 188:12
**99** 13:11

**a**

**ability** 19:20
**able** 68:10
**academia** 9:3,10
  9:15 14:8
**academic** 182:3
**academy** 9:8
**accelerated** 18:3
**accelerating**
  114:7,25
**accessible**
  120:23
**accident** 5:20
  18:21,25 19:22
  21:13,20,23 22:2
  24:5,14 26:7,8
  32:25 39:14,17
  40:4 42:7 50:21
  68:9 69:17
  70:13 71:9,15,24
  72:4,7 73:3
  92:15 94:2,19
  106:2 110:14
  117:19 125:15
  125:17 126:15
  126:16,16 130:6
  142:25 143:2,6
  146:15 153:6
  155:11 166:21
  179:15

| | | | |
|---|---|---|---|
| **accidents** 93:21 | **advertised** 59:4 | **aligned** 84:9 | 48:1 49:1 50:1 |
| **accommodation** 51:18 | 161:9 | **allow** 100:19 | 51:1 52:1 53:1 |
| **accompanied** 177:21 | **aerospace** 8:21 9:18 14:3 | 183:7 | 54:1 55:1 56:1 |
| **accomplished** 130:19 | **affiliated** 60:3 61:12,16 | **alstom** 9:2 11:23 12:21 13:15,16 13:18 | 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 |
| **accountant** 10:17 | **affixed** 165:22 | **altered** 150:8 | 66:1 67:1 68:1 |
| **accountants** 10:11 | **afraid** 103:20 | **alternate** 173:21 | 69:1 70:1 71:1 |
| **accounting** 8:23 | **afternoon** 5:13 5:14 182:16 | **alternative** 180:4,7,15 | 72:1 73:1 74:1 |
| **achieve** 179:4 | **ago** 17:7,12,13 | 181:14,14,19,24 | 75:1 76:1 77:1 |
| **act** 137:13 | 23:21 30:10 | 182:5 | 78:1 79:1 80:1 |
| **action** 56:19 74:11 126:10 182:19 189:14 | 31:14 33:23 61:19 70:20 | **amazon.com** 59:3 | 81:1 82:1 83:1 84:1 85:1 86:1 |
| **actions** 69:15 | **agree** 52:21 53:3 67:14 70:11,17 | **american** 28:7,8 99:2 | 87:1 88:1 89:1 90:1 91:1 92:1 |
| **active** 29:10 | 72:23 87:10,13 | **amputation** 38:20 111:14 | 93:1 94:1 95:1 |
| **actual** 19:14 20:22 22:2 25:24 44:3 67:25 70:6 97:20 104:25 105:6,7 123:4 169:21 174:25 | 88:18,23 103:3 105:14 106:20 108:15 111:16 117:16 118:9,14 128:5 131:14 133:19 139:22 150:23 151:3,16 171:20 176:23 177:3,20 179:2 179:14 180:22 | **analogy** 130:10 **analyses** 180:3 **analysis** 41:15 42:18,25 141:19 162:23 **andrew** 1:20 5:1 5:2,9 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 | 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 |
| **add** 118:22 173:9 | **agreed** 4:5,10,14 | 18:1 19:1 20:1 | 119:1 120:1 |
| **added** 119:9 120:16,22 173:12 | **ahead** 11:9,10 15:19 55:22 118:3 148:5 | 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 | 121:1 122:1 123:1 124:1 125:1 126:1 |
| **addition** 7:16 | **aid** 54:22 | 30:1 31:1 32:1 | 127:1 128:1 |
| **additionally** 7:15 | **air** 12:6,10,16,17 | 33:1 34:1 35:1 | 129:1 130:1 |
| **address** 5:10 | **aircraft** 9:25 10:25 11:17 | 36:1 37:1 38:1 39:1 40:1 41:1 | 131:1 132:1 133:1 134:1 |
| **adjacent** 35:15 83:19 | 12:13 | 42:1 43:1 44:1 45:1 46:1 47:1 | 135:1 136:1 137:1 138:1 |
| | **akram** 91:4,10 | | 139:1 140:1 |

141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1,11 188:3
189:7 190:4,21
**angle** 168:17
**angles** 147:16,17
**angular** 137:11
**ansi** 99:2 106:13
106:22 131:18
131:22 132:2
**answer** 6:6
93:17 95:15,18
113:22 114:5,12
114:18,21,23
115:10,19,25
116:7,14,23
117:5,13 135:15

148:5 179:19
**answered**
164:17
**answers** 117:15
117:18
**anybody** 26:4,6
46:22 64:6
110:21 125:8
164:13
**apart** 68:7
175:19
**apartment** 31:10
31:18 32:5,6
**appear** 29:22
76:15 101:23
**appeared** 33:13
**appearing** 34:21
**appears** 73:14
75:3,6 76:5,8
79:10,14 80:11
82:24 99:14
101:4,13 134:13
134:23
**applies** 150:17
**apply** 27:14
50:11
**appreciate** 47:16
128:3 186:18
**appropriate**
109:7 122:11
**appropriately**
111:19
**approximate**
17:10
**approximately**
94:5
**approximation**
23:22

**area** 53:16 68:17
69:15 70:10
99:18 146:23
**areas** 89:6,16
**argue** 109:11
172:5
**arm** 38:18 90:12
102:20 120:24
123:6,7,19
159:10
**arrived** 39:22
**arrow** 127:5
**ascertain** 26:7
31:24 70:14
71:19 141:14
162:11,16 178:6
**aside** 30:11
162:9
**asked** 64:14
114:20 140:15
164:17
**asking** 5:19 6:12
99:22 161:24
**asks** 135:5
**aspect** 183:22
**assembled** 85:21
**assist** 74:23
**associate** 13:25
102:21
**associated**
173:12
**association** 7:12
**assume** 7:22
14:16 16:21
36:4 52:5 62:15
65:18 75:16
76:11 87:3
110:8,15 144:12

144:17,19,25
152:5
**attached** 56:20
165:7,10,12,15
165:16
**attaching** 21:15
**attempt** 71:22
162:24
**attempted** 180:6
180:10,14 181:2
181:7,12
**attempting** 50:2
**attempts** 129:12
184:17
**attention** 56:24
57:10,13 95:22
99:10 100:7,24
105:11,15
**attorney** 14:11
40:17,25 42:24
45:13 62:14
63:2 64:8,9,10
182:17
**attorneys** 2:5,11
2:21 4:5 32:12
34:7 63:9 64:4
**audio** 112:11
**audits** 10:12
**auger** 81:12
101:15,17,17
102:11 115:8
121:10,20 122:6
122:6,8,19
124:16 127:20
129:20 137:10
138:6 139:8,12
139:24 140:7
151:8 170:22

augers 49:16
august 1:18
190:3
automotive
28:19
available 152:3
average 126:19
127:6,8 144:5
avoid 109:9
131:24 132:3,15
132:23 133:4,10
133:16,23 134:3
avoided 108:13
aware 20:12
39:9 40:6 72:12
72:18 90:24
91:3,7,13,17,25
92:23 93:2
118:6,10 136:3
161:4 168:8,22
182:25
axis 144:7

**b**

b 131:5 133:23
188:9
bachelor 8:11
bachelor's 8:20
back 8:14 9:21
13:18 18:4,16,17
23:14 57:18
60:25 107:16
119:24 131:11
134:17 136:11
155:23 182:11
185:6
background
8:10 26:24

33:25 43:20
79:18 108:7
balance 95:3
base 54:2
based 39:3 42:23
117:17 119:13
123:11,23
134:11,21 155:7
182:24
basically 9:24
10:15,25 12:8,11
13:16 15:10,15
15:20 18:7
21:22 24:14
35:8 39:19
42:16 49:17
51:16 54:4
59:23 66:20
67:24 74:22
77:19 79:18
109:25 124:5,23
127:21 137:19
144:5 153:7
basing 87:23
basis 24:24
170:24
bathroom
182:11
beef 162:14
171:2
beings 53:7
believe 19:8
22:19 41:17
48:3 66:3 69:4
86:9 90:19 94:9
95:18,20 96:8
107:14 108:19
130:21 137:17

143:18 152:12
156:15 164:23
165:9 166:20
168:15,16,24
169:10 177:6,25
benefit 119:9
bent 76:18
berlin 12:3
best 19:20 26:17
29:13 31:3
33:10 76:25
100:5 114:14,17
better 9:9 49:9
49:18 104:10
111:23 163:23
172:24
big 49:15,21
66:19 97:7
98:21 110:4
139:9 147:25
149:5
bigger 38:6 49:6
120:14,20
149:12,13,14,19
biomechanical
53:17,20,23 54:5
54:10 124:24
153:15
biomechanics
53:14 54:10,15
142:24
bit 123:20
black 84:17
158:7
blade 13:4 44:3
81:21
blades 49:16
82:4,7 124:11

blender 49:17,24
blood 54:7
189:14
blue 103:15,17
104:14
bmw 12:2,3,14
12:16 13:13,18
boarded 15:7
boat 24:10,11,18
24:19 25:5,6
boats 24:9 29:8
boatyard 23:9
24:2,6,10 26:13
29:18
body 52:15,16
52:19 120:24
122:8 126:7
127:11 144:7
146:8,20 147:21
148:18,20,22
149:6 153:17
boiled 42:16
bones 54:7 153:5
bonier 124:22
books 10:15
bottom 78:15,25
79:7 81:12
101:16 113:13
boulevard 2:22
bow 35:6,7
box 2:13 62:6
98:14 174:25
175:7 176:6
boxed 91:18
boyfriend 18:3
brain 126:2,5
128:15

break 55:2
  110:22 111:2
  128:13 161:23
breaking 125:24
breaks 89:5
brief 55:4 62:25
  111:3 182:13
briefly 8:9 31:15
bring 103:21
  160:10
bringing 175:24
brochure 58:12
broken 13:12
brooklyn 2:7
brought 14:4
  64:16
buckets 49:23
buddington 5:11
building 35:16
  35:18
bump 148:21,22
bumped 149:3
bunch 64:15
  118:4
business 5:10
butcher 46:14
  72:16 162:12
button 69:3
  74:22 84:18,20
  84:23,25 85:2,9
  85:22 86:4,8,10
  88:15,19,23
  97:15,19,21,23
  120:16,21 121:3
  121:4,6,7,8
  127:4 129:16
  136:13 137:14
  137:19 141:7,9

142:10,22
  145:13,20 147:3
  147:25 148:8
  149:4,8,11,22,23
  150:3,7,19,24,25
  151:4,21 152:2,6
  152:11,21 156:3
  156:8 157:7,19
  157:20,25
  158:11,16,19,24
  159:2,5,7,12,19
  159:21 160:2,5
  160:11 161:2
button's 148:17
buttons 83:7,15
  84:5,8,14 86:15
  86:20,24 87:6,8
  87:17,18,21
  88:10 150:10
bypass 157:25
bypassed 180:24
  181:5 186:15

c

c 2:2 3:2 23:8
  60:7 72:15
  134:2 189:2,2
cab 35:12
cabinet 76:22
  77:17 82:21
  105:8,25 156:19
cad 172:14
calculations
  9:24 123:22
  138:22
california 64:12
called 51:23
  53:16 64:11

94:20 125:11
  136:18
cancelled 64:11
  64:13
capacity 11:21
captain 29:8
caption 55:18
car 125:17
  126:15 136:8
  137:4
care 113:24
  114:3,14,17
careful 113:15
  113:18 115:16
  117:3
cargo 15:7
carries 89:18
case 1:4 5:18
  6:22 7:12 8:4
  14:11,24 15:5
  16:9,16,24 17:15
  17:18,24 18:22
  19:7,9,25 20:2,5
  20:7,9,15,17,21
  20:25 21:2
  22:11,14,23 23:5
  23:5,7,14 24:3,4
  24:13 25:2,13,14
  26:3,13 27:23
  29:18,19 30:2
  31:10,13,16,22
  32:17,21 33:6,8
  33:11,16,19,22
  33:25 34:7,8,9
  34:13,25 35:14
  35:22,22,25 36:3
  36:4,8,11,15,18
  36:23,25 37:2,6

