UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ISOJON KHUSENOV,

                    Plaintiff,

         v.

PROKRAFT INC. and PRO-CUT,

                    Defendants.

---

PROKRAFT INC.,

                    Third-Party Plaintiff,

         v.

KARZINKA US, INC.,

                    Third-Party Defendant.

---

**MEMORANDUM & ORDER**
21-cv-03703 (HG)

**HECTOR GONZALEZ**, United States District Judge:

        Plaintiff Isojon Khusenov ("Plaintiff") brings this action against Defendants/Third-Party

Plaintiffs Prokraft Inc. ("Prokraft") and Pro-Cut (together, "Defendants")[1] to recover for

personal injuries sustained on May 29, 2021, while utilizing the Pro-Cut KG-32 meat grinder

("Meat Grinder").  Plaintiff's Rule 56.1 Statement ("Plaintiff's 56.1"), ECF No. 39-1 ¶ 1.

Plaintiff was employed as a "Butch[er] Apprentice" for Third-Party Defendant Karzinka US Inc.

("Karzinka" or "Third-Party Defendant") at the time of his injury.  *Id.* ¶ 2.  Plaintiff asserts

several claims against Defendants including:  (i) breach of the warranty of merchantability and

---

[1]        Defendant Prokraft is a distributor of food-industry and equipment products in the United
States.  Defendant Pro-Cut is a brand name owned by Prokraft which it uses on the products it
sells.  Defendants' Rule 56.1 Statement ("Defendants' 56.1"), ECF No. 35-2 ¶¶ 5–6.

fitness, ECF No. 1-1 ¶ 38 (Complaint); (ii) strict products liability, *id.* ¶¶ 49, 59; and (iii) negligence, *id.* ¶ 72.

Presently before the Court are:  (i) three separate motions to disqualify an expert from Plaintiff, Defendants and Third-Party Defendant, ECF Nos. 54, 55, 56; (ii) two separate motions for summary judgment and dismissal of Plaintiff's complaint from Defendants and Third-Party Defendant, ECF Nos. 34, 35; and (iii)  Defendants' motion for summary judgment against Third-Party Defendant on its common law indemnity cross-claim, ECF No. 35-3 at 19–22.  For the reasons set forth below, the Court:  (i) denies the motions to disqualify experts; (ii) grants Defendants' and Third-Party Defendant's motions for summary judgment and dismissal of Plaintiff's complaint; and (iii) finds Defendants' motion for summary judgment on its common law indemnity cross-claim to be moot in light of the dismissal of Plaintiff's complaint.

## **BACKGROUND**[2]

On December 17, 2019, non-party S&V Restaurant Manufacturing ("S&V") purchased the Meat Grinder from Defendant Prokraft.  ECF No. 35-2 ¶ 4 ("Defendants' 56.1").  Prokraft is a distributor of food-industry products including meat grinders, which it purchases from a company in Mexico.  *Id.* ¶ 5.  The meat grinders arrive at Defendant Prokraft's warehouse "in boxes, sealed, and ready to ship, after which they are each sold as a package."  Karzinka's Rule 56.1 Statement ("Karzinka's 56.1"), ECF No. 34-19 ¶ 5.  The Meat Grinder, as sold, comes with a permanently affixed safety guard, and a plunger.  ECF No. 35-2 ¶ 5 (Defendants' 56.1).  The purpose of the plunger is to "push meat into the machine and thus keep [the] machine[] operator's hand away from the head stock opening [on the Meat Grinder]."  *Id.* ¶ 11.  On January 7, 2020, Third-Party Defendant Karzinka, a retail grocery store with four retail locations/meat

---

[2]        Unless otherwise specified, the facts cited by the Court are undisputed.

markets, purchased the Meat Grinder from S&V for use at one of its stores in Queens ("Meat Store"). *Id.* ¶¶ 8, 29. The Meat Grinder "was equipped with a safety guard from the manufacture[r] which was not a removable device." *Id.* ¶ 9. The safety guard is a circular object located inside the meat tray, underneath which is a hole leading to the "auger."[3] ECF No. 34-19 ¶ 40 (Karzinka's 56.1). A warning label with both text and pictograms is affixed to the front of the Meat Grinder. ECF No. 35-2 ¶¶ 23–24 (Defendants' 56.1).

On April 30, 2020, Plaintiff's father was hired by Karzinka. *Id.* ¶ 30. Defendants and Third-Party Defendant contend that sometime after that, the butchers at the Meat Store decided to remove the safety guard on the Meat Grinder because it was "slowing down the work." ECF No. 34-19 ¶ 43 (Karzinka's 56.1); *see also* ECF No. 35-2 ¶ 39 (Defendants' 56.1) ("To put smaller pieces into the grinder would require a 'little more work and a little more time.'"). Some of the butchers asked Plaintiff's father to remove the safety guard, which he ultimately did with some difficulty. ECF No. 35-13 at 62–63 (Hodjimametov Deposition Tr.). Third-Party Defendant further contends that Plaintiff's father initially tried to use a hammer, but when that did not work, he used a metal grinder to cut off the safety guard. ECF No. 34-19 ¶ 44 (Karzinka's 56.1).

In June 2020, Plaintiff began working at Karzinka's Meat Store, initially in the chicken department as a butcher's assistant. ECF No. 34-19 ¶¶ 18, 38 (Karzinka's 56.1). After working in that capacity for approximately six months, Plaintiff began operating meat grinders. ECF No. 35-2 ¶ 16 (Defendants' 56.1). Plaintiff was trained on how to use the Meat Grinder and plunger by another employee, Khusen Nosirovich Hodjimametov. ECF No. 34-19 ¶¶ 36, 42 (Karzinka's

---

[3]     The "auger" is the screw-like piece that grinds the meat and is attached to the motor of the meat grinder.

56.1); ECF No. 35-2 ¶ 32 (Defendants' 56.1).  Plaintiff was informed that there was no safety guard on the Meat Grinder and was instructed to use the plunger and to be "very careful" when using the Meat Grinder.  *Id.*[4]

On May 29, 2021, Plaintiff was operating the Meat Grinder without the safety guard, when the sleeve of his uniform got caught in the machine and his hand and arm were pulled into the machine and crushed by the Meat Grinder's auger.  ECF No. 35-2 ¶ 27 (Defendants' 56.1). Plaintiff asserts that he did not put his fingers in the Meat Grinder, but that his sleeve was too big and was pulled in by the machine.  ECF No. 39-1 ¶ 58 (Plaintiff's 56.1).  Plaintiff further contends that he usually turned the Meat Grinder off with his right hand, but with his right hand caught, he had difficulty finding the off button.  *Id.* ¶ 59.  Plaintiff alleges that the off button on the Meat Grinder was blocked by a knob and obscured underneath the Meat Grinder tray.  *Id.* ¶ 60.  Mr. Hodjimametov was working with Plaintiff on the day of the incident and ran to his aid when he heard Plaintiff scream.  *Id.* ¶ 77.  Approximately fifteen seconds passed between the time Mr. Hodjimametov arrived at Plaintiff's side and the time the Meat Grinder was turned off. *Id.* ¶ 80.  As a result of the incident, Plaintiff's right arm needed to be amputated just below the elbow.  ECF No. 35-2 ¶ 48 (Defendants' 56.1).