37:8,19 38:7,13
  38:14,22,25 39:6
  39:10,11,17,23
  40:2,5,9,9,12,19
  40:23 41:3,15,22
  41:25 42:4,10,11
  43:2,9,17,21,22
  44:7,10,13 46:21
  48:21 49:4,11
  50:2,20,20,23
  53:9 55:7,16,18
  56:9,13,24 62:17
  64:24,25 65:6,15
  65:16,24 66:4,5
  70:20,24 71:4
  72:13,17,21 73:4
  77:9 88:25
  90:23,25 91:5,12
  91:22,24 92:9
  93:15 94:5,17,25
  95:8,17 96:17
  110:10 119:13
  127:18 129:5
  130:14,18 131:8
  137:8,16 138:5
  139:18 141:19
  144:13,20 145:2
  146:6 151:5,13
  152:25 154:2,11
  165:5,6,20 168:3
  168:8 174:8
  190:2
cases 14:19
  26:11,14,19
  29:14 41:7
  44:21 45:3,4,7
  54:13 64:15,17
  65:20 125:3

casing 97:20
  124:6
catastrophic
  90:14
categories
  107:24
category 108:10
caught 66:12,13
  111:15 118:11
  118:24 127:20
  145:9,11 147:13
  147:22 149:6
causation 73:4
  153:20
cause 182:24
caused 32:14
  155:10
causes 126:6
causing 90:13
caution 107:24
cautious 113:23
  114:3,8 115:2
  116:16 117:7
center 144:6,8,9
central 79:20
certain 99:5,5,6
  112:3
certainty 130:7
  147:23 152:9
certifications
  125:6
certified 154:22
certify 189:6,12
cfr 58:22,23
change 82:16
  110:4 190:4
changed 150:8

changes 118:17
  162:19
changing 171:7
charge 7:23
charging 7:23
chartered 10:11
check 66:2
checking 182:8
chester 2:15
chew 109:4,21
chicken 162:15
children 100:21
  183:14,16
choice 82:17
chose 134:8
chute 90:13
  102:20,24
  161:15
circle 102:25
  103:15,18
  104:14
circuit 169:19,22
  169:25 172:15
circuitry 171:17
  171:24 173:10
circumstance
  95:2
circumstances
  19:21 117:25
  174:16 183:11
cite 150:16
civil 30:6 55:23
claim 42:14
claimed 15:18
claims 162:7
clarification
  90:5 120:17
  184:7

clean 50:2
  170:13,19 171:3
  175:22 176:3
cleaned 50:13,14
  170:4,9 174:13
  175:12
cleaning 38:16
  38:18 50:6
  100:19 170:17
  171:7 174:21
clear 6:6 90:10
  102:17 105:22
  178:5
clearer 103:22
  157:5
clearly 90:2,7
client 47:3 90:25
client's 47:6
clockwise 77:24
close 18:6 97:14
  115:7 132:13,21
  132:22 133:4,9
  133:15 147:18
  156:7
closed 43:25
closer 84:19
clw 56:7
coast 9:8 26:22
  29:9 136:19,21
  137:3,6 138:9,13
  139:19,21
  140:16
coasting 140:6
coding 11:3
coefficients 25:9
coincidence 35:4
cold 16:7

collapse 33:17
  35:2
collapsed 43:25
collecting 49:23
colloquy 115:3
  116:22
color 84:21
  157:5
colors 99:5
column 98:6,9
  100:11,25
  105:17,23
columns 98:23
  165:10
combination
  45:9,11
combustion
  12:11
come 85:4 95:16
  137:5 139:16
  185:21
comes 50:5
  81:24 176:6
coming 70:12
  74:20 169:20
comment 135:18
  140:10
commercial
  14:25 26:11
  36:2 58:20
commission
  190:25
common 26:14
commonsense
  114:5,23
communicate
  131:15

communicated
  111:20
companies  10:13
company  8:22
  45:21 47:21
  56:15 190:1
compensated
  7:18
competitive
  150:11
competitors  47:2
  47:6
complete  169:22
  169:24
completes
  167:18
completing  8:17
complex  32:6
compliant
  106:12,19,22
comply  170:19
component
  52:18
components
  180:11
comprehensive
  15:25 18:18
compressors
  11:2,5,18 12:9
  12:10
comprise  180:11
conceivable
  159:15
concept  125:10
concepts  172:13
  173:2
concerned  53:24

conclusions
  25:12 40:15
conduct  50:21
configuration
  72:6
confirm  21:13
  22:24
confronted
  126:20
congdon  2:19
  60:23 182:18
connecticut  5:12
  27:6,20,21
connection
  174:23
connector
  175:17,19
connectors
  176:5
connects  176:6
conscious
  134:15,25
  135:22
consequence
  132:23
consequences
  131:23 132:14
  134:3
consider  18:24
  173:22 183:23
consideration
  97:11 173:8
considerations
  173:7,21
consistent  74:11
  74:17
constantly  87:20
  161:11

constituency
  124:20
consult  46:21
consultant  46:2
consulted  9:17
consulting  8:22
  13:17 47:18
cont'd  3:2
contact  122:19
contained  59:6
  61:3 62:4
context  51:5
  125:15
continue  116:4,8
  140:3
continued
  139:23 186:9
continuing
  127:24 140:7
control  58:22
  126:12
conversation
  62:23,25 63:6,13
  63:16,18
conversations
  62:16,18,20 63:4
  63:8,24
cooking  31:19
cooling  13:5,6
copy  8:3 55:17
  186:24 187:3
corner  75:2 83:6
  83:9,12,12,13,13
  83:20 142:17
correct  13:11
  14:10 15:23
  16:10,11,12,14
  16:15 17:3

19:18,24 22:3,4
22:9,10 25:15,17
25:22 27:24,25
28:3,4,16,22
30:21,23 32:17
32:18 33:14,15
34:14,24 41:4,5
41:12,20,21
43:12 47:16
53:12 57:20,21
57:24,25 58:3,4
60:10,11 61:22
62:2,14 63:15
64:21 65:4,5,7,8
65:10,11 67:6,7
67:11 68:12,13
68:22,24 69:3,6
69:7,12 70:3,4,7
70:8,18 71:18
73:5,21 75:15,21
76:2,3,19,22,23
78:13 79:11,12
79:22,23 80:2,3
80:6,7,9,10,19
80:20 81:7,8,14
81:15 82:11,13
82:22,25 83:2,8
83:14,19,21,25
84:6,7,10 85:2
85:24 88:16
89:3,16,17,20
90:17,18,22
91:23 94:11
97:16,17,25 98:4
98:5,7,8,11,12
98:15,16 99:7,16
101:6,10,11,25
102:4 103:4,6

104:17 106:8,9
106:19,24 107:8
107:20,23,25
108:2 109:14
110:6,7 115:9,17
116:13 117:11
120:2 121:17
123:8,9 124:11
124:25 126:3,4,7
126:8,11 127:21
127:22,24,25
128:23 129:3,4,6
129:9,10 130:17
131:3,7,17,20,24
132:4,15,24,25
133:5,6,12,17,18
133:22 134:10
134:16 135:3
136:16 137:15
137:20,21,24
138:4,6,7 140:9
140:12,13,18,19
141:20,24 142:8
146:15,18,20,21
146:25 147:2,5,6
147:14 148:2,14
148:16 150:3
151:2 153:10,13
155:5 157:19,21
158:17,20
164:11,13,14,16
164:18 165:3
166:2,3,6,13,14
166:19,22
167:11,21,22
168:4,5,6 169:4
169:9 170:14,15
171:11 172:2

173:25 174:3,4,6
174:7 176:15
179:7,8,13
180:20 183:3,4,9
183:10,13,17,18
183:25 184:3,15
185:22,23 186:3
186:4
**correcting** 140:9
**corresponding**
126:6
**cost** 141:14,18
142:21 150:7
173:7,15 174:3
176:12
**costs** 173:12
**counsel** 3:6 7:24
20:10 45:8
61:21,25 62:2,17
62:24 63:25
65:13,14 70:22
72:20 188:18
**counsel's** 36:17
**couple** 8:5 23:17
23:20 62:13
63:21 89:6
123:24,25 128:5
**course** 113:22
114:7 117:7
**courses** 52:7
**court** 1:2 4:18
20:14 22:25
29:22 30:15,20
31:8 56:5
110:25 186:20
**courtroom** 30:5
30:25

**coventry** 9:4
13:20
**coworker** 72:13
**coworkers** 74:20
**cpr** 54:22
**crafts** 26:16
**crane** 33:17 35:2
35:9,10,18,22
**cranes** 35:4,15
**cranfield** 8:15
10:19 11:16
**crash** 136:7
**crawford** 60:15
60:16,17,17
**crawford's**
60:20 61:23
**crawler** 33:17
**create** 180:6,10
**creates** 81:23
**critical** 67:13
**crosstalk** 40:7
81:25 87:12
**crush** 100:13
132:13,22
**crushed** 24:12
124:5,8 130:3
**crushing** 124:14
130:11
**crux** 10:2
**crystal** 105:21
**current** 121:3
**currently** 184:13
**curriculum** 8:4
**customer** 179:17
**cut** 1:9 5:18 11:9
48:12 57:23
75:14,17 82:21
100:13 115:8,16

116:18 132:13
132:22 150:17
175:7 177:5
178:5 179:16
**cutting** 171:9
176:23
**cv** 1:4 13:9 23:24
28:10 56:7
**cylinder** 157:13
157:16 169:20
169:21
**cylinders** 168:19

## d

**d** 37:20,20 56:11
56:11 60:7
188:2
**daily** 170:24
**damage** 32:15
90:14 129:21
153:25
**damaged** 100:18
133:15
**danger** 90:2,8,9
94:11,15,23 95:6
95:11 107:2,8,13
107:24 108:20
109:7,23,24
111:7,19,23
118:13,17,18,22
125:21,23
127:10,11,13
136:4 182:23
184:11,18,24
185:12
**dangerous**
114:10,14 116:3
116:24 117:4

118:7,24 151:11
**darby** 11:24
**date** 35:23 57:6
97:5 103:25
104:6 112:19
113:2 156:25
190:3
**dated** 60:4
**day** 70:17 72:16
162:5,6,14 164:9
171:8 174:20
187:14 189:18
190:23
**days** 63:5,11
**de** 136:24 137:19
137:24
**deal** 98:21
**death** 90:14
108:14 109:2,10
109:12 110:2,17
182:25
**december** 6:24
6:24
**decision** 126:6
**deck** 15:14,17
16:2,8
**deemed** 107:2
**deep** 49:13
**default** 150:13
**defect** 24:25
**defendant** 1:16
2:21 17:20
36:14 47:4
56:12 58:14
59:24 187:3
**defendant's**
55:10 57:4 97:3
104:4 112:22,23

112:24 156:23
188:10
**defendants** 1:10
1:21 2:11 3:6
5:17 22:13,23
56:13,17 59:21
65:24 92:6
95:24 121:17
129:15 160:22
**defense** 7:20
20:10
**define** 122:10,15
125:4 127:2
**definitely** 76:14
185:13
**definition** 51:14
53:20 123:13
125:14
**degree** 8:20 14:3
53:23 96:12
130:6 152:8
**degrees** 83:10
147:8
**deliberately**
124:18
**delivered** 42:14
42:15
**denominator**
26:15
**denotes** 104:14
**department**
12:25
**depends** 122:10
122:15 125:3
127:9 158:25
**depicted** 103:17
**deponent** 190:4

**deposed** 20:2
38:22 41:24
42:3 44:6,9
70:23 71:3
72:21 90:25
91:8,11 135:11
**deposition** 1:20
4:14 7:25 16:17
20:4,25 21:5
22:12 25:14
26:5 32:24
34:10,21 44:12
45:5 64:12,19
92:5,23 95:19
112:9 113:16
186:25 190:3
**depositions** 25:7
32:9 34:5 39:7
45:2 59:12,13
65:15,24 66:4
**des** 3:9
**describe** 30:22
66:23
**described** 25:7
**describes** 98:22
**describing**
104:20
**description**
49:10,19 90:10
188:10
**design** 9:23 11:4
12:23 24:21,22
24:25 44:4,5
141:3,23 150:8
150:16 172:14
172:24 173:14
173:16,21,25
176:19 180:4,7

180:15 181:14
181:19,24 182:5
183:6
**designed** 24:17
46:6,9 50:16
106:23 124:23
148:17 149:4
150:25 151:5
166:2 179:3
183:21 184:25
185:3,18
**designing** 58:25
**despite** 140:23
**destroy** 108:22
**detached** 76:21
76:25
**detail** 171:23
172:14 173:4
**detailed** 173:25
**details** 35:2
175:18
**determinations**
39:23
**determine** 82:10
147:23 165:14
180:16 181:3,8
181:13,18
**device** 149:2
166:17 167:24
171:25 174:9
175:14 186:12
**devices** 16:14
40:10 43:3
167:20
**diagrams** 172:15
176:12
**diameter** 82:12
149:20

| | | | e |
|---|---|---|---|

**difference** 93:10
93:12 94:10,16
109:19 119:15
122:3 151:19
**differences**
109:18
**different** 82:4,7
82:9 84:2 89:6
114:19 127:13
152:10,22 171:4
171:9
**difficult** 145:25
**difficulty** 144:24
**dimensions**
149:7,9
**dip** 175:25
**direct** 57:10,12
57:14 100:24
**directed** 105:13
**directing** 56:24
**direction** 124:11
**directly** 83:18
143:16
**disc** 13:5,6
**disclosure** 58:13
58:15 66:22,25
**disclosures**
66:21
**disconnect**
100:14 169:17
**discredit** 118:20
**discuss** 45:17
120:6
**discussed** 45:16
120:7
**discussion** 23:3
186:22

**displayed** 82:20
**dissemble** 68:10
**dissimilar**
128:20 149:11
**dissipate** 137:2,6
**dissipated**
152:16
**dissipation**
138:3
**distance** 83:23
**distribute** 47:25
**distributes** 47:21
**distribution**
15:12
**distributor**
185:2
**district** 1:2,3
56:5
**divorces** 30:12
**docket** 55:24
56:2,6
**doctor** 6:20
11:10 53:5
68:15 69:18
70:11 73:19
97:9 104:10
107:18 111:5
113:6 117:14
118:15 121:5
133:19 139:22
150:16 153:21
153:22 157:3
186:11,18
**document** 57:13
**documents** 58:7
59:8 61:6 66:22
**dodge** 127:5

**doing** 9:24 10:24
11:3 13:17 14:8
22:18 25:8
34:18 35:5
54:13 110:24
124:17,23
138:23 144:4,10
151:11 172:23
172:23
**doubt** 162:18
**dr** 55:6 57:8
106:7 182:16
186:6
**drafting** 9:24
**draw** 100:7
**drawing** 124:15
166:24 167:3,9
167:15 171:14
171:15
**drawings** 150:2
172:15,18,23
**drawn** 142:19
143:7
**drew** 167:12
**dribble** 62:7
**drivers** 35:13
**drop** 42:20
102:13 103:13
**drops** 42:20
74:16
**dry** 21:21
**dual** 33:16 35:5
**duly** 5:2 189:9
**dummy** 18:15,16
19:16,16 20:23