Plaintiff contends that he did not understand what the pictograms on the warning label affixed to the Meat Grinder meant, and that he was not aware that the Meat Grinder was "*really* dangerous."  ECF No. 39-1 ¶ 56 (Plaintiff's 56.1) (emphasis in original).

---

[4]     Although Plaintiff does not dispute that he was told by Mr. Hodjimametov that there was no safety guard on the Meat Grinder, *see* ECF No. 40-1 ¶ 42, at his deposition Plaintiff testified that he did not know the safety guard had been removed.  *See* ECF No. 35-9 at 103 (Plaintiff's Deposition Tr.) ("Q. Did you ever ask anybody who removed the safety guard?  A. I didn't know it was removed because I thought it was like that because when I started doing it, it didn't have it.").

## PROCEDURAL HISTORY

Plaintiff filed suit against Defendants on June 7, 2021, in Queens County Supreme Court. ECF No. 1-1.  Plaintiff asserts claims against Defendant under theories of negligence, strict products liability, and breach of express and implied warranties.  *Id.*  On June 30, 2021, Defendants removed the case to this District.  ECF No. 1.  On August 10, 2021, Defendants filed a complaint against Third-Party Defendant seeking contribution and common law indemnity for any judgment which Plaintiff may obtain against Defendants.  ECF No. 16 ¶ 20 (arguing that the injuries "allegedly suffered by Plaintiff . . . were caused solely and as a direct and proximate result of the negligence, carelessness and/or recklessness of [Karzinka]" and/or its agents).  On June 16, 2022, Defendants and Third-Party Defendant filed separate motions for summary judgment ("Defendants' Motion" and "Karzinka's Motion").  ECF Nos. 34, 35.  On June 27, 2022, Third-Party Defendant filed its opposition to Defendants' motion.  ECF No. 37.  Plaintiff subsequently filed oppositions to both Defendants' and Third-Party Defendant's motions ("Plaintiff's Opp." and "Plaintiff's Karzinka Opp.").  ECF Nos. 39, 40.  In support of his oppositions, Plaintiff attached the affidavit of Dr. Andrew Foley ("Foley Report").  ECF Nos. 39-3, 40-4.  On July 22, 2022, Third-Party Defendant filed its reply.  ECF No. 44.  On July 25, 2022, Defendants filed their reply.  ECF No. 45.

On August 1, 2022, the Court extended the deadline to complete expert discovery and, as a result, provided the parties the opportunity to submit supplemental briefing in connection with their motions.  *See* Scheduling Order, dated August 1, 2022.  On September 22, 2022, Defendants and Third-Party Defendant filed supplemental briefing ("Defendants' Supp. Brief" and "Karzinka's Supp. Brief").  ECF Nos. 54, 55.  In conjunction with the supplemental briefing, Defendants attached the affidavit of expert George H. Pfreundschuh ("Pfreundschuh Report").

ECF No. 55-4.  On October 6, 2022, Plaintiff filed his response to Defendants' supplemental briefing ("Plaintiff's Supp. Brief").  ECF No. 56.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, a court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party has the burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).[5]

In deciding a summary judgment motion, any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995).  In reviewing the evidence and inferences that may reasonably be drawn, the court "may not make credibility determinations or weigh the evidence.  Credibility determinations . . . are [a] jury function[ ], not [that] of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there

---

[5]    Unless noted, case law quotations in this Order accept all alterations and omit all internal quotation marks, citations and footnotes.

must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**DISCUSSION**

Plaintiff asserts claims against Defendants under three theories:  (i) strict products liability; (ii) breach of express and implied warranties; and (iii) negligence.  *See generally* ECF No. 1-1 (Complaint).  Defendants and Third-Party Defendant contend that summary judgment is appropriate on each of Plaintiff's claims because:  (i) the Meat Grinder was not defectively designed, ECF No. 35-3 at 5–11 (Defendants' Motion), ECF No. 34-20 at 13–19 (Karzinka's Motion); (ii) the Meat Grinder did not have a manufacturing defect, ECF No. 35-3 at 12–13, ECF No. 34-20 at 19–21; (iii) Defendants supplied the Meat Grinder with an owner's manual and safety warning decals, ECF No. 35-3 at 13–15, ECF No. 34-20 at 21–24; and (iv) Plaintiff was aware of the dangers of using the Meat Grinder without a safety guard, ECF No. 35-3 at 15–17, ECF No. 34-20 at 25–27.

Defendants also argue that Third-Party Defendant, as Plaintiff's employer, is liable for indemnity for any alleged injury sustained by Plaintiff.  ECF No. 35-3 at 19–22 (Defendants' Motion).  The Court first addresses the parties' requests to exclude the testimony of each of their opponents' respective experts, followed by the merits of Defendants' and Third-Party Defendant's motions for summary judgment, before finally addressing Defendants' motion for summary judgment on their claim for common law indemnity against Third-Party Defendant.

I.     **The Parties' Motions to Exclude Expert Testimony**

As a threshold matter, the Court must address the parties' arguments that the expert testimony of Mr. Pfreundschuh and Dr. Foley should be excluded.  ECF No. 55 at 13 (Defendants' Supp. Brief); ECF No. 54 at 10 (Karzinka's Supp. Brief); ECF No. 56 at 7

(Plaintiff's Supp. Brief); *see also Lara v. Delta Int'l Machinery Corp.*, 174 F. Supp. 3d 719, 727 (E.D.N.Y. 2016) ("When adjudicating a motion for summary judgment, a court may first need to determine the admissibility of expert testimony."). As such, the Court will first consider the parties' motions to exclude their opponents' respective experts before turning to the merits of the motions for summary judgment.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which was further clarified by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Rule 702 provides, in pertinent part, that an expert, qualified by "knowledge, skill, experience, training, or education" may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the Court must determine: (1) whether the witness is a qualified expert; (2) whether the opinion is based on application of reliable data and methodology to the facts of the case; and (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine an issue of fact." *Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-cv-209, 2022 WL 4357555, at *10 (E.D.N.Y. Sept. 20, 2022); *see also Beruashvili v. Hobart Corp.*, No. 05-cv-1646, 2010 WL 11622750, at *5 (E.D.N.Y. July 15, 2010) ("Under *Daubert*, the district court must perform the gatekeeping function to ensure that: any and all scientific testimony or evidence admitted is not only relevant, but reliable."). Ultimately, the admissibility of expert testimony "is a question of law which rests squarely within the broad discretion of the trial judge." *Lara*, 174 F. Supp. 3d at 729. Accordingly, the Court examines each expert's testimony in turn.