**e** 2:2,2 3:2,2
56:10,16 60:7
63:7 188:2,9
189:2,2
**earle** 2:22
**earlier** 48:10
55:6 64:14
116:15 134:6
**early** 40:8,14
**easier** 115:24
**easiest** 125:16
**easily** 159:23
**eastern** 1:3
**eating** 42:13
**eddy** 3:5
**education** 8:17
**educational** 8:10
**effect** 4:16 21:18
94:25 136:6
**effectively** 10:17
102:18 148:9
**effectiveness**
150:6
**effort** 134:15,25
135:22
**efforts** 168:13
**eight** 62:22
63:24 64:2 79:2
79:7
**eighth** 85:9
**either** 66:12
74:21 88:19
159:23 162:20
**ejected** 18:4
**electric** 31:23
172:15

electrical 8:12
171:24 175:8,15
electronics
172:11,20
174:18,22,24
175:3,19
embedded 98:14
emergency 43:7
59:2 120:15,21
121:3,5 126:21
126:23 136:11
136:13 141:5
150:19,25 151:4
151:21
employed 10:22
11:11 13:21,24
45:20 168:20
employees 177:4
employment
10:24
enclosure 85:9
174:25
enclosures 185:7
encounter 81:9
159:18 160:4
encountered
161:2
encounters 81:7
ended 104:19
135:17,24 136:9
energize 85:12
energized
136:24 137:24
energizes 137:19
energy 58:23
136:23,25 137:7
137:9,11,22
138:3,24 139:7

139:15 152:15
engage 87:7
88:14
engaging 88:19
engine 12:13
13:8 16:3 137:4
engine's 13:2
engineer 9:22
10:21 46:2
60:21 125:2
181:24
engineering 8:12
8:15,21 12:24
26:21,23,25 27:5
27:13 52:23,25
53:17,21,23 54:2
54:5,6,11,16
60:3 61:17
152:8 180:3
engineers 28:6,8
28:12,20 119:5
engines 9:25
english 96:11,15
98:11 100:9
102:6
enlarge 104:7
entered 14:7
entire 176:19
entirety 119:7
entrance 185:21
entry 102:18
equipment 10:25
11:6 23:9 24:2
26:13 28:2
45:22 46:2,10
47:22 59:2
100:21 175:9

ergonomics
50:25 51:4,23
52:10,13
errata 190:1
error 180:17,18
es 56:7
escapes 49:3
especially
117:24
esq 2:8,16,17,25
3:10
established
185:4
estimate 83:22
estimation
122:24
evaluate 46:2
72:24
evans 2:25 55:3
182:15,17 186:5
187:2 188:7
event 123:4
eventually 169:5
173:24
everybody 130:8
everyone's 54:24
evidence 17:2
67:13
exact 35:23
92:17,21 140:24
147:20 149:22
154:9
exactly 63:22
64:23 69:14
70:9,16 105:23
124:2 132:7,11
140:18 141:15
169:12 173:11

exam 27:10,16
examination 5:6
135:10 182:14
186:9 188:4
189:8,10
examined 5:4
example 171:2
exception 41:8
exclamation
100:3
exhibit 57:3,4
73:18 78:12
79:4,7 96:19,23
97:2,3,9,18
103:22,24 104:4
104:11 105:22
112:10,24 113:4
120:4 156:22,23
157:4 188:11,12
188:14,15,16
exhibits 188:18
existed 145:14
existing 149:16
149:23 181:10
exit 18:14
expect 161:11
expensive
141:16
experience 93:13
experienced
72:15
experiment
138:21
experimental
11:4
expert 1:20
18:25 19:6 21:9
21:25 22:5,6

30:19 31:2,7
37:7 51:15 57:4
59:17,18,19 61:4
61:4,11 64:16,19
65:2 70:11 77:2
92:9 93:5,15
95:17 99:8
106:6,11,21
118:2 121:16,17
124:25 125:4
135:6,8 153:16
188:11
**expert's** 95:25
**expertise** 99:19
151:17
**experts** 51:8,9
59:21,24
**expired** 28:15,16
**expires** 190:25
**explain** 74:15
**explosion** 31:20
31:23 32:14
**extent** 153:3
154:9,23 155:4,9
**exterior** 16:4
**extra** 117:2
**extricate** 74:21
**eyeballs** 87:7
**eyes** 86:19

**f**

**f** 60:7 189:2
**face** 84:2 142:15
149:25
**facility** 13:7
**facing** 142:16
143:19

**fact** 67:9 91:18
91:21 97:18
118:16 123:3
140:23 155:7
161:18
**factors** 50:25
51:4,9,15,23
52:3,10
**factual** 43:16,20
**failing** 131:23
132:15,23 134:3
**failure** 23:9 24:2
35:20
**failures** 43:10
**fair** 6:8,18 9:11
9:14,16 12:6
14:6 16:23
18:20 19:19
30:17 41:6,10
68:20,21 69:11
69:13,17 75:20
77:6 80:25 96:2
104:13 106:3
122:4 146:10
154:13 158:2
164:10
**fairly** 67:12
128:10
**familiar** 50:24
51:3,22 53:13
88:12 125:10
130:8 170:2
**familiarity** 88:2
**far** 19:5 41:22
53:24 106:15,23
**fashion** 89:22
**fast** 35:9 128:18
139:6

**father** 168:16
**fda** 50:4,10
170:8,19
**feasibility**
142:20 150:5
172:25
**feasible** 173:23
**feat** 178:19
**february** 58:19
112:9,14,19
113:17
**fed** 68:4 69:10
**federal** 39:10
**feed** 100:15
133:8 156:6
**feedback** 182:6
**feeling** 129:20
**feels** 128:14
**feet** 49:13
**fell** 35:15,18
**field** 19:10 26:25
31:2 98:19
141:22
**figure** 32:13
42:21 87:5
**file** 55:20
**files** 38:2 45:12
45:19
**filing** 4:6
**filled** 14:16
**filmed** 18:16
**finally** 169:7
**find** 21:14,19
24:14 31:21
36:19 38:2,10
49:7 167:24
178:10

**finding** 42:17
**fine** 135:15
**finger** 44:2,24
122:18,20
**fingering** 100:14
**fingers** 101:24
113:25 114:4,10
114:15,17 115:8
115:16 116:13
116:17 124:14
124:21 127:19
129:19,25 130:4
133:3 154:6
**finish** 6:5
**fire** 18:7 31:11
31:20 32:10
33:4
**firm** 5:16 8:23
10:10 36:20,22
60:22 63:10
**first** 5:2 6:21,21
11:23 14:24
26:10 29:14
37:21 41:8
54:22 62:7 67:4
74:6 75:2 87:4
87:14 88:20
89:22 90:16,20
91:16 93:6 98:6
101:8 115:5
117:20 130:23
135:16 159:18
177:8 184:18
**fishlinger** 2:19
60:24
**five** 17:10 30:9
55:2 127:7
161:5 162:13

166:15 182:12
**fixed** 183:2,5,13
  183:24 185:3,25
**flaherty** 2:19
  60:23 182:18
**flawed** 24:21
  52:23
**flesh** 54:7
**floor** 2:6 160:2,8
  160:10
**foldable** 43:24
**folded** 44:24
**foley** 1:21 5:1,2
  5:9 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1,6 56:1
  57:1,8 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1

81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1

163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1,16
183:1 184:1
185:1 186:1,6,25
187:1,11 188:3
189:7 190:4,21
**follow** 182:20
  186:8
**following** 58:6
**follows** 5:5
**food** 31:19 45:22
  46:3,10,22 47:22
  50:5,11 58:20
  170:20
**foot** 49:12,13
  125:19 145:19
  146:3
**footage** 58:12
**force** 4:16
**forearm** 154:8
**forget** 35:23
  131:13
**form** 4:11 51:20
  105:6 117:21
  148:4 155:14,15
  163:16 177:12
  177:14,17
**formal** 38:25
  50:21

**format** 149:10
**formed** 15:16
  16:8 24:24
**forth** 189:8
**forward** 77:25
**forwarded** 61:20
  61:24
**found** 62:10
**four** 11:13 13:11
  23:20 30:9
  107:23 138:17
  155:22 157:6
  158:5 161:3
**fraction** 140:2
**fractions** 128:21
  138:19
**free** 77:25
  147:13
**frequency**
  170:10
**friction** 24:18
  25:9 139:11,15
  165:18
**front** 34:22
  49:22,22 57:7
  142:12,13,15
  143:10,17 148:7
  149:24 152:6
  158:22
**full** 10:4,5,23
  56:8 74:9
  156:17 161:19
**fully** 106:12
**fumbling** 160:25
**function** 139:10
**fundamental**
  94:10 155:8

furnace 42:17,22
furniture 51:18
further 4:9,13
  40:21 125:25
  147:16 180:2
  189:12

**g**

g 57:3,4 73:18
  78:13 79:4,7
  107:16 120:5
  155:24 188:11
gas 8:25 12:23
  13:3
gates 49:22
gathered 34:2
general 54:2
  58:24 61:9
  104:21 180:22
generally 99:22
generated 20:20
  38:24 59:11
  61:16 62:12
  95:23 106:7
  121:17
generating 17:2
  58:6 59:8,10
gentleman 31:17
  35:17 42:12
  44:23 74:10
  91:7 168:15
george 60:5
getting 66:15
  114:19 119:19
  124:10 127:17
  169:7 177:13
giant 81:13

gil 2:8 177:16
give 6:5 20:4
  34:25 43:15,19
  49:9 53:19
  55:19 56:8
  59:25 88:7 89:8
  125:13 127:6
  140:24 174:17
  182:9
given 7:3,8 62:9
  70:15 164:9
  189:11
go 8:5 10:6 11:9
  11:10 14:21
  15:19 16:16
  20:7 23:13 25:4
  26:2 33:5 39:13
  55:22 60:25
  69:25 72:3 73:7
  76:12 78:10
  82:5,8 85:23
  89:10,21 96:19
  107:15 109:23
  112:3 113:4
  115:12 118:3
  119:24 120:10
  131:4 148:5
  155:21,23
  156:16 157:25
  161:5 162:24
  169:16 172:11
  173:3 178:13
  183:8 185:6
goes 19:6 25:11
  74:13 77:11
  81:6,10,22
  137:14 146:18

going 5:23 6:4
  7:22 10:14,14,15
  15:7 52:19
  57:12,14,18
  69:19,22 73:6
  75:22 76:12
  82:10 86:13
  95:4,16 96:20
  99:10 101:20
  102:20 103:24
  104:3 112:21
  113:7,9,13 117:6
  117:21 119:23
  124:2 135:4
  137:22 138:14
  139:2 140:21
  155:18 158:9,24
  158:25 163:9
  164:2 170:25
  171:21 173:9,11
  175:4,13
good 5:13,14
  24:19,21 70:14
  72:24 128:10
  182:16
google 179:23
gotten 167:21
grab 99:9
grabbed 151:7
graduate 9:22
granulate 116:8
  116:10
granulated
  117:6 118:12
great 17:11
  104:8
green 84:17
  85:20,21,23

97:22
grind 90:11
  163:2 168:21
grinder 36:3,15
  37:8 38:6,9 46:7
  46:17 49:18,24
  53:11 57:23
  66:9,14 68:2,8
  72:9 76:13
  78:22 90:3,8
  100:14 111:13
  111:15,21
  113:20 115:22
  116:17 117:9,19
  133:3,20 134:14
  134:16,24 135:2
  135:18,20,23,25
  136:10 142:4,6
  150:18,24
  151:22 153:23
  156:5,13 157:9
  157:11,12,18
  158:5,8,13
  159:11 160:7
  161:21 168:17
  168:21 169:6
  176:25 177:4,22
  179:17 180:8
  181:5,10
grinders 59:3
  153:25 154:17
  156:9
grinding 48:2
  118:7 164:20
  169:6
groton 5:11
ground 118:11
  136:5 159:9

168:18
**guard** 9:8 26:22
29:9 68:16
79:16,20,22
80:19,22 81:4
100:17 104:14
104:16 110:11
133:15 146:23
161:13,18,22
163:25 164:19
164:21 165:3,7
165:11,18,22,25
166:4 167:17
168:4,5,9,14,21
168:23 169:8,22
169:23 171:25
174:10,12
176:24 177:5,23
178:4 179:3,18
183:2,6,6,13,24
184:6,14,19
185:3,24,25
**guard's** 184:9
**guarding** 16:12
**guards** 185:8
**guess** 17:9
119:22
**guessing** 6:16
130:5
**guidebook** 58:25

**h**

**h** 56:16 60:7,7
72:15 91:10
188:9
**half** 85:7 122:21
122:21 139:20

**hamburger**
82:14
**hammer** 168:25
**hand** 66:13 69:9
69:19,22,25
74:18 75:2 76:9
77:9 79:13
80:13 86:7
90:12,13 99:20
100:10 101:14
101:19 102:23
104:15 108:16
108:22 109:4,20
111:15 114:6,10
114:11,25 115:7
115:23 116:3,4
117:9 118:8,11
118:24 122:6
123:21 124:3,15
124:17 127:19
127:21 129:19
129:22 130:16
130:23 134:16
135:17,22 136:5
136:9 139:23,25
143:7 144:15,16
144:21,23 145:3
145:6,8,11,12,16
145:18,23,24
146:2 147:5,12
147:13,22,24
148:16,19,23
151:7,14 152:18
153:14,24 154:6
157:24,24
158:21,23 159:3
159:6,20,25
160:3,10,11,15