8

A. Admissibility of Dr. Foley's Testimony

   *1. Qualifications*

   Dr. Foley is a licensed professional engineer with a Ph.D. in engineering mechanics from Cranfield University and over 30 years of experience in mechanical engineering. ECF No. 39-3 at 4 (Foley Report). He holds a Bachelor of Science degree in electrical mechanical engineering from the University of Sussex, in the United Kingdom. ECF No. 55-2 at 8 (Foley Deposition Tr.) Prior to earning his Ph.D., Dr. Foley worked as a consultant in the United Kingdom for Lucas Aerospace Engineering Company, where he designed, and drafted calculations for starter motors for aircraft engines, *id.* at 9, and Kingston Engineering, where he worked in the accounting department and audited manufacturing companies by reviewing their books and records, *id.* at 10. Following the completion of his Ph.D., Dr. Foley worked for several gas turbine manufacturers, including Rolls Royce, Alstom, and Siemens. He has been a professor of engineering for over 25 years, teaching at several universities including Coventry University, and Ohio State University. *Id.* For the last 17 years, Dr. Foley has been teaching at the United States Coast Guard ("USCG") Academy in New London, Connecticut. *Id.* at 8–9. He is also a licensed USCG "100-ton master."[6] *Id.* at 29. He has been retained to provide expert opinions in personal injury and products liability cases previously and is currently retained in another active matter concerning an industrial meat grinder in a New Jersey federal action. *Id.* at 14–38, 41, 56. Dr. Foley has never been qualified as an expert, however, and has never had to provide expert testimony in a court proceeding. *Id.* at 30. Dr. Foley further testified that he has experience in reviewing the engineering, design and operations of machinery by detailing the cases he has

---

[6]  This USCG license means that Dr. Foley can captain boats up to one hundred tons. ECF No. 55-2 at 29 (Foley Deposition Tr.).

worked on as an expert, and the types of design and injury analysis he conducted in those cases. *Id.*

Considering his significant experience in engineering, and because neither Defendants nor Third-Party Defendant dispute that Dr. Foley is a qualified expert, this Court concludes that Dr. Foley has the "knowledge, skill, experience, training, [and] education" required by Rule 702 to offer opinions in this case.

### 2. Reliability and Relevance

Defendants and Third-Party Defendant contend, however, that Dr. Foley's expert opinion is unreliable and insufficient. *See generally* ECF No. 55 (Defendants' Supp. Brief); ECF No. 54 (Karzinka's Supp. Brief). Specifically, Defendants and Third-Party Defendant challenge Dr. Foley's opinions that: (i) an "interlock" device[7] could have been incorporated into the design of the Meat Grinder, ECF No. 55 at 5–8, ECF No. 54 at 5–9; (ii) a mushroom-shaped emergency stop button should be located on the front of the Meat Grinder cabinet, ECF No. 55 at 8–10, ECF No. 54 at 4–5; and (iii) the warning label on the Meat Grinder was inadequate, ECF No. 55 at 10–13, ECF No. 54 at 9–10.

*Daubert* requires courts to evaluate reliability by considering a number of factors including: "(1) the ability to test the expert's methodology or reasoning; (2) whether the expert's theory has been subjected to peer review and publication; (3) its potential rate of error; and finally, (4) its general acceptance in the relevant scientific community." *Lara*, 174 F. Supp. 3d at 733 (citing *Daubert*, 509 U.S. at 592–94). These factors are not exhaustive and the reliability

---

[7]     An interlock device or system prevents machinery, such as meat grinders, from being used when the safety feature is removed. The interlock system is wired to disable the machine if a safety guard is removed or tampered with. ECF No. 39-3 at 23 (Foley Report).

inquiry is "a flexible one." *Daubert*, 509 U.S. at 594.  "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

In formulating his 25-page opinion, Dr. Foley considered:  (i) the owner's manual and sales brochure for the Meat Grinder; (ii) video footage of Plaintiff's incident on May 29, 2021; (iii) Plaintiff's and Third-Party Defendant's initial disclosures; (iv) Defendants' interrogatory responses; (v) photographs from two inspections on January 1, 2022, and February 11, 2022; (vi) research on various meat grinders; and (vii) reports, guidebooks and workplace safety standards for machinery such as meat grinders and emergency stop buttons.  ECF No. 55-2 at 58–59 (Foley Deposition Tr.).  Dr. Foley further testified that he simulated using the Meat Grinder during his inspection.  *Id.* at 162–63.

Turning first to Dr. Foley's opinion that an interlock device could have been incorporated into the design of the Meat Grinder, the Court finds that Dr. Foley's principles and methods in arriving at this conclusion are sufficient and reliable.  Dr. Foley opined that "it would seem prudent to install an interlock system" which "would render operation of the [Meat Grinder] without the guard not possible."  ECF No. 39-3 at 23 (Foley Report).  Although his proposed sketch of the interlock system is basic, *id.*, when prompted during his deposition, Dr. Foley testified to the composition of an interlock device, and the potential effects of cleaning a meat grinder with water on the electrical circuitry of an interlock device.  ECF No. 55-2 at 170–176 (Foley Deposition Tr.).  Dr. Foley admittedly did not consider the cost of such a device, did not provide a detailed design of the interlock system, and did not attempt to test or create an interlock system on the Meat Grinder itself.  *Id.* at 173, 176, 180.  Nevertheless, Defendants' own expert, Mr. Pfreundschuh, testified that there are competitor meat grinders on the market with interlock systems located on the underside of the meat grinder tray.  ECF No. 56-1 at 185–

86 (Pfreundschuh Deposition Tr.).  While Mr. Pfreundschuh questions the efficacy of such an interlock device in preventing an injury, *id.*, the Court is tasked with considering the "principles and methodology [of the expert testimony], not . . . the conclusions that they generate." *Daubert*, 509 U.S. at 595.  Accordingly, the Court disagrees with Defendants and Third-Party Defendant that Dr. Foley's opinion must be precluded as "junk science." *Boateng*, 2022 WL 4357555, at *12 (finding that expert's imprecision is "not fatal to his ability to offer expert testimony as a matter of law").

Turning next to Dr. Foley's opinion that a mushroom-shaped emergency stop button should be located on the front of the Meat Grinder cabinet, the Court also finds that Dr. Foley's principles and methods are sufficient and reliable.  Dr. Foley opined that the stop button on the Meat Grinder is obstructed, not clearly visible, and not always within reach of the user.  ECF No. 39-3 at 17–21 (Foley Report).  As such, Dr. Foley proposes including a bigger mushroom-type emergency stop button on the front of the Meat Grinder.  *Id.* at 24–25; ECF No. 55-2 at 142 (Foley Deposition Tr.).  Dr. Foley further opined that:  (i) other manufacturers of similar meat grinders have placed emergency stop buttons at the front of the machine, ECF No. 39-3 at 21 (Foley Report); (ii) other models of meat grinders sold by Defendants include stop buttons that are less obstructed, *id.* at 19; (iii) his experience as a mechanical engineer informs his opinion that a mushroom-type emergency stop button would result in a faster machine stoppage time in the event a user's fingers or sleeve got caught in the Meat Grinder's auger, ECF No. 55-2 at 125–30, 136–40 (Foley Deposition Tr.); (iv) he has used emergency stop buttons on rotating machinery such as lathes and mills, *id.* at 141–42; and (v) the cost of such a button would not be "tremendously expensive relative to the price of the machine," *id.* at 141.  While Dr. Foley did not draw any specific plans or conduct any feasibility studies, *id.* at 142, given that similar

12

products already exist in the marketplace, the Court is persuaded that Dr. Foley's opinion is reliable and sufficient.