160:23 167:12
183:8,12,25
185:5,19,20
186:2 189:18
**hand's** 130:2
140:6 149:6
**handed** 135:24
**handle** 43:25,25
44:4 156:6
158:4,13,14,15
158:18,23 159:4
159:8,16 160:4
161:2
**hands** 100:14,15
102:11 116:21
133:3,8 135:2
136:4 153:24
154:17 183:15
**handwritten**
167:9
**hang** 126:18
**happen** 93:21
121:7 123:5,10
**happened** 15:18
20:23 21:14
22:9 23:4 24:15
25:21 29:25
31:22,24 38:12
38:14 65:3 66:7
70:10,16 94:3
128:3,3,4
**happening**
128:11
**happens** 81:18
115:11 128:24
**hard** 88:21 95:2
**hardware** 51:21
52:15

**harm** 119:18
**hazard** 107:12
109:9 111:6,8,11
111:20 117:18
118:10 125:17
131:16,19,24
132:4,14,15,20
132:24 133:5,11
133:16,21,24
134:4,14,24
**hazardous** 58:23
108:12,18
**hazards** 132:19
**head** 12:25 68:8
77:22 78:2
100:15 120:15
120:20 133:3
143:10,20
146:14 149:5,12
149:13 156:5,13
157:9,11,12
158:5,8,13
170:22 174:24
**head's** 157:18
**headstock** 69:5
77:4,8,17,22,25
78:3 80:2,5,8,15
80:24 81:11
82:5 146:24
156:14,19
157:23 183:9,12
183:25 185:5,20
185:22 186:3
**headstock's**
184:3
**hear** 16:22
112:12

**heard** 51:25
  136:18
**hearing** 20:14
  29:23 33:14
  117:14 126:24
**hearsay** 154:20
**heart** 50:9
**heating** 41:14
  42:11
**held** 1:21
**help** 60:2 73:5
  95:4 119:12,18
  146:5
**helps** 95:7
**hereinbefore**
  189:8
**hereto** 4:6
**hereunto** 189:17
**high** 114:6,24
  139:13,16 159:8
  161:9
**highest** 109:24
**hira** 91:4,9
**history** 32:7
**hit** 121:6,8
  147:24 149:5
  152:21 159:16
  159:23 160:2
**hitting** 137:13
  137:18
**hobart** 47:8,8,24
**hold** 24:17
**holding** 21:15
**hole** 68:17 69:15
  69:16,20 70:10
  79:20 143:21,22
  143:23 144:2,17
  145:6,8,12 163:2

  166:9,12
**holes** 81:23,24
  82:7,9 166:5,7
  178:18
**home** 55:13,16
**honda** 43:22
**hopper** 49:15,21
**horizontal** 80:4
  84:11 157:15
**horizontally**
  161:14
**horsepower**
  85:17
**hose** 18:7 38:17
**host** 34:6
**hot** 128:17,20
  130:9
**hour** 8:2 162:8
  178:2
**house** 42:19
**housing** 181:10
**human** 50:25
  51:4,8,15,20,23
  52:3,9,14,16
  53:7 54:6 87:25
  119:20 153:17
**humans** 53:10
**hundred** 29:7,8
  93:7
**hundredth** 87:15

**i**

**i.e.** 120:25
**ice** 15:9,16 16:7
**idea** 70:14 72:24
  81:5 119:20
  121:6 142:21
  166:7

**ideal** 80:18
  107:5,9,11
**ideally** 22:17
  86:9,22
**identical** 44:23
**identification**
  57:5 97:5 104:6
  112:25 156:24
**identified** 61:5
  182:4
**identifies** 132:14
  132:19 133:4,10
  133:16,21,23
  134:2
**identify** 46:25
  47:5 131:19,23
  132:3 140:16
**imagination**
  124:5
**imagine** 128:9
  144:6 170:21,24
**imbedded** 73:23
**impact** 152:2
**impaired** 156:4
  157:8 158:11
**implement** 180:7
**implied** 178:2
**important** 22:5
  25:19 64:18,23
  95:15 109:17
**imported** 48:19
  49:5
**importer** 48:16
**imports** 47:13
**improperly**
  110:2
**improved**
  161:16

**inability** 183:24
**inch** 83:23 85:7
  85:10,10 88:22
  149:17
**inches** 146:4,4
  154:4
**incident** 15:17
  33:2 34:4 40:5
  64:21 66:23
  151:6 179:15
**inclined** 86:25
**including** 53:7
  53:10
**incorporate**
  181:8
**independent**
  184:17,21
**independently**
  32:20
**index** 55:11
**indicate** 58:9
  166:16
**indicated** 11:20
  14:24 55:6 67:8
  106:5
**indicates** 13:9
  14:19 29:3
  57:19 108:12
  121:19
**indicating**
  104:15 144:4
**indirectly** 178:4
**individual**
  135:11
**industrial** 38:5
**industries** 56:15
  56:16

industry 11:17
45:23 46:4,11,23
47:2,6 95:9
information
16:25 32:11
34:2 40:21
43:16,20 55:15
66:16 155:8
177:9
ingest 90:11
ingested 66:13
initial 7:8,10
58:13,15 66:21
66:24 130:15
initially 68:5
injured 32:21
35:12,16 39:25
49:25 116:3
139:24 140:8
injuries 18:9
152:9 154:10,14
155:12
injury 14:25
17:17 23:10
24:3 26:12,12
41:9 57:24
93:10 108:14
109:3,12,14
110:3,18 151:20
152:17 153:4,20
154:16,24 155:5
155:10 182:25
184:22
inquiry 71:20
inserted 79:19
inserting 161:12
inserts 90:12

inside 11:5 82:5
97:21 99:20
101:12 104:16
175:4,6
inspected 39:19
inspecting 163:7
inspection 58:17
58:18 121:13
138:15
instant 15:6
instantaneous
130:12
instantly 129:24
institute 28:6,12
99:3
instruction
40:25 100:22
instructive 67:15
insulated 167:17
intense 128:9,18
intent 81:2 102:9
102:10 119:11
intention 107:10
interact 53:8
interaction
51:17 52:14
119:20 153:17
interacts 51:20
52:16
interested
189:15
interfacing
119:21
interim 161:17
interior 16:3
interlock 16:14
40:9 43:3
161:20 166:17

167:18,20,24
169:11,13,14
171:13,18,22,25
172:8,10,20
173:10 174:9
175:13 176:8,17
176:18,19
180:12 181:4,9
186:12,14
interlocks
180:23
internal 18:8
interrogatories
58:16
interrogatory
14:13 23:8
interview 32:21
71:23
interviewing
45:16
interviews
135:10
introduce
177:11
introduction
57:16
investigate
35:19 57:23
investigating
33:4
investigations
32:11
involve 40:9,12
involved 11:16
12:5 15:6 22:7
38:15 43:23
46:17 52:24
53:2,4 59:15

64:21 106:2
171:17
involves 14:25
27:23 43:22
involving 5:21
41:8 179:16
iowa 3:9
island 43:14
isojon 1:6 5:21
190:2
issue 106:25
121:24
issues 17:23
181:15
items 59:5 61:2
62:3

j

j 56:10
jacobson 3:10
january 58:17
112:17
jersey 15:8
36:12 37:8,24
48:21 49:11
55:8 56:5
jet 17:16,25 18:6
18:11,12 19:5,11
19:12,13,13,14
23:5,14 26:12
job 9:15 10:2,3,6
10:18 12:18
13:19 125:8
joints 153:5
joseph 2:16 5:15
judge 30:24
34:22 93:19
177:17

**jump** 23:14,25
41:13 131:11
**jumping** 10:18
**jumps** 47:9
**juncture** 40:8
**june** 13:10,10
60:4
**justified** 107:14
173:18

**k**

**k** 56:16 91:10
**karzinka** 1:15
58:14 91:4,11
92:15 177:4
182:18
**keep** 5:23 100:14
133:2 134:15
135:2,22 136:4
155:14
**kg** 57:23 78:22
150:17
**khusen** 72:14
**khusenov** 1:6
5:22 58:3 74:7
110:10 115:6
127:19 145:2
190:2
**khusenov's**
179:15
**kilowatts** 138:25
139:3
**kind** 7:3 9:20
11:8 12:14
14:12 20:13
29:23 30:19
38:3 47:11
51:19 54:7,22

60:19 75:10
76:14 98:23
109:17 123:14
126:9 130:13
147:8 148:13
178:2,7
**kindly** 112:15
**kinds** 135:9
171:4
**kinetic** 137:11
**king** 2:14
**kingdom** 8:13
31:6,7 103:8
**kingfisher** 47:9
48:7,12,13
**kingsford** 10:7
**knew** 26:7 114:9
116:17 117:3,8
117:18 118:23
**knife** 81:21,22
**knob** 80:9 156:7
158:4,7
**knobs** 78:3
**know** 6:12 16:19
20:9 22:21 23:4
25:20 29:25
33:21 37:22
38:8 39:8,12
42:5 44:11 48:4
48:14,20,24 49:2
50:8,10 51:11
54:17 69:14
72:6 78:24 86:7
87:16 88:11,13
88:15 90:24
91:21 92:14,22
93:5 95:8,15
96:4,5,6,10,14

96:16 106:17
111:25 114:12
114:13 117:2
119:16 121:10
127:18 128:8,9
129:23 130:2
131:8,10 132:8,9
132:10 135:24
138:14 140:18
141:15 143:5,13
143:20,23
145:15,24 146:4
146:7 147:20
148:6,6,10,12,13
152:17 153:3,7
153:22,25 154:4
154:9,15 160:14
160:22 162:2,7
162:20 164:6
167:4 171:23
178:20 179:11
179:12,19
**knowing** 116:2
126:14
**knowledge** 26:18
29:13 31:3
33:10 50:4 77:2
163:8
**known** 156:14
179:16
**knows** 116:23
**kohler** 56:15,16
**kws** 48:17

**l**

**l** 4:2 37:20 56:11
56:16 97:2,3,10
188:12

**label** 82:24
84:20 88:21
104:5,22 131:15
131:19,22 132:2
132:16,18
133:20 141:10
143:14 188:14
**labels** 131:13
134:8 184:19
**laboratories**
60:4
**laboratory**
58:21
**lack** 40:13
151:16
**lady** 18:2 38:15
43:23 91:9
**laid** 98:24
**language** 96:6,7
**lapsed** 28:25
**large** 32:6 35:3
**larger** 48:22
49:10
**lasers** 11:6
**lathe** 122:13
**lathes** 88:6 142:3
**law** 2:4 5:16
57:20 60:22
63:9
**lawnmower** 43:9
43:23,24 44:3,15
44:18,21,24
**lawsuit** 46:18
**lawyers** 7:20
**learn** 71:6,12
**leave** 68:7 124:4
**leaving** 68:11

**left** 13:16 75:2
76:9 79:13
80:12,13 81:20
82:23 84:15
143:11,22 145:6
145:12,16,17,24
146:2,19 147:4
147:13,24
148:19 157:14
158:21 159:25
**level** 107:12
109:24 184:20
**license** 27:5,11
27:13 29:5,7,9
29:10
**licenses** 27:3
**lies** 176:21
**lift** 35:5
**lifting** 159:6
**limit** 140:25
**limited** 16:24
**lincoln** 12:21
**line** 84:11 103:2
113:14 115:5,13
115:20 116:11
119:9 190:4
**lined** 143:21
**list** 14:21 36:2
62:3
**listed** 17:15 59:6
**literally** 85:20
88:22 124:7,10
127:4
**literature** 162:7
162:9 177:21
**little** 9:19 10:8
15:3 42:9 43:15
118:14 125:24

171:14,23
**live** 27:20 34:16
34:17,21
**llp** 2:10
**load** 49:14
**loaded** 25:6
49:15
**located** 83:18
145:4 169:12
**location** 120:22
142:9 149:22
156:3 158:10
162:10
**lock** 58:23
**locking** 156:6,6
158:13,14,18
**locks** 77:21,22
**log** 15:11
**logs** 16:2
**london** 8:23 9:8
10:7,11
**long** 17:12 92:14
93:19 131:9
**longer** 28:13
93:25 123:20
**longest** 17:7
**look** 19:11 21:4
21:9 22:22
23:18 24:14
32:16,25 37:23
37:25 44:15
55:19 57:2 60:2
61:10 67:5,9
73:20 86:19,22
87:8,21 88:10
92:11,22 106:6,8
153:9 154:16
155:2 157:3

160:18 174:2
186:13
**looked** 19:11
25:25 33:3 39:4
44:18 60:9,13
77:13 92:2
121:16 125:4
154:11 165:14
**looking** 16:25,25
20:22 25:4,4,5,6
32:7,19,23 48:9
51:16 74:24
78:12,24 79:6
82:19 93:24
105:4,22 132:16
138:22 143:24
147:7 149:15
157:10 159:12
167:8
**looks** 75:12
102:20 105:19
132:18 147:9
158:15
**loose** 123:15
**loosen** 77:24
**lost** 96:21
**lot** 122:3 124:4
**lots** 12:8 163:19
**low** 139:15
**lucas** 8:21 9:18
9:20

**m**

**m** 37:20 56:10
56:11 91:10
103:22,24 104:4
188:14

**machine** 16:12
20:22 37:10
38:3,16,19 39:20
48:2,22,25 49:6
49:10 50:2 51:5
52:17,20 67:3,19
67:20,22 68:10
68:11 74:18
77:14 78:18,21
80:13 85:13
86:2,13 87:3,20
88:2,3,9,13 89:2
91:19 92:3,25
93:14,22 94:5,14
95:12 97:14
100:16 102:21
102:22 104:23
104:25 105:7,25
105:25 107:14
108:17 110:11
110:17 111:12
112:6 117:4
119:21 120:7,16
120:22 121:2,9
121:11 122:4,14
127:23 129:13
130:19 131:6
133:9 136:14,24
137:7,14,20,23
138:8,23 141:17
142:2,12,14
143:10,20
145:23 146:9,13
146:22 147:9,18
148:2,7 150:14
150:18 152:7,15
152:16,19 154:5
156:8,18 158:22