Finally, turning to Dr. Foley's opinion regarding the adequacy of the warning label on the Meat Grinder, the Court finds that his principles and methods are also sufficient and reliable. Defendants and Third-Party Defendant contend that Dr. Foley's testimony should be precluded because:  (i) Dr. Foley did not review Plaintiff's deposition transcript and testimony prior to producing his report, ECF No. 55 at 12–13 (Defendants' Supp. Brief); (ii) Plaintiff admitted that he knew the danger posed by reaching his hand too far into the Meat Grinder, *id.*; and (iii) determining the adequacy of warning or safety labels does not necessarily require expert testimony, ECF No. 54 at 9 (Karzinka's Supp. Brief).  In formulating his opinion, Dr. Foley considered the American National Standards Institute ("ANSI") guidelines and concluded that the Meat Grinder should have a "DANGER" label, indicating a "hazardous situation which, if not avoided, *will* result in death or serious injury" rather than a "WARNING" label, indicating a "hazardous situation which, if not avoided, *could* result in death or serious injury."  ECF No. 39-3 at 14, 24–25 (Foley Report) (emphasis added).  Dr. Foley further opines that the warning label should be repositioned to be more visible to the operator.  *Id.*  The Court finds that Dr. Foley's methodology (reviewing ANSI guidelines and considering the danger posed by the Meat Grinder in light of his expertise as an engineer) enjoys "general acceptance within the relevant community of . . . engineers and others whose experience gives them a special ability to opine whether a product's warning label is defective or inadequate."  *Ortiz v. Stanley-Bostitch, Inc.*, No. 98-cv-6099, 2000 WL 640645, at *3 (S.D.N.Y. May 18, 2000).

The Court, however, notes that Dr. Foley did not substantiate his view or provide expertise that would be helpful to a jury's effort to decide the issue of proximate cause.

13

Therefore, Dr. Foley's testimony is precluded on the issue of the *foreseeability* of the removal of the safety guard. *See, e.g.*, ECF No. 39-3 at 25 (Foley Report) ("Practical operation of the machine for high commercial throughputs is inconvenient with the provided guard and plastic pusher. As such, users are *likely* to remove the guard . . . .") (emphasis added); ECF No. 55-2 at 161 ("In the interim, recognition of the fact that *users will remove* the guard needs to be made.") (emphasis added). When pressed to provide an explanation for his conclusion that the safety guard was likely to be removed because "to obtain the high meat-processing rates advertised . . . it is not realistic to expect an operator to be constantly removing and inserting the plastic pusher into the guard," *id.*, Dr. Foley admitted that: (i) he did not ascertain the processing capabilities of the Meat Grinder; (ii) he did not attempt to place meat into the hole of the Meat Grinder; (iii) he does not know what the processing rate for workers at Karzinka is; and (iv) he did not cite any studies for the conclusion that the Meat Grinder would be unable to meet the processing rates advertised other than his view that it would be a "feat" to get 3,000 pounds of meat into the Meat Grinder. *Id.* at 161–79. Accordingly, the Court concludes that Dr. Foley does not have the requisite expertise to opine on the likelihood that the Meat Grinder's safety guard would have been removed.

B.   Admissibility of Mr. Pfreundschuh's Testimony

    *1.   Qualifications*

Plaintiff argues that Mr. Pfreundschuh lacks the sufficient education or experience to qualify him as an expert. ECF No. 56 at 7–9 (Plaintiff's Supp. Brief).

Mr. Pfreundschuh is a licensed professional engineer with over 31 years of engineering experience. He holds a Master of Science in Mechanical Engineering and Applied Mechanics degree from the University of Pennsylvania and a Bachelor of Science degree in mechanical

engineering from Rutgers University.  ECF No. 55-4 at 2 (Pfreundschuh Report).  In addition, he holds certificates in construction safety and general industry safety from an Occupational Safety and Health Administration Training Center and is a member of numerous professional associations and committees including:  American Society of Mechanical Engineers; American Society of Safety Professionals; ANSI Accredited Standard Committee; American Society of Testing and Materials International Committee E34 on Occupational Health and Safety; and the E34.10 Table Saw Task Group.  *Id.*  Mr. Pfreundschuh further testified about his extensive experience operating power tools, equipment, and machinery.  *Id.*

Mr. Pfreundschuh is an engineering consultant, primarily for claims and litigation.  ECF No. 56-1 at 14 (Pfreundschuh Deposition Tr.).  For the first 11 years of his career, Mr. Pfreundschuh focused mainly on telecommunications and defense-related projects, specifically developing optical fiber devices and optical amplifiers for laser communication.  *Id.* at 33–35.  He then joined Affiliated Engineering Laboratories, a mechanical engineering firm, where he has been employed for over 20 years.  *Id.*; ECF No. 55-4 at 13 (Pfreundschuh Report).  Mr. Pfreundschuh has participated in a number of continuing education courses on occupational health and safety, machinery and machine guarding standards, principles of ergonomics as well as warnings and instructions to increase safety.  ECF No. 55-4 at 11 (Pfreundschuh Report).  Mr. Pfreundschuh has previously been retained in personal injury cases and provided expert testimony in at least five cases, some of which went to trial.  ECF No. 56-1 at 98–110 (Pfreundschuh Deposition Tr.).

Considering his significant experience in engineering and in providing expert testimony in personal injury cases, the Court concludes that Mr. Pfreundschuh has the "knowledge, skill, experience, training, [and] education" required by Rule 702 to offer opinions in this case; *see*

15

*also Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) ("An expert

need not be precluded from testifying merely because he or she does not possess experience

tailored to the precise product or process that is the subject matter of the dispute.").

### 2. *Reliability and Relevance*

Plaintiff argues that Mr. Pfreundschuh's expert opinion is unreliable and insufficient.  *See*

*generally* ECF No. 56 (Plaintiff's Supp. Brief).  Specifically, Plaintiff challenges the following

opinions:  (i) that Karzinka employees would have likely bypassed an interlock safety feature if

it existed and that an interlock requires a different approach to the guarding mechanism, ECF

No. 55-4 at 6 (Pfreundschuh Report), and (ii) that given the speed of the auger in the Meat

Grinder, substantial bodily injury would occur even if an emergency stop button existed, *id.* at 7.

In formulating his opinion, Mr. Pfreundschuh considered:  (i) available components of

the Meat Grinder; (ii) an exemplar meat grinder; (iii) reports, guidebooks, and workplace safety

standards for machinery such as meat grinders; and (iv) "file material" provided by Defendants'

counsel.  ECF No. 55-4 at 3 (Pfreundschuh Report).