161:10 162:4,10
162:13,24
163:24 164:9,20
164:22 165:2,8
165:17,23
169:17,25 170:3
170:9,18 171:8
173:10 176:20
178:3,8 183:2,7
183:17,21,23
184:13 185:18
**machinery** 11:19
43:9 51:17,18
53:11 142:3
153:18
**machines** 50:6
50:11 53:8
58:21,25 88:5
95:6 119:8
142:4 150:10,11
**mails** 63:7
**main** 10:2
**maintain** 55:12
**maintenance**
32:5 100:23
**making** 25:11
122:23 172:6
**maldonado**
37:20 56:11
**malfunctioning**
31:11
**man** 35:16
**manager** 12:24
91:4,11
**mannequin**
18:15
**manner** 117:22

**manual** 58:12
77:14 90:2,7,17
90:21 91:15,18
92:2 100:22
120:7 178:12,25
**manuals** 32:8
34:5,6
**manufacture**
47:14,25
**manufacturer**
38:8 47:12
48:15,20,24
156:10 185:2
**manufacturers**
8:25 164:24
**manufactures**
45:21
**manufacturing**
10:13
**marine** 23:8,25
26:13 29:18
**marjorie** 56:10
56:11
**mark** 100:3
112:21
**marked** 57:3,5
96:24 97:4,10
104:5 112:16,25
156:24
**marriage** 189:14
**marshal** 32:10
**marshal's** 33:4
**martha's** 24:6
**mass** 137:9
**massachusetts**
41:18
**master** 29:4

**master's** 29:4,7
**matched** 15:11
**material** 56:14
**materials** 39:3
54:7 77:13
91:18
**math** 140:12
**matt** 3:10
**matter** 30:6,10
30:11 41:14
85:20 137:18
161:8 175:21
189:16
**max** 138:20
140:22
**mean** 15:25 28:7
66:18 74:8
118:4 125:7
127:14 129:25
137:14 138:17
139:14 144:3,10
185:10
**means** 29:8
132:3 133:4,10
133:16,23
**measured** 18:14
**measurements**
11:5 39:21
**measures** 168:22
**meat** 36:2 38:5,9
46:7,16 47:25
49:14,20 50:6
59:3 66:9 68:4
68:17,18 69:10
69:21,24,25 72:9
74:7,12 75:6,14
75:18,19 76:11
76:14,20 79:10

79:14,21 80:17
80:19,21,23 81:5
81:9,16 82:10,13
82:14,15 110:12
111:13,21
113:19 115:11
115:22,23 116:5
116:9,9,13,16,20
117:6,9,10,19
118:7 124:18,22
134:14,24
139:12 142:6
144:14,15,21
145:3,3,5,8
147:9,11 150:18
150:24 161:9,13
162:2,25 163:7
163:10,11 164:8
164:20 166:8,11
166:13 171:4
176:24 177:22
178:13,16
179:16 180:8
181:5,10 185:19
**meats** 170:13
171:9
**mechanical** 8:12
10:20 26:21,23
26:24 28:6,12
54:5 60:21 88:5
125:2 126:9
**mechanics** 8:15
**medical** 54:20
152:24 153:10
153:22 154:3,12
154:22
**meet** 178:11

meeting 63:3 110:13

member 28:5,14 28:14,19,23 54:18

mental 135:6

mentioned 80:9 161:3

met 69:16 71:9 71:14

metal 25:9 76:5 76:8 169:21

mg 38:10 49:2

middle 100:25 157:14

millimeters 149:19

milling 122:14

milliseconds 123:2

mills 88:6 142:4

minced 82:13,15

mind 126:10

mine 62:11

minute 55:2 121:15 168:18

minutes 63:2,14 169:7

mississippi 31:18 33:20

misuse 176:24

mixes 49:20

model 15:14 16:2

models 48:4

moines 3:9

moment 36:7 49:3,8 89:8

93:14 118:14 129:19 137:23 143:6,7 146:15 146:17 147:12 147:21 152:14 152:18 182:9

moments 8:5

money 7:4,12

months 11:25,25 64:2 70:20 92:16,18,19 94:7

motion 18:17 20:10

motor 58:20 85:17 136:15

motors 9:25

move 77:24 127:12 155:19 161:13

moved 25:8 35:8

moves 144:10

moving 24:7,9 35:7 43:24 56:23 100:13 122:7 123:6 127:4 132:12,21 139:6 144:3,4,22 145:5

multiple 25:6 62:16 171:8 174:20

multitude 25:3

muscle 126:10

mushroom 120:15,20 141:4 141:13,23 142:10 149:5,8 149:13 152:2,5

**n**

n 2:2 3:2 4:2 37:20 56:11 60:7 72:15 188:2

name 5:8,15 13:2 36:18 37:18,21 49:7 55:9,10 56:8,12 72:14 182:17 190:2,4

named 5:21 60:5 91:9

names 48:19 59:22,25,25

national 99:2

nature 87:25

near 69:16 99:10 102:11 185:21 186:3

necessarily 64:24 128:7 159:20

necessary 151:17

need 52:24 90:3 90:9 102:5 110:21 130:22 171:22 173:11 173:22 179:3 184:10 186:24

needs 85:17 120:16,21 136:14 161:16 161:19 162:11 162:16,17 170:9 174:10 187:3

never 30:18 33:13 88:3 150:2,5 178:21

new 1:3,24 2:7 2:15,24 5:3 9:8 12:23,25 13:3,4 13:7 14:2 15:8,8 27:8,9,17,22,24 27:24 28:3 36:12,20 37:8,24 48:21 49:11 55:7 56:5 137:22 189:5

news 179:24

nick 182:10

nightshift 38:16

nine 11:25

nope 51:13

nosirovich 72:14

notary 1:23 4:15 5:3 187:17 189:4 190:25

noted 187:5

notice 107:25

november 6:24

nozzle 18:15

number 55:11 55:24 56:3,6 92:17,21 120:2 120:10,12,14 121:25 140:22 166:5 178:24

numbered 78:25

numerous 34:4 65:20

| **o** | occurred 19:23 | 183:5 186:17 | operators |
|---|---|---|---|
| | 21:20,24 22:3 | once 30:7 32:16 | 180:24 |

**o**  4:2 37:20,20
  56:10,11,11,16
  72:15,15
**o'berg**  1:22
  189:4,22
**o'callahan**  2:19
  60:23
**o'connor**  2:10
  5:16
**oath**  22:8 34:19
  72:17
**object**  117:21,22
  135:5 155:13
  164:2 177:16
**objection**  104:18
  115:18 116:6,22
  117:12 135:13
  135:14 148:3
  163:16 177:7
**objections**  4:10
**observations**
  40:16
**observe**  128:2
**obstacles**  160:12
**obstructions**
  156:4,11 157:8
  158:6,12 159:23
**obtain**  72:24
  161:8
**obtaining**  182:6
**obviously**  21:25
  65:2 84:2
**occasions**  71:4
  110:13
**occur**  42:21
  65:22 155:11

**occurred**  19:23
  21:20,24 22:3
  32:14 65:20
  71:25 72:4,7
  73:3 92:15
  143:7
**occurring**
  124:16
**occurs**  146:16
**offer**  29:19
  89:15 95:17
  151:17 171:21
  171:23
**offered**  34:12
  47:20 151:25
**offhand**  17:6,7
  36:20 37:22
  39:12 48:5
**office**  2:4 9:23
  55:13,17 57:20
  63:5,18 64:5
  91:3,10
**ohio**  9:6
**oil**  12:10,17
  42:12,13
**okay**  6:2,14 8:7
  8:8 14:22,23
  22:7 28:13
  41:13 54:24
  55:3 57:17,23
  71:12 73:9,16
  82:3 85:11
  89:11 90:15
  101:2,3 105:18
  108:3 113:11
  120:6,10,14
  121:23 161:23
  165:7 176:22

183:5 186:17
**once**  30:7 32:16
  64:8 71:3 73:6
  75:17 85:19,21
  166:8 169:23
  184:8 185:12
**one's**  108:16
  183:7,24
**ones**  93:23
**ongoing**  36:7,9
  45:3
**open**  63:12
  104:19 132:20
  132:21 133:2,7
  133:13
**opened**  31:19
**opening**  69:10
  70:3,6 108:16
  110:12 183:8
  185:21
**operate**  53:11
  86:13 88:9
  100:17,21
  133:14,14
  148:23
**operated**  46:16
  58:20 87:15,16
  88:3,6 120:23
**operating**  86:11
  108:17 146:12
  183:17
**operation**  68:19
  121:12 148:16
  161:21
**operations**  81:3
**operator**  88:8
  92:2 142:16
  161:11 185:25

**operators**
  180:24
**opinion**  15:22
  17:5 24:24 32:3
  33:24 37:7
  64:17 77:3 89:2
  89:5 99:8
  106:11,21
  111:18 119:25
  120:11 123:10
  141:12 151:18
  151:25 162:23
  168:8 169:10
  171:22 173:19
  182:22
**opinions**  89:24
**opposed**  94:15
  104:20,24 107:3
  110:5 182:23
**opposite**  83:11
**option**  116:8
**orange**  98:14,18
  99:9 108:7
**order**  19:20 77:6
  77:12,16 79:21
  85:11 86:5,18
  87:5 99:9 100:6
  121:14 122:24
  123:2 146:5
  161:13 178:10
**original**  105:12
**orlando**  2:10
  5:17
**outcome**  94:16
  189:15
**outfit**  51:22
**outside**  67:25
  82:8 183:16

oven 31:20,23
ovens 32:7
overlaid 102:18
ovington 2:22
owner's 58:12

**p**

p 2:2,2 3:2,2 4:2
  60:7
p.c. 2:4
p.l.c. 3:5
p.m. 1:18 187:5
p.o. 2:13
page 14:18 57:11
  57:15,15,18 61:3
  62:4 73:8,11,12
  73:13,18,20
  74:24 75:22,23
  78:11,25 79:3,7
  89:10,12,12,18
  89:19 107:17,18
  107:22 113:5,13
  113:14,21,21
  115:3,3,12,13,20
  116:11 120:3,13
  155:25 156:21
  167:5 188:4,10
  190:4
pages 112:3
  113:7,9
paid 95:22
pain 128:8,15,18
  128:22,25
  129:20 130:11
  130:13
pan 156:19
paper 182:4

parameters
  21:23
pardon 9:12
part 9:9 10:3
  14:9 19:17
  46:20 52:4,9,11
  67:20,22 68:10
  80:2 101:19
  119:4 122:8
  135:17 148:19
  154:6 169:18
  176:18 184:12
part's 135:16
particular 11:19
  15:5 17:23
  18:22 19:9,25
  20:15,17 27:19
  29:19 34:8,25
  39:6 43:21
  46:21 48:25
  52:20 65:6 66:5
  76:4 85:12
  90:23 91:24
  92:24 93:14
  94:25 95:7
  96:17 98:2
  99:25 121:11
  127:18 130:14
  138:12 139:18
  143:2 154:24
  162:3 164:25
  165:6 174:8
  183:20 185:18
particularly
  10:12 92:12
  122:9,16
parties 4:6 21:2
  27:24 189:13

parts 100:13
  127:12 132:13
  132:21 148:22
  153:17 170:17
party 1:13,16
  2:11,21 3:7
  56:19 58:14
  182:19 187:2
passed 42:12
passenger 18:2
patent 181:17,21
  181:21
path 159:3,21
  160:14,22
pavlides 2:20
  60:24
pe 27:17 60:5
  106:7
pedal 125:20
peer 181:20,25
  182:6
people 51:17
  52:3 71:17
  93:22 107:13
  136:7 163:12
  184:4,17
percent 149:12
  149:19
perception
  125:11,14
  126:14,19
perform 180:14
  181:2,7,12
performance
  181:15
performed
  181:17

period 21:16
  124:2 152:22
  168:18
permanent
  167:18 168:5
  183:2,5 185:3
permanently
  165:22
person 32:21
  40:2 49:25
  52:18 64:20
  72:13 85:12
  102:19 135:7
  159:5
person's 22:7
personal 3:6
  23:9 24:2 30:10
  30:11
personnel
  100:20
persons 51:12
  64:20 71:7,13,20
  71:23 72:20,25
peter 2:17 73:17
  78:10 89:9
  96:18,22 104:8
  107:15 112:7,10
  112:11 120:5
  156:16 167:2
pfreundschuh
  106:7
ph.d. 8:14,20,24
  10:23 11:13,22
  26:20
phase 85:15,16
phone 63:8,18
phonetic 24:8

photo  75:2
photograph
  74:25 76:21
  78:16,19 79:6,9
  82:19 97:4
  104:5 156:17,24
  157:10,14
  188:12,14,16
photographed
  37:10 39:20
photographs
  32:10 34:3
  58:16,18 62:12
  67:2 72:8 73:10
  73:12,15,22
  153:13
phrase  151:23
physical  52:14
  128:25 154:10
  169:14
pick  37:17
picked  54:13
pictograph
  102:14,19
  103:14
pictographs
  101:5
picture  68:12
  76:4,16 81:20
  103:23 157:5
pictures  74:5
  153:24 154:17
piece  28:2 46:9
  67:13 117:10
pieces  75:14,17
  75:18
pilot  15:2,7 41:9

pinch  44:4
pipe  38:17,18
place  75:13
  119:5 152:11
  165:3,19 174:12
  183:13
placed  81:17
  90:4 149:21
placement
  106:16
placing  66:9
plaintiff  1:7,13
  2:5,12 3:7 5:21
  17:19,21 21:6,10
  32:24 36:14,16
  37:19 41:4,10,20
  42:3 44:9 56:9
  58:2 65:16 66:7
  68:12 70:15,23
  71:3,8,14 72:21
  74:7 76:16
  91:25 92:13
  95:10 96:6
  110:10 113:17
  117:17 129:6
  134:7 143:5
  152:3 155:3
plaintiff's  7:24
  36:17 55:9
  58:15 61:21,25
  62:2,16 63:17,25
  65:12 69:9,15
  70:22 72:19
  112:2 113:6
  117:16 123:6
  134:12,22
  139:23 151:7,20
  152:9,18 164:16