Turning first to his opinion that Karzinka employees would have likely bypassed an

interlock safety feature if it existed, the Court finds that Mr. Pfreundschuh's conclusion that the

Karzinka employees *themselves* would bypass the interlock system is not a proper subject for

expert testimony.  Mr. Pfreundschuh opines that "an interlock feature implicitly requires a

different guarding philosophy in which the safety guard is intentionally designed to be

removable instead of permanently affixed to the headstock."  ECF No. 55-4 at 6.  He further

opines that given that the safety guard was removed in the instant litigation, "it stands to reason

that employees of Karzinka would have likely bypassed the electric interlock circuit had one

been provided."  *Id.*  He bases that conclusion on his experience and the research he has done in

cases reported by the Occupational Safety and Health Administration, "where workers were injured despite the presence of an interlock." *Id.*

The Court finds that Mr. Pfreundschuh is permitted to opine on the effectiveness of an interlock system, the rationale for implementing them into machinery such as grinders, and the conclusions from his research about whether interlock systems prevent removal of the safety guard. Mr. Pfreundschuh's experience as an engineer, engineering consultant and in evaluating safety guards qualifies him to offer those opinions. If necessary, however, a jury will decide how much weight to give those opinions in light of his experiences. *See Hilaire*, 54 F. Supp. 3d at 236 ("[I]t is for the jury to decide what weight should be given to [] testimony. Once the testimony has been found to be admissible, the adverse party is free to challenge any shaky or unreliable testimony before the jury using the traditional devices of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."). Mr. Pfreundschuh is not permitted, however, to opine on the likelihood that the Karzinka employees themselves would bypass an interlock system. He has no data or research to support that conclusion. Any such conclusion is too speculative as it is based on assumptions made by Mr. Pfreundschuh about the Karzinka employees' states of mind and technical abilities to remove an interlock system. *See Lara*, 174 F. Supp. 3d at 734 ("Despite the flexible inquiry required under *Daubert* and its progeny, and in order to uphold its gatekeeping function, a court should exclude expert testimony where it is speculative or conjectural . . . .").

Turning next to Mr. Pfreundschuh's opinion that given the speed of the rotating screw in the Meat Grinder, substantial bodily injury would occur even if an emergency stop button existed on the front of the Meat Grinder (as proposed by Dr. Foley), the Court finds that Mr. Pfreundschuh's principles and methods are sufficient and reliable. Mr. Pfreundschuh testified

17

that:  (i) the auger is rotating at a rate of approximately three revolutions per second, ECF No.

55-4 at 7 (Pfreundschuh Report); (ii) given the rate of rotation, any body part will be pulled into

the auger quickly "such that substantial bodily injury would occur even if a person could react in

less than a second to shut the machine down" by means of an emergency stop button, *id.*; and

(iii) even if a person was able immediately to shut off the machine, "there is still an

approximately 3-1/2 second coast down time from inertia in the motor . . . .  That stored energy

would cause injury," *id.*  Mr. Pfreundschuh testified that he based his conclusions on

measurements he took and research he did, including:  (i) measuring the approximate number of

revolutions on a similar grinder's "no load" speed using a DSLR camera, ECF No. 56-1 at 164;

(ii) using a stopwatch to estimate the coast-down time from rotational inertia in the motor, *id.* at

167–70; and (iii) reading about reaction time specifically referencing a "Human Factors and

Ergonomics Design Handbook," as well as knowledge acquired through his education as an

engineer that brain recognition time is "four-tenths of a second," *id.* at 189–90.  The Court

concludes that given Mr. Pfreundschuh's engineering experience, he also has the requisite

expertise to opine on whether injury would occur given the speed of the rotating screw.  *See*

*Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 73 (S.D.N.Y. 2001).

In conclusion, although the Court is dismissing the case in its entirety, it nevertheless

finds that the jury should consider the weight and credibility of Mr. Pfreundschuh's and Dr.

Foley's expert testimony, and will not preclude either expert from testifying should that become

necessary.  Accordingly, the motions to preclude the expert testimony of Mr. Pfreundschuh and

Dr. Foley are denied except with respect to Dr. Foley's opinion regarding the foreseeability of

the removal of the Meat Grinder's safety guard or Mr. Pfreundschuh's opinion about the

likelihood that Karzinka employees themselves would bypass an interlock safety feature.

II.   **Defendants' and Third-Party Defendant's Motions for Summary Judgment on Plaintiff's Strict Products Liability and Negligence Claims (Second and Third Causes of Action)**

As discussed previously, Plaintiff asserts claims based upon theories of negligence and strict products liability. *See* ECF No. 1-1 ¶¶ 45–73 (Complaint). "Under New York law, a plaintiff's claim based upon an alleged design defect or manufacturing defect sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently." *Boateng*, 2022 WL 4357555, at *9. Accordingly, the Court will analyze Plaintiff's negligence and strict products liability claims together.

In order to establish a *prima facie* case with respect to his strict products liability and negligence claims, Plaintiff must show that the Meat Grinder "was defective and that the defectively designed [Meat Grinder] was the actual and proximate cause of [his] injury." *Lara*, 174 F. Supp. 3d at 740. "There are three types of defects recognized under New York law: (1) design defects; (2) manufacturing defects; and (3) defective or inadequate warnings." *Id.* Here, Plaintiff claims that design defects and failure to provide adequate warnings were the cause of his injuries. *See* ECF No. 39-2 at 3 (Plaintiff's Opp.).

A.  Design Defect

"In a strict liability claim for defective design, Plaintiff must show: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing Plaintiff's injury." *Lara*, 174 F. Supp. 3d at 740. "The design of a product is not reasonably safe if a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner. The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a

19

substantial likelihood of harm, and it was feasible to design the product in a safer manner." *Boateng*, 2022 WL 4357555, at *13.

In their motions, Defendants and Third-Party Defendant argue that Plaintiff cannot provide evidence to create an issue of fact regarding:  (i) whether the Meat Grinder was unreasonably unsafe, ECF No. 35-3 at 6–7 (Defendants' Motion), ECF No. 34-20 at 13–16 (Karzinka's Motion); (ii) whether an alternative design is feasible, ECF No. 55 at 4–10 (Defendants' Supp. Brief), ECF No. 54 at 4–9 (Karzinka's Supp. Brief); or (iii) whether the design defect was the proximate cause of Plaintiff's injury, ECF No. 35-3 at 8–11, ECF No. 34-20 at 16–19.  The Court finds that although there is a genuine dispute of material fact regarding whether there is a feasible alternative design, Plaintiff has not satisfied the substantial likelihood of harm or proximate cause elements for the design defect theory of strict products liability.

Defendants and Third-Party Defendant argue that the removal of the safety guard from the Meat Grinder substantially altered the product, and thus, Defendants cannot be held liable for Plaintiff's injuries.  ECF No. 35-3 at 8–11 (Defendants' Motion); ECF No. 34-20 at 16–19 (Karzinka's Motion).  Plaintiff contends that:  (i) the absence of an emergency stop button and the obstruction of the Meat Grinder's stop button exacerbated Plaintiff's injuries, ECF No. 39-2 at 5–6 (Plaintiff's Opp.); (ii) Plaintiff was aware that his fingers could get caught in the Meat Grinder, but was not aware that his sleeve getting caught in the Meat Grinder could lead to his injuries; and (iii) the fact that the Meat Grinder continued to operate without the safety guard "suggests that it was designed to do so," ECF No. 39-2 at 7–8.  The Court finds that:  (i) Plaintiff failed to establish that the Meat Grinder as designed posed a substantial likelihood of harm, and (ii) the removal of the safety guard substantially altered the product, and this modification was the proximate cause of Plaintiff's injury.