168:16
plan  131:4
plans  142:19
plastic  161:12
plate  80:12
pleading  55:18
please  6:12,20
  17:22 56:13
  58:8 73:18,19
  78:11 100:11
  112:7 114:22
  155:25 161:5
  167:3 186:21
plug  85:14,15,16
plugged  85:19
plunger  79:19
  79:24 80:22
  81:3 185:15,16
  185:17 186:2
pneumatic  11:6
point  6:10 16:6
  20:18,24 30:18
  38:21 40:16
  42:17 44:4
  65:13 70:19
  71:6 86:12 87:2
  89:22 90:16,20
  91:17 109:16
  112:2 129:12,23
  135:19 140:14
  148:10,15
  155:17,21 157:6
  158:5 161:3,5
  165:2,21 166:15
  172:4,6
points  119:25
pork  162:14
  171:2

port  2:15
portion  80:5
  97:23 107:21
  146:19 157:23
portray  172:17
pose  181:14
posed  90:3,8
  164:5
position  45:17
  72:10 86:11
  147:21 166:10
positioned  146:8
possess  54:20
possibility  172:7
  172:10 186:14
possible  15:16
  25:10 97:7
  151:9 178:7
possibly  101:24
  160:4
post  11:22 68:9
potential  131:16
  178:2 180:16
potentially
  117:4 160:13
pounds  162:8,14
  162:14,15
  177:25 178:16
power  76:22,25
  77:17,22 78:2
  85:15 100:18
  105:8 136:15
  139:2 143:10
  174:24
powered  152:15
practical  137:18
  161:8 174:6
  175:21

**practice** 27:21
**practiced** 88:2
**prakhin** 2:4
　57:20 63:9 64:8
**precautions**
　116:19 117:2
**precisely** 124:17
**preclude** 20:11
**predominantly**
　12:16 66:25
**preliminary**
　39:23
**prep** 75:10
**preparation**
　45:22 46:3,11,22
　47:22
**preparing** 58:10
　58:20
**present** 3:4
　72:16 73:2
　97:14 105:24
　108:17 185:9
**presented** 19:22
　111:12,20
　117:18 118:10
　134:14,24
**presents** 111:13
**press** 86:3,24
　151:11
**pressed** 151:6,14
**pressing** 85:20
　85:21 127:3
**pressure** 11:7
**pressures** 18:14
**pretty** 15:25
　18:7,18 78:8
　88:20 128:24
　130:2,12,13

**prevent** 151:5
　161:21
**prevented**
　166:21
**prevention**
　94:19
**price** 141:17
**primarily** 11:16
**primary** 96:7
**prior** 110:16
　117:19
**private** 13:17
**pro** 1:9 5:18
　48:12 57:23
　82:21 150:17
　175:7 179:16
**probably** 26:20
　49:12,13,18
　62:22 63:21
　66:19 68:8
　74:13 76:13
　85:7 87:20,25
　99:21 102:16
　121:13 123:19
　123:24 124:21
　128:19 129:24
　129:25 130:3
　149:12 162:19
　163:14 165:13
　165:18 170:22
　175:9 178:3,12
**probes** 11:7
**problem** 11:11
　44:5 163:25
　176:7,8,11,21
　177:13
**problems** 167:19

**proceed** 41:2
**proceeding**
　20:14 30:15
**process** 38:17
　44:2 50:6 66:10
　70:6 87:11,14
　126:2 128:22
　169:6 174:21
**processed** 162:3
　163:12 164:8
**processing** 50:11
　125:19 128:15
　129:21 161:9,25
　162:17 163:24
　164:7
**produce** 172:14
**product** 34:5
　50:18 58:11
　76:14 77:14
　100:15 133:8
**production**
　178:7,11 179:5
**products** 50:7
　76:11
**professional**
　27:4,12 28:10
　30:13,14
**professor** 13:25
**program** 14:2,5
**project** 12:24
**prokraft** 1:9,12
　5:18 47:3,11,13
　48:16 91:7
　179:16 190:2
**prokraft's** 47:2
**prominently**
　82:20

**proper** 100:22
　155:14 177:12
　177:14
**properly** 170:19
**property** 42:25
**proposal** 171:13
　171:18 186:11
**propose** 151:4
　152:6 181:4
**proposed** 172:21
　180:4 181:4,18
　181:23 182:4
　186:15
**proposition**
　180:23
**protect** 107:13
**protecting**
　184:17
**protrusion**
　159:24
**protrusions**
　156:5 157:9
　158:12
**provide** 45:15
**provided** 8:3
　18:11 32:12
　34:7 45:7 62:13
　156:9 181:23
**provides** 45:13
**proximity** 18:6
　69:9 97:15
　156:7
**psychological**
　52:18
**psychologist**
　135:8
**psychology** 52:9
　52:15,23,25 53:2

53:4 87:24
119:20
**public** 1:23 4:16
5:3 187:17
189:4 190:25
**published** 182:3
**pull** 112:8,13
122:7,11 128:18
130:15
**pulled** 35:9
38:19 118:5
122:20 123:8
124:10 127:21
127:23 128:14
129:19 154:5,7,7
**pumping** 139:12
**purchase** 92:4
177:22
**purchased** 91:20
**purpose** 21:10
21:12 131:14
172:16 173:17
176:16 177:24
182:5
**purposes** 140:17
**pursuant** 170:8
**push** 69:25
79:21 80:18,23
86:21 104:14,15
115:23 116:5,9
116:13 148:18
166:11 185:19
**pushed** 66:11
68:18 80:22
81:19 82:11
124:7 163:10
166:8

**pusher** 79:19
100:16 104:3
133:9 161:12
163:5,6 164:21
166:9,9,12
**pushes** 49:21
**pushing** 66:11
74:11 81:3
110:12 116:20
144:15,16 145:6
145:7 147:9,10
166:12 170:12
**put** 18:16 73:17
74:5 80:17 95:5
96:22 97:10
98:18 102:10,23
108:23,24 109:3
109:5,20 113:23
114:11 115:7
119:5,10 124:18
135:6 142:11
144:18 149:24
150:14 157:24
162:25 166:10
167:2 176:3
**puts** 108:16
**putting** 20:22
113:19 125:19
141:12 162:9
166:11
**pwc** 17:16
**pyramid** 94:20

**q**

**qualifications**
51:11
**qualified** 30:19
30:22 31:6

153:16
**quantity** 172:5
**question** 4:11
6:5,11 31:5
44:16 52:22
71:11 78:21
95:16 104:20
105:13 113:10
113:15,18 114:2
114:9,16,19,21
114:21 115:5,14
115:21 116:2,12
116:15,25 117:8
117:22 148:4,11
151:24 152:4
154:21 163:17
164:4,5 166:21
177:12 179:20
**questions** 5:20
117:15 155:16
177:15 182:20
**quick** 55:19
111:2 122:17
128:25 130:13
137:16,17
138:15,16
**quickly** 120:19
122:7,8,9,10,16
122:19 123:11
123:14 128:10
130:2 139:17
**quiet** 37:11,17
**quite** 17:12
98:21 178:19
**quotation**
133:13
**quote** 132:12,13
132:20,21,22,22

133:2,4,7,10,15
**quoted** 92:6
160:21 178:11

**r**

**r** 2:2 3:2 56:10
56:10,16 60:7
72:15 91:10,10
189:2
**radius** 139:8,10
139:11
**raise** 160:3
**raised** 84:25
85:3,8 160:8
**range** 25:10
31:11 42:20
**rate** 7:23,25
164:7 180:17,18
**rates** 161:9,25
163:24 179:5
**reach** 86:3,23
87:21 157:22
159:13,14
**reached** 129:16
**reaching** 32:2
74:20 127:3
159:17
**react** 126:13
127:12 128:4
129:2
**reaction** 125:11
125:14,22 126:7
126:10,15,20
127:2,3 130:12
130:15
**read** 44:25 89:22
95:21 96:14
100:11,21 113:7

119:16 120:11
120:18 129:8,15
134:8,17 140:21
146:7 155:24
158:9 161:6
164:15
**reading** 113:8
132:5
**reads** 113:14
**ready** 60:6
**realistic** 161:10
**realized** 178:3
**really** 93:9,11
114:13 147:22
**rear** 18:2
**reason** 27:19,22
94:21,22 95:5,8
109:6 119:3
138:12,24 175:2
190:4
**reasonable**
130:6 152:8
**reasons** 29:12
151:10
**recall** 22:14
33:18 55:8,9,10
**receipt** 7:10
**receive** 61:11,15
**received** 7:11,14
7:15 61:18 66:3
95:24
**recess** 55:4
111:3 182:13
**recognition**
161:17
**recognize** 30:25
**recommend**
141:11

**recommended**
141:4 173:2
**reconstruct**
19:21
**reconstruction**
18:21,25 19:17
20:21 50:22
70:13 125:15
130:7 142:25
**record** 5:8 6:7
23:2,3 58:9
78:23 105:2,21
155:25 186:21
186:22,23
189:10
**records** 32:5
92:6 152:25
153:10 154:3,12
154:22
**recreating** 20:23
**rectum** 18:9
**red** 84:24 85:2,5
85:8 86:4 97:15
97:19 102:25
141:9 147:25
158:16,19
159:19
**redd** 2:10,16 5:7
5:15,16 27:15
39:5 41:23
44:17 47:19
54:24 55:5
61:13 67:17
73:17 78:10
79:3,5 83:5 89:9
96:18 97:6,8
104:7,9 105:3
107:15 110:21

111:4,10 112:7
112:13,18 113:3
115:12,20
116:11 120:5
126:18 134:19
135:13 141:2
155:18,20
156:16 157:2
167:2,7 177:16
177:19 182:8,12
186:8,10,17
188:5
**referencing**
90:17 91:16
**referred** 111:6
111:11
**referring** 158:15
**regard** 179:22
**regarding** 5:20
55:16 151:18
**regular** 85:16
117:10 182:23
**reinforces**
118:17
**related** 26:19
189:13
**relates** 112:5
**relation** 72:9
143:14 145:13
147:4
**relative** 141:16
146:9
**relatively** 123:11
123:14 139:9
**relevant** 99:21
108:20 184:24
**relying** 24:18

**remember** 13:2
17:8 22:19
23:19 36:20
49:7 59:24
63:22 92:17,20
**removable** 168:4
**remove** 77:3,7,7
77:16 107:11
161:18 168:13
168:23 184:4
185:10
**removed** 100:17
101:24 133:15
156:10 166:2
168:9 169:24
170:18 174:11
175:12 177:24
179:3,6,9,17
184:9 185:8,24
**removing** 161:12
184:14,18
**render** 40:22
64:16
**rendered** 15:4
17:5 89:2
162:23 168:7
**rendering** 33:24
37:7
**rendition** 101:14
**repeat** 185:7
**rephrase** 6:13
28:9 61:13
**replaced** 90:9
**report** 15:24
17:2,5 18:18
20:20 23:16
32:25 33:2,4
37:15 38:25

40:22 57:2,5,7
57:11,15 58:6,10
59:7,9 60:3,4,9
60:12,18,19,20
60:21 61:3,12,15
61:24 62:4 67:8
73:7,8,23 74:5
78:11 95:19,23
95:25 106:6,8,10
107:16 118:5
120:3,12 121:16
129:14,15
149:10,18
155:23 156:2
167:5 168:11
172:16,22 173:5
173:17,19
174:17 176:16
188:11
**reporter** 1:23
22:25 60:6 90:5
110:23,25
120:17 134:19
184:7 186:20
**reporting** 190:1
**reports** 40:5
59:13,17,18,19
61:4,5 62:6
**represent** 5:17
78:20 182:18
**representative**
22:16
**request** 37:14
**requested** 45:8
**require** 148:23
173:4
**required** 161:22
175:20

**requirements**
58:24 170:8
**requires** 99:4
150:18
**research** 10:24
11:12 179:21
186:13
**reserved** 4:12
**residential** 41:14
**respect** 180:3
182:21
**respective** 4:6
**respond** 125:23
140:22
**response** 14:13
14:18 23:8
58:15 77:15
78:14
**responses** 5:24
5:25
**restraining**
24:19
**restraint** 140:25
**restroom** 111:2
**result** 108:14
109:2,10,12,13
110:2,17
**resulting** 89:24
**resume** 23:19
**retained** 6:22
7:3 14:20 17:19
20:18,19 26:18
29:14 31:12,21
33:22 35:14,19
35:21 36:14,23
36:25 37:2,4,5
37:13,15 40:18
41:4,10,19 42:24

45:12,17,25 55:7
57:19,22 60:22
62:7 188:18
**retainer** 7:4,8
**returned** 12:21
**review** 20:25
25:16 46:20
59:7 64:19 65:9
89:16,25 141:19
152:24 181:20
181:22,25 182:6
**reviewed** 32:2
44:12 45:5 58:7
58:10 60:18
61:6 62:5 92:2
**revolutions**
121:14,20 139:4
139:5
**rhode** 43:14
**ribs** 76:13
**right** 10:5 25:21
34:23 36:9
55:13 56:22,23
62:6 67:5,10
68:4 69:23
73:11 77:8
81:19 82:16,21
83:12,16 84:3,19
85:23 86:7,8,15
86:20,21 87:8
88:4,17 89:6,19
90:21 97:19,24
98:10 99:6,15
100:10 102:3,11
102:12,25 103:9
103:11 106:15
107:4 108:5,8,24
109:10,24 110:3