"A manufacturer is not an insurer against injury, nor must the product be optimally safe. The ultimate issue is whether the product is reasonably safe, not whether it incorporated the safest possible features."  *Colon*, 199 F. Supp. 2d at 84; *see also Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 508 (E.D.N.Y. 2019) ("In the absence of such foundational facts, an expert's bare, conclusory statement that a product is defective has no probative force."). While Plaintiff's expert proposes alternative designs that allegedly make the Meat Grinder *safer*,[8] Plaintiff fails to demonstrate that the Meat Grinder *as designed with the safety guard* poses a substantial likelihood of harm.  In fact, Plaintiff's expert Dr. Foley agreed that the removal of the safety guard was a misuse of the Meat Grinder and that "as a permanent fixed guard . . . on [the Meat Grinder, the safety guard] would not allow one's hand to go down into the opening of the headstock."  ECF No. 55-2 at 176–77, 183 (Foley Deposition Tr.).  When questioned, Dr. Foley further agreed that "under no circumstances could one get their hand into the headstock with that fixed safety guard in place" outside of children operating the machine. *Id.* at 183.  The Court therefore finds that no reasonable juror could find that as designed (with its permanently affixed safety guard) the Meat Grinder posed a substantial likelihood of harm.

Moreover, New York law provides that "manufacturers may not be held liable under a strict products liability or negligence cause of action where, after a product leaves their possession and control, there is (1) a subsequent modification which substantially alters the product, and (2) this modification is the proximate cause of plaintiff's injuries."  *Beltran v.*

---

[8]     As discussed previously, Dr. Foley testified to two possible alternative designs:  (i) the incorporation of an "interlock" device into the design of the Meat Grinder, ECF No. 55 at 5–8, ECF No. 54 at 5–9, and (ii) a mushroom-shaped emergency stop button located on the front of the Meat Grinder cabinet, ECF No. 55 at 8–10; *see supra* section I.A.2.  The availability of alternative designs, however, do not on their own demonstrate a triable issue of material fact as to whether the Meat Grinder was defectively designed.

*Techtronic Indus. N. Am., Inc.*, No. 13-cv-5256, 2015 WL 3651099, at *3 (E.D.N.Y. June 11, 2015).  However, "a plaintiff may overcome a substantial modification defense by demonstrating that the post-sale modification did not render a safe product defective because the product incorporated a defectively designed safety feature at the time of sale.  In other words, the plaintiff must raise a triable issue of fact whether the safety feature was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Hoover v. New Holland N. Am., Inc.*, 11 N.E.3d 693, 703 (N.Y. 2014).  Summary judgment therefore hinges on whether a plaintiff has successfully established the existence of a triable issue of material fact concerning whether or not the injuries would "have arisen *but for* the post-sale modification of [the] safety feature on an otherwise safe product." *Id.* at 704 (emphasis in original).

The Court finds that Plaintiff has failed to demonstrate the existence of material issues of fact sufficient to overcome Defendants' and Third-Party Defendant's substantial modification defense.  Plaintiff does not dispute that:  (i) the Meat Grinder was equipped with a safety guard "which was not a removable device," ECF No. 35-2 ¶ 9 (Defendants' 56.1), ECF No. 39-1 ¶ 9 (Plaintiff's 56.1); (ii) when the Meat Grinder was delivered and set up at the Meat Store, the safety guard was in place, "pinned or welded" on, ECF No. 35-2 ¶ 37; ECF No. 39-1 ¶ 37; (iii) the safety guard was removed from the Meat Grinder, ECF No. 34-19 ¶ 45 (Karzinka's 56.1); ECF No. 40-1 ¶ 45 (Plaintiff's Karzinka 56.1); and (iv) on the date of Plaintiff's accident there was no safety guard on the Meat Grinder, ECF No. 35-2 ¶ 19 (Defendants' 56.1), ECF No. 39-1 ¶ 19 (Plaintiff's 56.1).  Moreover, Mr. Hodjimametov testified that he and the other butchers asked Plaintiff's father to remove the safety guard, and that Mr. Hodjimametov was present

when the guard was removed using a metal grinder.  ECF No. 35-13 at 62–63 (Hodjimametov Deposition Tr.).[9]

Based on the evidence presented, the Court finds that Defendants and Third-Party Defendant have established that the product was not defectively designed at the time it was manufactured and sold to Karzinka, and Plaintiff has failed to demonstrate that the Meat Grinder with the safety guard was not reasonably safe.  Therefore, Plaintiff has not satisfied the substantial likelihood of harm or proximate cause elements for the design defect theory of strict products liability.  *See Hoover*, 11 N.E.3d at 704 ("The substantial modification defense is intended to insulate manufacturers and others in the distribution chain from liability for injuries that would never have arisen *but for* the post-sale modification of a safety feature on an otherwise safe product."); *Darsan v. Guncalito Corp.*, 545 N.Y.S.2d 594, 596 (N.Y. App. Div. 1989) (granting summary judgment on strict products liability claim based on design defect theory where injury was caused by meat grinder with safety guard forcibly removed); *Hernandez v. Biro Mfg. Co.*, 674 N.Y.S.2d 72, 74 (N.Y. App. Div. 1998) (granting summary judgment on strict products liability claim based on design defect theory where injury was caused by meat grinder with safety feature removed).  Accordingly, the Court grants Defendants' and Third-Party Defendant's motions for summary judgment with respect to Plaintiff's defective design theory of liability.

---

[9]      Third-Party Defendant further contends that Plaintiff's father initially tried to use a hammer but when that did not work, he used a metal grinder to cut the safety guard off.  ECF No. 34-19 ¶ 44 (Karzinka's 56.1).  Notably, the President of Prokraft, Eduardo Flores, testified to observing testing on similar meat grinders at a trade show.  ECF No. 34-5 at 169–70 (Flores Deposition Tr.).  He described observing a trade show participant unsuccessfully attempt to break off the safety guard with a hammer.  *Id.*

B. <u>Failure to Warn</u>

In addition to the theory of liability predicated on defective design, Plaintiff also seeks recovery based on a theory of failure to warn.  Plaintiff alleges that Defendants failed to adequately warn of the potential dangers of the Meat Grinder.  Defendants and Third-Party Defendant argue for summary judgment because:  (i) Defendants explicitly warned users of the dangers of using one's hands to feed the meat into the auger on the warning label on the Meat Grinder, and (ii) Plaintiff was aware of the danger of using his hands to place meat into the grinder.  ECF No. 35-3 at 13–17 (Defendants' Motion); ECF No. 34-20 at 21–27 (Karzinka's Motion).