113:12 124:19
126:2 127:5
130:16,20,24,25
131:2,6,9 133:11
134:9 137:10
138:3 140:8,18
141:5 142:7,20
143:22,25
144:14,21,23
145:3,4,11,17,23
147:12,16,17,22
158:16,19,24
159:10 160:19
163:15 166:5,18
167:10,25 169:3
169:8 171:4,10
171:13,14
172:21 173:2,7
173:13,23
174:12,14,15
178:15,23 180:2
182:11
**rigidly** 165:15
165:16
**ring** 157:16
**risk** 111:14
181:15
**road** 5:11 140:14
**robert** 60:17
**role** 12:15 30:14
**rolls** 8:25 11:21
11:24 12:3,5
13:13,17
**room** 16:3 68:7
71:8,13,17,24
72:7,11 73:2
**rotated** 18:4
145:25 147:8

rotating 11:19
18:17 81:20
121:20 124:13
124:14 137:10
142:3,4 147:10
rotational 10:24
royce 9:2 11:21
11:24 12:3,5
13:13,17
rpms 121:14
run 127:24
running 13:7
139:2
russian 96:8,9
102:6

**s**

s 2:2 3:2 4:2,2
60:7 72:15
188:9
safety 50:5 68:16
100:17 131:15
131:19,22 132:2
133:14,20 134:8
169:8 183:6,13
sailboat 24:7
sale 59:4
sales 58:11
saw 59:14 95:11
105:6 123:3
165:18
saying 118:25
141:8 160:6
163:18 176:10
says 17:16 28:11
28:18 29:4
31:10 33:16
36:2 58:5 92:6

107:22 109:8,25
129:15 131:25
132:6 158:10,10
178:14
scenario 127:14
scene 26:7 33:5
39:13,16 42:6
schematics
172:19
science 8:11
screen 74:17
96:21 97:11
123:7
screw 81:13
90:11 101:15
121:2 122:12
123:23 124:6,12
sealing 4:7
search 179:24
181:18,21
seat 18:3
second 55:20
102:13 121:21
122:20,21,21,24
123:2 126:18
128:21 131:11
135:17 138:19
138:20 139:5,6
139:20,20 140:2
140:10 165:17
184:19
secondhand
177:8
seconds 74:14
123:18,21,24,25
127:8 128:5,12
138:17,18,18
139:21 155:10

secretary 63:7
section 35:6
79:25 81:6,10,17
100:9 106:13,22
107:22 131:18
see 21:13 23:11
26:2 28:21
43:11 49:2 65:3
66:25 67:19,20
67:21,23 68:3,6
68:8,11,23 69:2
69:5,9,19,20,21
69:23,24 70:3,5
70:9 71:16 72:8
74:8,9,10,19
75:4,23 76:5,6
76:15,20 78:16
80:8 82:20,23
86:6,6,10 88:21
88:22 89:12
97:9,19,22 100:3
103:15,19
104:21 106:10
107:18 118:18
121:22 123:4,5,5
125:17,25 138:9
141:10 145:16
145:22 146:2,11
146:14,19,22,23
146:24 147:3
153:12 154:22
157:13 175:7
178:14 180:2
seeing 22:20
67:3 87:17
115:10 117:5
121:12 125:18
125:21 151:10

seen 14:14 40:4
54:4 59:12,16
73:11 95:21
111:25 113:6
153:24 154:3,17
160:20 164:19
178:18
segments 118:5
134:12,22
sell 47:25
send 14:12 45:18
65:19
sensation 128:20
sense 106:14
118:22 126:13
126:22,25
sensing 127:11
sensitive 175:2
sensors 11:7
sent 14:15,16
65:21,23
separate 169:2
september
189:18
seriatim 89:21
series 5:19 18:12
81:23
serious 17:16
18:8 108:14
109:3,12,13
110:3,18 152:13
182:25
seriously 35:16
server 169:16
service 16:24
services 7:5,24
15:4 47:21

| | | | |
|---|---|---|---|
| servicing 100:19 | shows 96:19 | silver 158:7 | sliced 81:21 |
| set 14:4 21:22 | 156:17 | similar 53:25 | 124:7 |
| 189:8,18 | shut 131:5 | 105:19 122:2 | slightly 77:25 |
| settle 33:11 | 136:15 | 124:21 150:10 | 85:5,8 |
| settled 16:22 | shutoffs 43:7 | simulated 163:8 | slipped 15:8 |
| 23:6 30:3 | sic 124:20 | sir 5:13 7:7,18 | 24:11,20 |
| seven 73:12 | side 69:24 70:2 | 8:3,18 14:14 | slow 18:17 |
| 75:23 | 76:9 78:7 79:13 | 17:22 21:8 23:4 | slowly 113:24 |
| severed 44:2 | 80:13 83:11 | 30:4 35:21 | small 88:5 139:9 |
| severity 153:4 | 84:5,6 94:14 | 45:20 46:6,25 | 152:20 183:15 |
| 154:23 155:4,9 | 98:10 100:10 | 52:21 53:13 | smelling 126:23 |
| shape 105:5 | 120:25 144:21 | 54:20 68:14 | snap 137:15 |
| sheet 190:1 | 145:4,7 147:25 | 69:11 73:6 74:4 | societies 28:11 |
| ship 14:25 15:7 | 156:18 157:19 | 89:12 110:8 | society 28:8,19 |
| 15:11,13 16:4 | siemens 9:2 | 130:7 170:7 | 51:24 52:4 |
| 26:11 | sign 100:2 | sit 27:2 129:18 | 54:16 |
| ship's 15:14 16:2 | 102:18 103:3 | site 37:9 | somebody 87:3 |
| 35:5 | 106:16 107:13 | situation 108:13 | 151:10,10 |
| shipyard 35:4 | 108:20 109:2,7 | 108:18 128:23 | 167:23 |
| shop 46:14 | 111:23,24 | situations 99:5 | somebody's 99:9 |
| 162:12 163:13 | 184:11,13,24 | six 11:25,25 | someone's 100:7 |
| 164:13 | signal 89:25 90:6 | 17:13 62:22 | son 53:22 |
| short 110:21 | 90:10 | 63:24 73:8,14,18 | sorry 11:9 13:23 |
| shorthand 1:22 | signature 189:21 | 89:16 92:18,19 | 19:3,13 23:17 |
| shortly 65:22 | signed 4:15,17 | 94:6 119:25 | 43:18 48:12 |
| shot 146:18 | 187:13 | size 82:4,7,9 | 59:14 66:2 |
| shoving 66:10 | significance | 98:25 106:18 | 73:13,16 82:2 |
| 69:20 | 99:18 | 149:11 178:18 | 90:6 91:6 96:9 |
| show 16:6 68:15 | significant 92:8 | sizes 106:15 | 120:19 150:21 |
| 68:16 74:6 | 92:10 93:4,16 | sketch 166:25 | 151:23 158:3 |
| 171:16 173:18 | 98:17 99:25 | 175:20 179:25 | 162:21 180:18 |
| showed 15:15 | signing 68:24 | sketches 150:3 | 185:6 |
| 176:17 | signs 16:10 90:3 | ski 17:16,25 | sort 80:12 149:2 |
| showing 150:3 | 90:9 94:22,23 | 18:11,13 19:5,11 | 166:17,23 |
| 154:22 | 98:21,23,25 | 19:12,13,14,14 | sorts 18:23 |
| shown 84:16 | 107:10 111:7 | 23:5,14 26:12 | source 66:19 |
| 104:22,24 | 118:21 120:9 | sleeve 66:12 | 160:25 |
| 149:17 | 185:9 | | |

space   51:19 72:4
  160:12
spanish   98:6
  102:6
speak   26:4,6
  64:5 96:10
  129:6
special   85:18
specialties   54:3
  54:6
specialty   118:2
specific   9:19
  10:9,19 15:4
  42:10 52:2 54:9
  61:10 127:15
  148:15 150:9
  153:5
specifically   21:4
  31:25 50:8,12
  51:5 55:17
  56:25 57:14
  61:8 73:7 74:25
  105:7 113:5
  142:5 146:8
  163:4 172:19
specificity
  140:16
speculating   6:17
  148:14 155:9
  176:14
speed   114:6,24
  121:10 122:12
spend   8:5
spinning   140:6
spirit   111:22
spoke   63:19 64:7
spoken   39:25
  40:18

spot   165:13,19
staff   14:4
stages   94:18
stainless   165:10
standard   58:21
  98:20,22 99:2,3
  99:4 120:15,21
  141:6 150:17
standards   50:5
  50:10 62:11
  170:20
standing   86:10
  143:6,14,16,19
  146:12 158:22
  159:11
star   24:8
start   8:9 55:25
  56:2 84:18
  85:23 86:14
  87:6 88:14,19
  90:15 144:18
  161:24
started   9:4 14:2
starter   9:25
starting   9:18
  37:16
state   1:23 5:3,8
  9:5,6 27:5,6
  39:11 90:2,7
  100:12 108:11
  135:6 152:7
  189:5
statement   9:11
  12:7 41:11
  68:20,21 69:11
  69:13,17 75:20
  80:25 96:2
  106:3 146:10

154:13 158:2
  164:10
statements   164:3
states   1:2 28:11
  30:5,20 56:4
  103:6
stations   16:5
steel   79:25
  165:10
steps   50:9
stick   85:6 104:14
  104:15
sticker   83:3,7,19
  94:13 95:11,12
  96:20,23 97:2,4
  97:13 98:3
  99:11 105:4,6,10
  105:14,15,24
  106:12,21 107:6
  108:5 112:6
  118:13,13,25
  119:4,14 188:13
stickers   95:6,6
  118:16,21
  119:10
sticking   157:16
stills   73:25
stipulated   4:4,9
  4:13
stocks   10:14
stomper   100:16
  133:9
stop   59:2 74:22
  84:23 85:25
  86:15 87:6
  88:14,19,22
  97:15 120:15,21
  121:3,4,5 136:12

136:13 137:5,6
  137:13 139:16
  141:5,6,13
  142:10 145:19
  150:19,25 151:4
  151:21 152:20
  152:21 156:3,8
  157:7,19,20,25
  158:11 159:5,19
  161:2,19 184:22
stops   121:9
store   164:8
stored   136:22,25
  137:9 138:3,24
  139:7,15
stories   179:24
stove   128:17,21
  130:9
street   2:6,14 3:8
stretching   176:2
strike   27:15 39:5
  41:23 44:17
  47:19 61:14
  67:17 83:5
  111:10 143:4
stuck   77:10
  122:6
studies   150:6,9
  176:13
study   50:24
  53:16
stuff   25:11 34:6
  76:12 95:3
  114:7 183:15
style   152:5
sub   157:6
subject   20:10
  95:12 106:2

133:20 164:22
165:23 181:19
**submerged**
174:13,19
175:16
**subscribed**
187:13
**substantial** 18:7
**subtle** 109:18
**succeeded** 169:7
**sudden** 74:16
**suffered** 18:8
38:19
**sufficient** 172:3
173:5 183:20
**suggesting**
148:25 177:23
**suite** 2:23 3:8
**sum** 7:4
**sums** 7:11
**superfast** 122:13
**supply** 85:18
**suppose** 19:6
30:23 124:21
**supposed** 42:14
121:7
**sure** 19:4,5
22:15 36:5
38:11 47:14
78:6,8 82:6
132:6 159:12
178:20 183:14
**surface** 85:4,5,7
160:8
**surprise** 91:23
94:4 170:7,11
**surprised** 92:11

**surrounding**
171:24
**suspended** 35:8
**sussex** 8:13
**sustained** 58:2
93:11 154:10
155:12
**switch** 74:21
86:16,17 87:22
129:16 142:23
169:16
**switched** 9:3
**switching** 137:4
**sworn** 4:15,17
5:2 22:6 29:19
34:12,20 65:15
70:15 72:25
110:9 117:16,17
119:14 189:9
**symbol** 99:20
**symbols** 16:10
**system** 41:14
119:4 126:12
136:24 161:16
167:18 176:19
**systems** 12:6,10
12:11,17,17 13:5
13:6

**t**

**t** 4:2,2 77:20,20
158:7 188:9
189:2,2
**table** 75:3,10
160:7
**take** 5:24 27:11
27:16,22 54:25
55:19 73:19

106:25 113:24
114:3,14,17
121:24 157:3
159:2 170:21
173:15 182:12
**taken** 1:21 52:6
55:4 68:7 74:2
75:25 111:3
132:17 147:24
168:23 182:13
**takes** 125:22
152:20,21 159:3
159:22
**talk** 67:4 101:7
111:5 131:12
156:12 160:17
163:20 164:12
172:11 177:17
185:14
**talked** 29:15
64:9 97:16
111:8 141:23
152:11 163:14
**talking** 30:12
38:4 59:19,20
65:12 101:21
105:16,16
127:10,16 158:3
158:7 163:22
172:9 173:20
**tall** 49:12
**tammy** 1:22
189:4,22
**taught** 54:12
**teach** 52:23,25
52:25
**teaching** 26:24