"A defendant may be liable under a negligence or strict products liability theory by failing to adequately warn of a potentially harmful aspect of the product." *Boateng,* 2022 WL 4357555, at *15.  "Plaintiff must show (1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm.  A manufacturer can be liable even after the product is sold based on dangers in the use of a product which come to his attention after manufacture or sale, through advancements in the state of the art with which he is expected to stay abreast, or through being made aware of later accidents involving dangers in the product of which warning should be given to users." *Id*.  "[M]anufacturer liability can exist under a failure-to-warn theory in cases in which the substantial modification defense . . . might otherwise preclude a design defect claim" because "it is neither infeasible nor onerous . . . to warn of the dangers of foreseeable modifications that pose the risk of injury." *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 307–08 (N.Y. 1998).  However, a "defendant can show the lack of proximate cause by demonstrating the futility of warnings, through evidence that plaintiff was fully aware of the

24

hazard through general knowledge, observation, or common sense." *Boateng*, 2022 WL 4357555, at *16.  Moreover, a defendant's duty to warn "can be satisfied by providing an adequate warning.  Factors to be considered when determining whether a warning is adequate as a matter of law are whether the warning is accurate, clear, and consistent on its face, and whether it portrays the risk with sufficient intensity.  Claims regarding the adequacy of a warning are normally fact-specific, and therefore, are not usually resolved on summary judgment.  However, in a proper case, the court can decide adequacy as a matter of law at the summary judgment stage." *Wu Jiang v. Ridge Tool Co.*, No. 15-cv-4124, 2018 WL 1525660, at *3 (E.D.N.Y. Mar. 27, 2018).

As discussed previously, Plaintiff's expert Dr. Foley opined about the alleged inadequacy of the warning label.  ECF No. 39-3 at 14, 24–25 (Foley Report).  In his view, the Meat Grinder should warn of a "hazardous situation which, if not avoided, *will* result in death or serious injury" and the warning label should be repositioned.  *Id.* (emphasis in original).  Plaintiff also testified to his failure to understand that his sleeve could be caught in the auger of the Meat Grinder, and to his inability to understand the warning label on the machine.  ECF No. 39-1 ¶¶ 56–58 (Plaintiff's 56.1).  Plaintiff further argues that Defendants were aware that users would try to remove the safety guard, by referencing the "unsuccessful attempt to break open the safety guard at a trade show," ECF No. 39-2 at 5–6 (Plaintiff's Opp.).  Defendants respond that the standards proposed by Plaintiff are not required, ECF No. 55-4 at 5 (Pfreundschuh Report), and that Plaintiff was aware of the danger of using the Meat Grinder, ECF No. 35-3 at 15–16 (Defendants' Motion).

The parties do not dispute that there is a warning label on the Meat Grinder informing users not to "operate [the Meat Grinder] if [the] safety guard is removed or damaged."  ECF No.

39-1 ¶ 47 (Plaintiff's 56.1).  Plaintiff argues that Defendants should be held liable under a

failure-to-warn theory because the safety warning was not visible from where he was located

when operating the machine and did not adequately communicate the nature of the hazard

presented.  ECF No. 39-2 at 2–3 (Plaintiff's Opp.).[10]  The Court disagrees with Plaintiff:

Defendants have an obligation to warn against the foreseeable misuse of their product but do not

need to warn users of every possible or obvious risk.  *See Liriano*, 700 N.E.2d at 307–08.  Here,

Defendants' warning is clear:  users should not operate the product if the safety guard is

removed.  *See* ECF No. 34-17 (Image of Warning Label) ("Do NOT operate if safety guard is

removed or damaged") (capitalization in original).  The warning label also contains three

pictograms:  (i) one consists of a triangle within which there is a hand with its fingertips cut off

by the auger; (ii) another cautions users from putting their hands and/or arms into the headstock

of the Meat Grinder; and (iii) a third shows an individual using a plunger through the circular

holes of the safety guard.  ECF No. 34-19 ¶ 47 (Karzinka's 56.1).  Furthermore, contrary to

Plaintiff's assertion, the warning label is affixed to the front of the Meat Grinder, in view of its

users.  *See* ECF No. 34-16 (Image of Meat Grinder with Warning Label).[11]

---

[10]    Plaintiff testified that he only speaks a little English.  *See* ECF No. 35-9 at 18.  The Court
does not find that this presents a triable issue of material fact as it relates to the adequacy of the
warning label.  In fact, there is case law to suggest that a plaintiff's inability to read the warning
label severs proximate cause because no alteration to the language or placement could have
effectively warned the plaintiff.  *See Mustafa v. Halkin Tool, Ltd.*, No. 00-cv-4851, 2007 WL
959704, at *19 (E.D.N.Y. Mar. 29, 2007) ("[T]he fact that the warnings were in English, a
language [plaintiff] was unable to read or understand at the time of the accident, severs the
causal connection between the alleged inadequacy of the warning and the accident.").

[11]    Dr. Foley opines that the warning label is "not visible from [the] operating position,"
ECF No. 39-3 at 16 (Foley Report), but users can indisputably see the warning label as they
approach the Meat Grinder.  *See* ECF No. 34-16 (Meat Grinder with Warning Label).



*ECF No. 34-17 (Warning Label)*



*ECF No. 34-16 (Meat Grinder with Warning Label)[12]*

---

[12]      The image of the Meat Grinder with Warning Label, ECF No. 34-16, does not depict the location of the Meat Grinder at the time of Plaintiff's injury.  The image is being reproduced here to demonstrate that the warning label was affixed to the front of the Meat Grinder.

27

The Court finds that the warning label was adequate as a matter of law because it was "accurate, clear, and consistent on its face, and . . . portray[ed] the risk with sufficient intensity." *Wu Jiang*, 2018 WL 1525660, at *3.  Additionally, Plaintiff was aware of the hazard the Meat Grinder posed, *Boateng*, 2022 WL 4357555, at *16:  (i) Plaintiff was informed by Mr. Hodjimametov that there was no safety guard on the Meat Grinder, and was instructed to use the plunger and to be "very careful" when using the Meat Grinder, ECF No. 34-19 ¶¶ 36, 42 (Karzinka's 56.1), ECF No. 35-2 ¶ 32 (Defendants' 56.1); (ii) Plaintiff admits that he knew the Meat Grinder was a dangerous machine,  ECF No. 39-1 ¶ 58 (Plaintiff's 56.1); and (iii) the machine has a clear warning affixed to the front panel alerting the public not to use the Meat Grinder without a safety guard, *see supra*.  The Meat Grinder's warning label is not inadequate simply because Plaintiff's expert opines that the word "Warning" on the warning label should instead read "Danger."  *See Wu Jiang*, 2018 WL 1525660, at *3 ("The defendant's warning was not inadequate simply because Jiang has identified an additional detail that could have been added to it."); *see supra* section I.A.2.