**technical** 144:24
**technology** 14:3
**tell** 6:20 7:7
17:22 21:8
31:15,25 33:25
36:13 37:6,18
38:12 68:14
71:2 74:4 90:19
96:24 112:15
116:19 118:25
145:10 175:11
**telling** 8:10
102:8
**temperature**
16:4,5,7 42:19
42:20
**tempest** 13:3,3
**ten** 49:12
**term** 51:3
136:18
**terms** 91:15
92:13 98:2
139:19 142:9,24
153:20 162:10
162:12 163:11
170:3,17 171:12
172:19 186:11
**test** 13:7 18:15
138:9,11,13
**tested** 178:21
**testified** 5:4 22:8
30:4 61:2 72:17
73:3 91:5 134:6
134:11,21 135:7
**testify** 20:13
30:14 31:7 33:8
34:9 136:2
153:16

testifying 34:22
70:21 118:2
testimony 7:19
20:11 22:7
29:20 34:12,20
65:16 70:12,16
72:25 95:17
110:9 112:5
117:16 119:14
134:13,23
135:12 140:20
144:13,20 145:2
160:24 189:11
testing 22:18
141:23
tests 18:12
180:15 181:3,8
181:13
text 74:15
textbooks 61:9
texts 106:14
thank 56:22
110:20 186:7,17
theoretically
171:6
thereof 40:13
thermal 15:14
16:2 42:18,25
thing 11:8 44:24
51:19 54:8,23
94:19 98:24
128:11 152:23
154:19 159:18
169:3 184:19
things 9:20 12:9
12:12 21:17
25:3 30:12 45:9
45:18 59:8 61:7

61:9 88:6 94:21
118:17 119:4
139:14 163:19
175:16 182:9
think 17:14
26:22 28:17
29:16 31:14
35:24 36:21
47:8,10 48:7,7
48:11,17 49:4
52:22 54:17
60:22 64:9,22
68:6 81:2 82:8
82:17 87:19
89:5,15 92:16,19
93:17 94:2
95:14,22 99:24
101:19 103:22
104:2 105:9,12
107:16 108:21
109:6 112:18
119:14,17 120:2
120:3 122:16
125:16 128:7,12
128:25 135:21
144:2 149:16
152:20 155:18
155:22,24 163:8
165:12 166:16
166:24 172:3,5
184:2 186:5
third 1:13,16
2:11,21 3:7
56:19 58:14
98:9 100:10
103:13 107:12
182:19 184:20
187:2

thomas 2:25
thought 130:23
thoughts 112:4
119:17
thousand 93:7
122:25,25
thousands 119:7
thread 77:20
threaded 77:20
three 14:18
26:10,19 29:14
31:14 57:11,15
57:18 61:3 62:4
73:10,14 74:5
85:15,16,17
87:15 94:6
98:23 105:17,23
115:13 120:2,11
120:12,14
121:20 122:2
123:21 127:7
138:17,25 139:3
139:4,5,14
140:10
throat 80:24
166:13
thunderbird
48:13,14
tighten 123:16
time 4:12 6:10
7:2 10:3,4,5,23
15:13,17 17:12
19:22 20:19,19
20:20,24 25:8
30:18 38:21
62:8 65:13
69:16 70:19,20
70:21 71:7,8,14

71:17,24 73:2
87:4,14,16 88:8
88:20 92:3 93:6
93:6 112:3
115:21 124:8
125:11,14,18,22
125:22 126:20
128:2,16 129:23
130:13 136:19
136:21 137:5
138:9,13 139:19
139:22 140:5,17
140:22,24,24
152:18,19,20,22
165:2,21 173:15
186:18 187:5
times 92:24 93:2
93:7,7,20 94:6
110:16,16 171:8
174:20
tips 129:24
130:3
titled 57:15
today 5:20 7:19
27:2 34:19
48:10 57:3
63:13 70:21
112:16 129:18
today's 103:24
186:25
told 41:7 64:17
154:14,19 155:3
tom 182:17
ton 29:4,7
tons 29:9 35:6
top 35:18 49:15
73:15 79:9
101:8 102:18

107:21 113:21
115:4,13 166:4
**toppled** 35:11
**total** 62:22 63:23
89:15
**touch** 128:17
148:11 158:23
**touching** 128:20
130:9
**tow** 24:8
**track** 15:11
**trailer** 24:8,9,12
24:16,20 25:24
26:3
**training** 10:17
52:2 54:10,21
**transcript** 21:5,9
32:24 92:23
112:2,4,8,14,25
113:5,7,9 129:8
146:7 155:3
160:18,21
164:16 186:24
187:4 188:15
189:9
**transcripts** 21:2
22:12,22 25:14
26:5 32:17,20
44:13 45:5,6
64:20 117:23
**transfer** 75:18
**transient** 41:15
**transit** 160:11
**transmission**
136:16
**transpired** 69:14
**transportation**
56:14

**trapped** 120:25
**travel** 159:21
**tray** 66:10 67:24
67:24 68:17
69:21,24 70:2
72:10 74:9,12
75:19 76:5,8,10
76:20,24 77:4,7
77:11,16 79:10
79:14,15 80:17
142:17 143:12
143:17 144:6,10
144:14,16,22
145:5,7 156:6
157:15 159:15
159:18 161:14
162:25 165:11
167:17 170:23
174:11,12,23
175:3,5,8,12,20
175:22 176:6
**treat** 117:9
**tremendously**
141:16
**trial** 4:12 16:20
20:7
**triangle** 99:15
99:17 100:4
101:10,12,18
108:8
**triangles** 99:23
**tribunal** 31:8
**tried** 32:13
113:23 117:7
168:24 178:22
179:11
**trips** 62:12

**trivial** 119:6
**true** 135:17
189:10
**try** 6:12 27:14
74:22 114:14,16
119:5 130:15
131:5 168:2,23
169:3
**trying** 47:7
48:11 63:20
74:21 86:20
93:16 102:24
107:12 112:13
113:24 114:3
172:4,8,17
**tub** 175:24
**tube** 66:11 67:25
68:3 69:22
**turbine** 8:25
12:23 13:3
**turbines** 11:2
12:10
**turn** 77:23
129:12,16
**turned** 137:24
139:24
**turning** 123:23
138:6 139:4
**turns** 24:15
81:14,16
**twice** 64:8
**twin** 49:16,16
**two** 12:22 13:16
33:23 35:3
44:21 49:22
59:12,16,23 61:4
71:3 74:19
82:18 83:15,24

84:5,8,14 86:19
87:8 94:6 98:3,3
120:8 122:25,25
123:18 138:18
139:20 154:4
160:12 165:9
168:18 169:2
184:16
**type** 46:17 50:18
120:15,20 142:2
**types** 14:19
171:9

**u**

**u** 4:2 60:7,7
**u.s.** 9:7 29:9
**uk** 28:12,15
**ukrainian** 96:9
102:7
**ul** 58:19 161:19
**undergo** 52:3
**underneath**
101:20 105:10
157:15 159:14
175:7
**underpinnings**
43:17
**understand** 6:11
7:21 21:23
34:19 86:14
102:5,7 155:16
164:4 165:4
173:11
**understanding**
38:13 52:13
66:6,8 75:9
80:16 92:20
96:13 100:6

129:11,13 134:7
143:3 153:8
163:23 165:21
165:24 168:12
170:16 172:25
174:18
**understood** 6:9
115:6,15 117:13
134:13,23
**undertaking**
10:23 11:13
**underwriters**
58:21
**unequivocally**
136:3
**unfortunately**
67:16 79:17
**unguarded**
111:15 122:5
**uniondale** 2:24
**unit** 76:25 77:17
**united** 1:2 8:13
30:5,20 31:5,7
56:4 103:5,8
**universal** 103:2
**university** 8:13
8:16 9:5,6,6
10:19 13:20
**unqualified**
100:20
**untrained**
100:20
**upgraded** 29:6
**upper** 75:2
107:21 140:25
**upwards** 160:3
**urreta** 2:17
89:11 96:25

103:21 112:12
112:17,21
156:22 167:4
**uscg** 29:4
**use** 51:6 81:2
87:19 99:9,23
100:15,16,22
110:2 115:22
116:16 118:20
130:10 133:8,9
135:12 149:7
150:19 162:12
168:24 169:5
170:3 171:3
185:25
**useful** 22:17
70:18
**user** 32:8 34:5
90:12
**user's** 90:12
120:24
**users** 161:18
181:5
**usually** 45:12,15
65:21 150:13
**utilize** 52:19
**utilized** 19:17
50:14 92:24
185:17
**uzbekistani**
102:7

**v**

**v** 72:15 190:2
**varies** 126:22
**various** 59:3
**vary** 105:5

**vector** 159:2,22
**venue** 30:25
33:18 37:24
55:11,25 56:2
**venued** 36:11
41:16 43:13
**verbal** 5:24
**veritext** 190:1
**versus** 82:15
**vertical** 79:25
81:6,10,17
166:10
**vertically** 161:15
**vibration** 11:7
**video** 34:4 58:12
65:7,9 66:17,18
66:20 67:2,4,5,9
67:12,18,23 68:6
68:15,24 69:8
70:5 71:16 74:2
74:10 76:2
123:3,12 143:9
143:24 145:17
145:22 146:3,11
146:25 147:7
**view** 156:18
157:21
**viewing** 123:11
**vineyard** 24:6
**virtually** 34:15
**visible** 143:17
**vision** 178:17
**visit** 37:9
**visual** 104:10
126:23
**visualize** 153:23
**visually** 118:18

**vitae** 8:4
**volt** 85:18

**w**

**wait** 138:2
**waiting** 40:22,24
**waived** 4:8
**walk** 79:8
**walked** 39:20
**walnut** 3:8
**want** 6:16,17 8:5
38:11 52:12
55:23 56:25,25
86:16 96:19
110:8 111:5
112:3 116:25
119:24 131:11
135:11 136:7,9
144:12,17,19,25
145:10 177:11
178:12 184:5
**wanted** 14:21
37:15 82:14
88:8 136:4
160:2
**wants** 85:25
167:23
**warned** 184:14
**warning** 16:10
50:17 83:7,19
84:20 88:21
89:25 90:3,6,8
94:11,15,22 95:5
95:11 96:20,23
96:25 97:4,13
98:13,18,25
99:14,21 100:2,4
102:2 105:17,23

106:12,16 107:3
107:7,10,23,24
108:3,10,12,25
109:8 111:22,24
112:6 118:13,21
120:8 131:12
141:10 143:14
182:23,24
183:19,22
184:12 185:9
188:12
**warnings** 40:12
43:5 68:24
82:24 98:4,10
100:12 109:17
111:7 182:21
**wash** 170:23
**washed** 176:9
**washington** 9:5
27:7
**water** 18:5,13
26:16,16,19
38:17 174:13,20
175:23,25
**way** 24:19 34:18
52:16 65:14
70:22 86:25
96:4,5 98:17
105:5 114:19
160:13 167:25
189:15
**ways** 169:2
**we've** 26:11,12
26:12 57:3
110:9 137:8
144:19,25
175:22,22 185:4

**weather** 15:12
16:5
**week** 61:19
64:10 94:6
**weeks** 63:21
**weight** 25:5
**welded** 165:13
165:19
**went** 11:24
13:18 15:13
16:19 19:10
25:23,24 31:18
32:4,8 37:10
39:16 42:17,22
74:18 135:19
**wet** 21:20
**whereof** 189:17
**whilst** 10:22
11:12
**white** 75:3 79:17
79:17 84:17
**whitefield** 3:5
**wire** 174:23
175:13,17 176:2
**wired** 174:10
**wires** 169:19
175:15
**wiring** 169:15
171:16 181:9
**wish** 41:2
**witness** 1:20
120:18 156:21
167:6 182:10
188:3 189:7,11
189:17
**witnesses** 25:20
40:19

**word** 94:10
98:13 99:13
107:6,7 110:5
111:18
**wording** 167:14
**words** 89:25
90:6,10 99:6
132:11,12,17
133:2,7,13 136:6
**work** 8:22 11:4
11:12,15,24 12:4
13:12 19:7
42:19 131:2
169:25 174:19
175:14 176:4
**worked** 8:19,21
8:24 9:5,20,22
11:21,23,25 12:2
12:12,20,22
13:10,15 26:22
46:13 92:14
**worker** 80:17
178:12
**workers** 24:7
68:9 75:14
164:7
**working** 9:4,23
10:10 12:23
13:4 26:25
38:15 49:11
51:14 52:19
53:20 93:13
114:7,24 125:13
163:13 176:17
184:21
**works** 46:22
**world** 80:18
103:11 107:5,9

107:11
**worm** 90:11
121:2
**worry** 134:20
**wrist** 113:24
153:8 154:15
**writing** 59:16
98:4 100:10
**writings** 59:7
**written** 50:17
59:22
**wrong** 68:14
90:20
**wrote** 15:24
18:18 168:10

**x**

**x** 1:5,11,17 188:2
188:9

**y**

**yamaha** 22:15
22:16,20
**yard** 24:7
**yeah** 12:16 15:24
17:25 48:9 64:3
73:16 79:3
82:17 86:17
97:21 98:20
101:23 102:9
103:12,16
105:19 117:5
118:6 120:8
123:21 124:12
124:20,22
126:12 128:24
130:21 131:25
136:17 141:6
151:9,13 184:16

**year** 17:4
**years** 9:7,10,14
  9:17 11:14
  12:12,22 13:11
  13:16 17:10,13
  23:17,20,20
  30:10 31:14
  33:23 54:14
  93:18
**yellow** 99:14,17
  99:23 100:2,4,6
  101:9,12,18
  108:8
**yep** 13:6 55:22
  73:21 132:18
**york** 1:3,24 2:7
  2:15,24 5:4 15:8
  27:8,9,17,22,24
  27:24 28:3
  36:20 189:5
**young** 18:2
**yuiry** 2:4 57:20

**z**

**z535** 131:18,22
  132:2
**z535.4** 106:13,22
**zd** 156:22,23
  188:16
**zg** 112:23,24
  188:15
**zohar** 2:8 63:2,6
  64:6,9,10 78:23
  104:18 117:20
  135:4,14 140:20
  143:4 148:3
  155:13 163:16
  164:2,17 177:7

  186:23
**zone** 148:9
**zoom** 1:22

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.