While the Court is mindful of the grave injury suffered by Plaintiff, it was an employee of Third-Party Defendant who removed the safety guard, and Third-Party Defendant who permitted its employees to use the Meat Grinder without it for over a year, through no fault of Defendants.  ECF No. 34-19 ¶ 51 (Karzinka's 56.1); ECF No. 40-1 ¶ 51 (Plaintiff's Karzinka 56.1).  Plaintiff's injury does not stem from the Meat Grinder's allegedly flawed design, or from Defendants' alleged failure to warn, but rather from his employer's disregard of the safety warnings and the substantial modification to the Meat Grinder.  "The fact that [P]laintiff suffered the consequences of what may have been a common practice . . . does not justify imposing liability upon [Defendants] for these injuries, where nothing suggests that [Defendants] were

aware of that practice." *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 191 (E.D.N.Y. 2001).   Plaintiff expects Defendants to warn users that the Meat Grinder is "*really* dangerous," ECF No. 39-1 ¶ 56 (Plaintiff's 56.1) (emphasis in original), but "a safety device built into the integrated final product is often the most effective way to communicate that operation of the product without the device is hazardous." *Liriano*, 700 N.E.2d at 308.   There is nothing in the record to suggest that Defendants knew Third-Party Defendant would grind off the Meat Grinder's safety mechanism—which they explicitly warned users not to do by instructing users not to use the Meat Grinder without a safety guard.  *See* ECF No. 34-17 (Image of Warning Label).  "[T]hat an employee may have no remedy in tort against his employer gives the courts no license to thrust upon a third-party manufacturer a duty to insure that its product will not be abused or that its safety features will be callously altered by a purchaser.  Where the product is marketed in a condition safe for the purposes for which it is intended or could reasonably be intended, the manufacturer has satisfied its duty." *Robinson v. Reed-Prentice Division of Package Mach. Co.*, 403 N.E.2d 440, 444 (N.Y. 1980).  Because the Court finds that the Meat Grinder was marketed in a condition safe for the purposes for which it was intended, that removal of the safety guard was a substantial modification, and that Defendants did not fail to warn of the dangers of using the Meat Grinder without a safety device, the Court grants Defendants' and Third-Party Defendant's motions for summary judgment on Plaintiff's design defect and failure-to-warn theories of liability.  *Cacciola*, 127 F. Supp. 2d. at 191.

**III.    Defendants' and Third-Party Defendant's Motions for Summary Judgment on Plaintiff's Claim of Breach of Express and Implied Warranties (First Cause of Action)**

As discussed previously, Plaintiff asserts a products liability claim against Defendants under a theory of breach of express and implied warranties.  ECF No. 1-1 ¶¶ 1–44.

A.   Breach of Express Warranty

Defendants and Third-Party Defendant argue that Plaintiff has failed to plead the terms of the warranty upon which he relies, and therefore his claim for breach of an express warranty should be dismissed.  ECF No. 35-3 at 17–18 (Defendants' Motion); ECF No. 34-20 at 27–29 (Karzinka's Motion).  Plaintiff fails to respond to Defendants' and Third-Party Defendant's arguments with respect to his claim for breach of an express warranty.  Accordingly, the Court deems this claim abandoned.  *See Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d. 249, 267 (E.D.N.Y. 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

B.   Breach of Implied Warranties

Defendants and Third-Party Defendant assert that summary judgment is warranted on Plaintiff's claim of breach of an implied warranty because the evidence reveals that the Meat Grinder was not defectively designed.  ECF No. 35-3 at 18–19 (Defendants' Motion); ECF No. 34-20 at 29–30 (Karzinka's Motion).  Plaintiff responds that the Meat Grinder was defective in design and that Defendants are liable under a failure-to-warn theory.  ECF No. 39-2 at 3 (Plaintiff's Opp.); ECF No. 40-2 at 3 (Plaintiff's Karzinka Opp.).

Sections 2-314 and 2-315 of the UCC create two implied warranties:  (i) the implied warranty of merchantability, and (ii) the implied warranty of fitness for a particular purpose.  *See*

30

UCC §§ 2-314, 2-315.  Courts in this Circuit do not consider the breach of the implied warranty of merchantability and the breach of the implied warranty of fitness for a particular purpose as two separate claims, and instead address them together.  *See Boateng*, 2022 WL 4357555, at *20. "A manufacturer may be held liable under New York law for breach of implied warranty when its products are not fit for the ordinary purposes for which goods are used.  N.Y. U.C.C. § 2-314(2)(c).  Specifically, a Plaintiff may recover upon a showing that a product was not *minimally safe* for its expected purpose, and the focus of a breach of implied warranty inquiry is whether the product meets the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners."  *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 488 (S.D.N.Y. 2013).  Summary judgment therefore hinges on whether the product was defectively designed or manufactured and was not minimally safe for its expected purpose.  *Id.*; *see also Boateng*, 2022 WL 4357555, at *21 ("[I]n a breach of implied warranty action, the inquiry is not whether there were safer designs available."); *Gonzalez by Gonzalez v. Morflo Indus., Inc.*, 931 F. Supp. 159, 165 (E.D.N.Y. 1996) ("Plaintiff's recovery in a breach of warranty action depends on a showing that the product was not minimally safe for its expected purpose, regardless of the feasibility of making the product safer.").

Because the Court grants Defendants' and Third-Party Defendant's motions for summary judgment on Plaintiff's strict products liability claim, *see supra*, Plaintiff can no longer support his claim for breach of implied warranty.  *See Fuentes v. Scag Power Equip. – Div. of Metalcraft of Mayville, Inc.*, No. 17-cv-825, 2019 WL 3804735, at *9 (E.D.N.Y. Aug. 13, 2019) ("If a plaintiff cannot make out a claim for strict products liability, then the breach of implied warranty claim will not stand.").  Moreover, the Court finds that Plaintiff did not present evidence to suggest that the Meat Grinder was not minimally safe for its intended purposes when it was

31

shipped.  *See supra*; *see also Fuentes*, 2019 WL 3804735, at *10.  Accordingly, the Court grants Defendants' and Third-Party Defendant's motions for summary judgment as to Plaintiff's implied warranty claim.

### IV.    Defendants' Summary Judgment Motion for Common Law Indemnity

Defendants argue that they are entitled to summary judgment on their claim for common law indemnity against Third-Party Defendant pursuant to Section 11 of New York Workers' Compensation Law because "the proximate cause of [] plaintiff's [grave] injury was the [Third-Party Defendant] workers' removal of the guard."  ECF No. 35-3 at 22 (Defendants' Motion). Third-Party Defendant argues that if the Meat Grinder is found to be defective or Plaintiff's negligence claim is successful, Defendants alone are liable for any injury which resulted from the use of the Meat Grinder and are precluded from obtaining common law indemnity.  ECF No. 37 at 3–7.  Because the Court grants Defendants' and Third-Party Defendant's motions for summary judgment and dismissal of Plaintiff's complaint, the Court need not reach the issue of common law indemnity.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' and Third-Party Defendant's motions for summary judgment and dismissal of Plaintiff's complaint.  The Court further:  (i) DENIES the parties' motions to exclude the expert testimony of Dr. Foley and Mr. Pfreundschuh, except to the extent that Dr. Foley is opining on the foreseeability of the removal of the Meat Grinder's safety guard and Mr. Pfreundschuh is opining on the likelihood that the Karzinka employees themselves would bypass an interlock safety feature, and (ii) finds Defendants' motion for summary judgment on their common law indemnity claim to be moot in

light of the dismissal of Plaintiff's complaint.  The Clerk of Court is respectfully directed to enter

judgment and close this case.

      SO ORDERED.


                        */s/ Hector Gonzalez*
                        HECTOR GONZALEZ
                        United States District Judge

Dated: Brooklyn, New York
       February 6, 2023